# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RENEE BURCHARD | ) | |
| 6016 Pike Branch Dr. | ) | |
| Alexandria, VA 22310 | ) | |
| | ) | Case No.: |
| KIRSTI GARLOCK | ) | |
| 6169 McClendon Ct. | ) | |
| Alexandria, VA 22310 | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| ANNA LAYMON | ) | |
| 510 Bay Bluff West | ) | |
| Daphne, AL 36526 | ) | |
| | ) | |
| KERI POTTS | ) | |
| 1735 New Hampshire Ave. NW | ) | |
| Washington, DC 20009 | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICA 250 FOUNDATION | ) | |
| 1800 G Street NW | ) | |
| Washington, DC 20006 | ) | |
| | ) | |
| AMERICAN BATTLEFIELD | ) | |
| TRUST | ) | |
| 1156 15th St. NW | ) | |
| Suite 900 | ) | |
| Washington, DC 20005 | ) | |
| | ) | |
| U.S. SEMIQUINCENTENNIAL | ) | |
| COMMISSION | ) | |
| 1800 G Street NW | ) | |
| Washington, DC 20006 | ) | |
| | ) | |
| *Defendants*. | ) | |

## COMPLAINT

Comes now Plaintiffs, **Renee Burchard** (hereinafter "Plaintiff Burchard"), **Kirsti Garlock** (hereinafter "Plaintiff Garlock"), **Anna Laymon** (hereinafter "Plaintiff Laymon"), and **Keri Potts** (hereinafter "Plaintiff Potts"), collectively "Plaintiffs," by and through undersigned counsel with the following COMPLAINT for declaratory and compensatory relief, and states as follows:

## INTRODUCTION

Plaintiffs are a group of four women who were the entire cadre of executive women employed by the America 250 enterprise from its inception in 2019 to their respective resignations in 2021. Plaintiffs hold the shared belief that the work of America 250 is work worth doing, and that the nation's semiquincentennial can honor the past, inspire the future, and leave a proud legacy for the next 250 years. But, Plaintiffs recognize that their service to the mission must now take a different form: calling attention to the mismanagement and discrimination of America 250 to make the organization better for all Americans.

The America 250 Foundation (hereinafter "the Foundation") is the sole-supporting non-profit organization overseen by the U.S. Semiquincentennial Commission (hereinafter "the Commission"), which was created by Congress to design and implement programing for the celebration of the semiquincentennial of the founding of the United States of America. The Foundation and the Commission are hereinafter referred to collectively as "America 250". The Foundation is funded by federal appropriations and from donations and corporate sponsorships. To date, The Foundation has received approximately $20 million in federal funds.

During their tenure, Plaintiffs were retaliated against and subjected to escalating hostility due to their complaints and opposition to noncompliant, unlawful and/or wasteful business practices that resulted in the potential squandering of federal funds; were subjected to a hostile

2

work environment based on their gender; and were systematically and intentionally underpaid and tasked with the work of their better-paid male colleagues. All four Plaintiffs were constructively discharged and forced to resign from their respective positions because they could no longer participate in noncompliant, unlawful and/or fraudulent use of taxpayer funds, and could no longer endure a toxic and volatile work environment.

Despite their repeated and vociferous objections to the cronyism, self-dealing, mismanagement of funds, potentially unlawful contracting practices and wasteful spending, Plaintiffs' efforts were rebuffed and ignored. Instead, they were belittled and humiliated in front of their co-workers, kept out of key decision-making meetings, usurped of resources and authority, systematically undermined and subjected to constant demeaning language. While they were being marginalized by the leaders of the Foundation, they were given enormous workloads, and were forced to actually execute large portions of the duties that were the responsibilities of male co-workers, who were paid more than Plaintiffs and/or enjoyed significantly fewer responsibilities and duties.

Plaintiffs herein assert the following claims against the Foundation: Violation of the whistleblower protection provision within the False Claims Act, 31 U.S.C. § 3729 *et seq*.; gender discrimination based on a hostile work environment and retaliation, and violation of the Equal Pay Act, as incorporated into the District of Columbia Human Rights Act, D.C. Code § 2-1401, *et seq.*, and common law claims of defamation, negligent infliction of emotional distress and wrongful discharge. Plaintiffs' claims against the Commission and American Battlefield Trust are based on common-law negligent supervision.

Plaintiffs herein seek declaratory relief in the form of a Court-mandated full forensic investigation of the Foundation and Commission with respect to pay practices, employment

policies and financial transactions and contracts. Plaintiffs also seek financial compensation for lost wages and the pain and suffering and harm they endured as a result of the potentially unlawful practices of Defendants.

## THE PARTIES

1.      Plaintiff Renee Burchard is a resident of the Commonwealth of Virginia.  She was employed as the Chief Administrative Officer and Chief of Staff of the Foundation, and was employed from April 1, 2020, until her resignation on or about December 6, 2021.

2.      Plaintiff Kirsti Garlock is a resident of the Commonwealth of Virginia.  She was first retained as a part-time consultant by the Foundation in March of 2021, and hired as the Chief Legal Officer of the Foundation on or about August 15, 2021.  She resigned on or about December 8, 2021.

3.      Plaintiff Anna Laymon is a resident of the State of Alabama.  She was employed as the Vice President of Programs and Planning at the Foundation from on or about January 4, 2021, until her resignation on or about September 17, 2021.

4.      Plaintiff Keri Potts is a resident of the District of Columbia.  She was employed as the Vice President of Communications and Public Relations of the Foundation from on or about March 15, 2021, until her resignation on or about September 17, 2021.

5.      The United States Semiquincentennial, a U.S. Congressional commemorative commission, was created in 2016 pursuant to the United States Semiquincentennial Commission Act of 2016, Public Law 114-196, whose purpose is "to provide for the observance and commemoration of the 250th anniversary of the founding of the United States through local, State, national and international activities planned, encouraged, developed and coordinated by a national commission

representative of appropriate public and private authorities and organizations." Technical amendments to the Act were authorized in Public Law 116-282.

6.      The American Battlefield Trust is an independent 501(c)(3) charitable non-profit organization that the Secretary of the Interior selected as the non-profit Administrative Secretariat for the Commission in 2018.  The primary role of the Administrative Secretariat was to work with the Commission to determine the most effective way to discharge the responsibilities of the Commission as stipulated under Public Law 114-196.

7.      The America 250 Foundation, Inc., created in 2019, is a Delaware non-profit corporation and recognized as exempt from federal income taxation as a charity under section 501c(3) of the Internal Revenue Code and classified as a Type II sole-supporting organization under section 509(a)(3) of the Code to further the Commission's purpose of facilitating, planning, developing, promoting, and coordinating observances and activities that are and will be associated with America 250.

## JURISDICTION & VENUE

8.      This honorable Court enjoys original jurisdiction over the matters asserted herein because they assert claims under the laws of the United States of America, to wit:  False Claims Act, 31 U.S.C. §§ 3729 (a) & 3730(h)(1) & (2).  The Court further enjoys pendant jurisdiction over the pendant state law claims herein because they arise out of the same facts and involve the same actors as the federal claim.

9.      Venue is proper in this Court because all acts, omissions, and decisions that form the basis of Plaintiffs' claims took place in the District of Columbia.

## <u>FACTS RELEVANT TO ALL PLAINTIFFS</u>

10.    In 2016, by act of legislation, the United States Congress created the United States Semiquincentennial Commission, a U.S. Congressional commemorative commission, to provide for the observance and commemoration of the 250th anniversary of the founding of the United States.

11.    The America 250 Foundation is designated as a Type II sole-supporting organization under section 509(a)(3) of the Internal Revenue Code, and as such, must be supervised or controlled by the Commission by having Commissioners serve as a majority of the directors of the supporting Foundation. The Foundation cannot exist on its own – it exists solely to support the Commission.

12.    The Foundation is the operational arm of the Commission and responsible for entering into public-private partnerships to fund and execute programming. The Foundation is funded by federal appropriations and from donations and corporate sponsorships.  To date, The Foundation has received approximately $20 million in federal funds.

13.    As stated in the First Report to the President published in 2019, "The Commission envisions America 250 (the brand name and commonly accepted alternative to the formal Semiquincentennial) as a monumental initiative—engaging all Americans in the largest and most inclusive celebration and commemoration in our nation's history—with the potential to:

   • Inspire the American spirit to deepen understanding of our history and the democratic process through education; increase engagement in our communities and governing affairs; and foster unity that includes the "many" Americans in our "one" nation;

   • Engage nearly 350,000,000 Americans and millions of friends worldwide by 2026;

   • Produce more than 100,000 programs engaging participants at the local, territorial, state, tribal, regional, national, and international levels;

• Attract billions of dollars in resources that will ripple through our national, state, and local economies to positive effect, and

• Extend over a multiyear crescendo reaching its peak on the Fourth of July 2026."

14.     The Secretary of the Interior selected the American Battlefield Trust, through a competitive bidding process, to be the non-profit Administrative Secretariat for the Commission in 2018. The Department of the Interior and the Trust then entered into a Memorandum of Understanding approving the creation of the America 250 Foundation in 2019.

15.     Despite the Foundation taking over operational functions of the Commission, the American Battlefield Trust has never been legislatively sunsetted as the Commission's Administrative Secretariat and like the Commission, remains responsible for oversight of the Foundation.

16.     The Congressionally created Commission is a bipartisan group of twenty-four Commissioners, and is composed of the following members: Four members of the Senate of which two are appointed by the Majority Leader of the Senate and two appointed by the Minority Leader of the Senate. Four members of the House of Representatives of which two are appointed by the Speaker of the House and two are appointed by the Minority Leader of the House.

17.     There are sixteen private citizens serving on the Commission. Four of which have been appointed by the Majority Leader of the Senate, four appointed by the Senate Minority Leader, four appointed by the Speaker of the House of Representatives and four appointed by the Minority Leader of the House, respectively.

18.     Pursuant to the authorizing statute, one of the private citizen commissioners is to be designated Chairman by the President of the United States. Mr. Daniel DiLella was designated Chairman by President Donald Trump in 2018, and re-designated as Chairman by President Joseph Biden in 2021.

19.     Current voting members of the Commission include:

    a.     Senator Robert Casey, Jr. of Pennsylvania
    b.     Senator Tom Cotton of Arkansas
    c.     Senator Jeanne Shaheen of New Hampshire
    d.     Senator Patrick Toomey of Pennsylvania
    e.     Representative Robert Aderholt of Alabama
    f.     Representative Dwight Evans of Pennsylvania
    g.     Representative Maria Salazar of Florida
    h.     Representative Bonnie Watson Coleman of New Jersey
    i.     Congressman Robert A. Brady of Pennsylvania (Ret.)
    j.     Ambassador David L. Cohen of Pennsylvania
    k.     Val Crofts of Wisconsin
    l.     Former Congressman Joseph Crowley of New York
    m.     Daniel M. DiLella of Pennsylvania (Chairman)
    n.     Cathy Gillespie of Virginia
    o.     Noah Griffin of California
    p.     Ambassador Amy Gutmann, Ph.D. of Pennsylvania
    q.     Andrew Hohns, Ph.D. of Pennsylvania
    r.     Jim Koch of Massachusetts
    s.     Lucas Morel, Ph.D. of Virginia
    t.     Wilfred M. McClay, Ph.D. of Oklahoma
    u.     Former U.S. Treasurer Rosie Rios of California
    v.     James L. Swanson of Washington, D.C.
    w.     Thomas Walker, Jr. of Alabama
    x.     Lynn Forney Young of Texas

20.     The Act also calls for Executive, Judicial, and Legislative branch, and other governmental and non-profit heads to serve as non-voting *ex officio* members of the Commission. Additional governmental departments were added as *ex officio* members of the Commission with the passage of a technical amendment package, Public Law 116-282.

21.     Current *ex officio* non-voting members of the Commission include:

    a.     Secretary of the Interior Deb Haaland
    b.     Secretary of State Antony J. Blinken
    c.     Attorney General Merrick Garland
    d.     Secretary of Defense Lloyd Austin III
    e.     Secretary of Education Dr. Miguel Cardona
    f.     Associate Justice of the Supreme Court Anthony M. Kennedy (Ret.)
    g.     Director of the Institute of Museum and Library Services Crosby Kemper
    h.     Librarian of Congress Dr. Carla Hayden
    i.     Archivist of the United States David Ferriero

      j.      Chairperson of the National Endowment for the Arts Dr. Maria Rosario Jackson
      k.      Acting Chairperson of the National Endowment for the Humanities Adam Wolfson
      l.      Secretary of the Smithsonian Institution Dr. Lonnie Bunch

22.     The Executive leadership of the Commission includes Daniel DiLella (hereinafter "Mr. DiLella") as Chair, Tom Walker as Vice Chair, Rosie Rios as Treasurer and Lynn Young as Secretary.  Mr. Frank Giordano (hereinafter "Mr. Giordano") serves as the Executive Director of the Commission.

23.     There are currently nine federal staff at the Commission, engaged in government relations, administrative, legal, and financial activities.

24.     The Foundation currently has twenty-nine (29) employees, and provides operational and programmatic support to the Commission.  A Master Services Agreement governs the relationship between the Commission and the Foundation.

25.     From the creation of the Foundation until December of 2021, only four women served in executive leadership roles. All four are Plaintiffs in this case.

26.     The Foundation Board of Directors was established in 2019. As directed by the Foundation's Bylaws, a majority of the Board must be Commissioners and the Executive Director of the Commission. This Board membership was designed to ensure oversight and the ongoing, collaborative relationship needed between the Commission and the Foundation. The Foundation Board of Directors consists of:

      a.      Lynn Forney Young
      b.      Former Treasurer Rosie Rios
      c.      Ambassador David L. Cohen
      d.      James Campi
      e.      Daniel M. DiLella (Chairperson)
      f.      Representative Dwight Evans
      g.      Frank Giordano
      h.      Joseph C. Daniels
      i.      Tom Walker

       j.     Dalila Wilson-Scott

27.    From its inception, the Foundation's General Counsel has been Thomas McGarrigle of the law firm Reed Smith, LLP.

28.    From its inception, the Commission's General Counsel has been Joseph Del Raso of the law firm Troutman Pepper, LLP.  He and Mr. McGarrigle have been the only counsel allowed in most Chairman or Executive Director level decision-making meetings, and conferences of the Foundation and the Commission.

29.    Former Treasurer Rios (hereinafter "Commissioner Rios") serves as the Chairman of the Commission Finance Committee and the Foundation Audit and Finance Committee.

30.    Ambassador David Cohen (hereinafter "Commissioner Cohen") serves as the Chairman of the Social Responsibility Committee of the Foundation, and the Chair of the Development Committee of the Commission with oversight of corporate sponsorships.

31.    Dr. Tony Rucci served as the President and CEO of the Foundation and hired each of the Plaintiffs. He resigned from the role of CEO in March 2021, but continues as a *pro bono* senior advisor to the Commission and Foundation. He led the search process for his replacement CEO at the direction of Mr. DiLella and Mr. Giordano, and currently serves as a member of the Commission Finance Committee.

32.    In March of 2021, Scott Hommel was appointed Interim President and CEO of the Foundation upon Dr. Rucci's resignation. He has served as COO for the entirety of his tenure at America 250.

33.    All positions of actual power and authority at America 250 from the time of its inception through resignation of Plaintiffs have been held exclusively by men, including but not limited to: the Chair, Vice Chair, Executive Director, and General Counsel of the Commission; and the Chair,

Vice Chair, CEO, COO, and General Counsel of the Foundation. This disparity created value gaps inconsistent with America 250's public facing representations.

34.     Instead of executing a nationwide search for a diverse candidate via a specialized search firm, as had been promised to staff and the American public, Chairman DiLella asked Dr. Rucci to spearhead the search, with himself and Mr. Giordano rounding out the all-male search committee.

35.     Counter to America 250's public position, the CEO position was given to a white male personal friend and associate of Commissioner Rios.  No women were in the final group of candidates advanced from the search committee to the Executive Committee for interview and consideration.

36.     The Foundation's Executive Committee subsequently hired Joe Daniels (hereinafter "Mr. Daniels") as its new President and CEO in October 2021.

37.     To address the concerns about diversity at the Foundation, and to appease those on the Commission who were unhappy about the hiring of Mr. Daniels, an African American male was hired as the Senior Vice President at the Foundation, at the same time as Mr. Daniels was hired.

38.     However, at the time there was no SVP position in the organizational structure or approved budget of the Foundation, and the new SVP was not given any specific duties or even a job description.  He was, however, given a higher salary and title than each of the Plaintiffs.

39.     When Plaintiffs raised concerns about the hiring of someone without any specific duties, they were each told that the new SVP was hired as a political favor, and that it was a trade-off for hiring a white male CEO.

40.     Plaintiffs were offended and flabbergasted at the obvious contempt displayed for diversity by Foundation leadership, and the tokenism at work in hiring the new SVP, even if he could

potentially grow into a valuable contributor.  Their concerns were ignored by Foundation and Commission leadership.

41.     Over the course of 2021, the Foundation began ramping up for its national brand launch, and in the Summer of 2021, dozens of contracts were in the pipeline for review and execution. The volume of the workload on Plaintiffs was enormous.  All Plaintiffs were regularly working late into the evenings, and on weekends.  All Plaintiffs repeatedly asked for additional staff support and resources to handle the workload.

42.     Plaintiffs' workload issues were compounded by the fact that they were all forced to take on duties that were supposed to be carried out by male colleagues.  The factual paragraphs below outline the ways in which Plaintiffs were expected to complete the additional workload of their male colleagues.

43.      As the volume of Foundation contracts increased, so too did Plaintiffs' concerns with respect to many of the contracts.  Plaintiffs observed that several of the contracts were with entities with which Mr. DiLella and Mr. Giordano had personal dealings or relationships, that created a potential conflict of interest and/or had questionable prices and services.

44.     In addition, Plaintiffs observed that several contracts with entities with which Mr. DiLella and Mr. Giordano had personal dealings or relationships that were initially fashioned as "*pro bono*" contracts to evade the Foundation's RFP process but then morphed into lucrative paid contracts with no oversight.  Despite hundreds of thousands in expenditures being spent from the budget on those service contracts, they were nevertheless being described as "*pro bono*."

45.     As an entity disbursing federal funds, the Foundation put in place a process by which it abided by federal contracting and procurement regulations that ensured competitive bidding and avoided waste of government resources.  Repeatedly, when Plaintiffs attempted to raise concerns

about a contract because the pricing was inexplicable, or because the bidding process was improper, they were shut down by senior leadership.

46.     Mr. McGarrigle was part of a small group of decision-makers (hereinafter "the Chairman's Group") of the Foundation, which was made up of Mr. DiLella, Mr. Del Raso, Mr. McGarrigle, Mr. Daniels, Mr. Hommel and Mr. Giordano, the Executive Director of the Commission and Foundation Board member.

47.     On information and belief, Mr. Giordano and Mr. DiLella are long-time associates and close personal friends. Mr. DiLella is the former Chairman of the Board, and current Board member of the "Philly Pops" orchestra, and Mr. Giordano is the current President and CEO of the Philly Pops.  Mr. Del Raso is the current Chairman of the Board of the Philly Pops.

48.     On information and belief, all four men, Mr. DiLella, Mr. Del Raso, Mr. McGarrigle and Mr. Giordano are all members of the Union League of Philadelphia, where they have conducted business and meetings on behalf of America 250.

49.     Not only were Plaintiffs ignored when they raised concerns about noncompliance, fraud, waste and abuse, but they were retaliated against.  The retaliation took the form of excluding them from further meetings about the contracts at issue, undermining and humiliating them with their colleagues and subordinates, and denigrating their work, all of which cumulatively created a hostile work environment.

50.     The ongoing hostility Plaintiffs were made to endure, and the incessant conflict over potentially unlawful and plainly unethical contracting practices, caused Plaintiffs extreme emotional and psychological duress.  They each, individually, and of their own accord, believed the work environment was so hostile and treacherous, that they chose to resign rather than be forced to continue working at an organization engaging in unethical practices.

51.     All Plaintiffs assert that they attempted to inform senior and executive leadership that some of the Foundation's activities were noncompliant, potentially unlawful and/or detrimental to the mission, and that in doing so, they were acting as whistleblowers, attempting to prevent fraud, waste and abuse of federal funds.

52.     All Plaintiffs assert that in addition to being retaliated against, shunned, isolated, humiliated and undermined because of their activities as whistleblowers, they were also subjected to a hostile work environment because of their gender.

53.     All Plaintiffs assert that the Chairman's Group acted as a "boys club," freezing out the women who were given titles and large responsibilities, but no authority or input into key decisions of the Foundation.

54.     Plaintiffs assert that when they attempted to be included in such decision-making, they were shut-down, ignored, and retaliated against.

55.     Plaintiffs assert that they were routinely subjected to a work environment where the women were held to a harsher and more taxing standard than the men.

## FACTS RELEVANT TO PLAINTIFF BURCHARD'S CLAIMS

56.     Plaintiff Burchard references and incorporates all of the allegations in the preceding paragraphs as if fully restated herein.

57.     Plaintiff Burchard was first hired in April of 2020 as a contract consultant to the Foundation.  She was originally hired to provide support to the CEO and COO.  As Dr. Rucci, Mr. Hommel, and Mr. Giordano began to see the scope of her competencies, she was quickly assigned additional roles and duties.

58.     Plaintiff Burchard set up all of the finance, accounting, HR/payroll and organizational structure, policies and procedures, and operations of the Foundation.

59.     On or about September 1, 2020, Plaintiff Burchard, as well as several other contract consultants, became full-time salaried employees of the Foundation.  At that time, there were a total of eight (8) employees.  Plaintiff Burchard's role was in administration and operations,  but there were no official titles yet.

60.     In February of 2021, Plaintiff Burchard was given the official title of Chief Administrative Officer, with the continued responsibility of executing the administrative functions of the Foundation.

61.     Once again, however, she was performing additional responsibilities far beyond the scope and scale of her stated duties, including finance, operations, compliance, and HR, as well as setting up the development function of the foundation, and directing the new messaging agency contract.

62.     In addition to all of her work and responsibilities at the Foundation, Plaintiff Burchard also ran all of the federal administration, operational, HR, finance and back-office functions of the Commission.

63.      She wrote federal job descriptions, handled all GSA communications and related activities, and co-developed and presented the Commission organizational structure and staffing options.  Plaintiff Burchard was never compensated for her work for the Commission.

64.     Plaintiff Burchard began to have serious concerns about the functioning of the Foundation when it became clear that despite weekly meetings of executive staff to make important decisions, all final decisions were actually made by the Chairman's Group, and reported back to the staff by Mr. Hommel as *fait accomplis*.

15

65.     Frequently, the final decisions of the Chairman's Group resulted in a benefit to an entity, person or group with direct personal ties to members of the Chairman's Group or specific Commissioners.

66.     For example, on information and belief, the partners of the contracted Corporate Sponsorship Firm A were personal friends and associates of Mr. Giordano. The firm was brought on as a contractor for the procurement of corporate sponsorships, without any RFP or open competition for the role.  Their contract required that they hit key benchmarks in the generation of corporate revenue.

67.     Despite not even coming close to those benchmarks and badly underperforming, and being given an extension of time to produce under the contract, by the Spring of 2021, it became clear that the firm could not produce the corporate revenue necessary for Foundation programming. Even worse, multiple potential corporate partners expressed that they did not want to work with or communicate with the partners of the firm ever again.

68.     Despite the termination of their contract, and the communication from Mr. Hommel to Corporate Sponsorship Firm A that their contract would end on June 30, 2021, due to lack of results, Mr. Giordano and Mr. McGarrigle personally interceded on behalf of the firm to reinstate their contract.

69.      Furthermore, Mr. McGarrigle and Mr. Giordano had several potential corporate partners carved out of the arrangement, so that Corporate Sponsorship Firm A would get paid 17% of those lucrative contracts without being involved in the solicitation or negotiation of these other successful partnership contracts.

70.     Upon information and belief, the only corporate partnership that the firm produced was a $10 million contract with Social Media Company A that violated multiple Foundation strategies

and policies, and was predicated on what Plaintiff Burchard was concerned was a potentially unlawful quid-pro-quo.  In a verbal agreement, America 250 promised Social Media Company A access to the National Park Service relationships that would allow the company the opportunity to launch a drone-based mapping project for its own business purposes, under the pretense that it would be a program of America 250.

71.     Moreover, total control of the announcement and publication of the America 250's partnership with Social Media Company A was reserved to the company, to be used for its own purposes, when it deemed it appropriate and timely. When Commissioner Cohen gave his formal development report to the Commissioners in September 2021, he stated that Social Media Company A would control the timing of the sponsorship announcement and asked the Commissioners to keep information internal.

72.     The contract with Social Media Company A also contained a vast and highly restrictive non-compete provision that prohibited the Foundation from contracting with any entity that might be competitive with any of its seventy (70) plus brands, across dozens of markets and industries, thus utterly hamstringing the Foundation's ability to contract with multiple potential companies. This restrictive covenant was in direct opposition to the goals and plans of the Foundation to partner with American companies in each economic industry/sector.

73.     Mr. McGarrigle and Mr. Giordano, with the approval of Mr. DiLella, inserted themselves to protect the financial interest of Corporate Sponsorship Firm A, which would receive 17% of the contract with Social Media Company A, over the vociferous and well-founded objections of the Foundation staff, who were tasked with making sure the Foundation was able to maneuver and make new contracts and relationships to fulfill its purpose.

74.     Other examples of Mr. DiLella and Mr. Giordano skirting the competitive bid process include, but are not limited to, the retention of Troutman Pepper, Reed Smith, Bank A, International Management Consulting Firm A, and Communications Firm A.

75.     Mr. Daniels has also improperly inserted himself into contracting with the Foundation by bringing on International Management Consulting Firm B, again without using a competitive or transparent process, and without disclosing that Mr. Daniels, himself, is affiliated with International Management Consulting Firm B presently as a senior advisor, and thus has a potential conflict of interest.

76.     All of the firms connected to Mr. DiLella, Mr. Giordano, and Mr. Daniels started as *pro bono* contracts, thus evading the America 250 competitive bid process, and then was converted into a lucrative sole source contract.

77.     Repeatedly, Plaintiff Burchard raised her concerns about these and many other questionable, wasteful, expensive, duplicative, or problematic contracts with Mr. Hommel and Mr. Daniels, but to no avail.

78.     In July of 2021, Employee A, a Vice President in the Foundation, was tasked with making a presentation to Bank of America.  The presentation went badly, and as a result, Mr. Hommel tasked Plaintiff Burchard and Plaintiff Laymon with producing presentations and proposals to Walmart, The Home Depot, and Bank of America, to reflect the Foundation's programming plan.

79.     They were to present the corporate partner strategy that was approved by Mr. DiLella, Mr. Giordano, and Commissioner Cohen wherein each corporation would be given industry/sector exclusivity for a total $10 million contribution. With over 30+ sectors, this strategy was set to produce more than $250 million for America 250.

80.     Both Plaintiff Burchard and Plaintiff Laymon insisted that Mr. Hommel inform Employee A about this reassignment of tasks, so it was clear that this change was at Mr. Hommel's request. He agreed to do so immediately.

81.     Mr. Hommel failed to inform Employee A of the reassignment, allowing Employee A to believe that Plaintiff Burchard and Plaintiff Laymon had undermined him of their own volition. From that point forward, Employee A was defamatory, rude, hostile, taciturn, uncooperative and disrespectful of both Plaintiff Burchard and Plaintiff Laymon.

82.     In multiple meetings, Mr. Hommel witnessed Employee A's unprofessional, defamatory, denigrating and humiliating behavior towards Plaintiffs Burchard and Laymon, and said nothing. When Plaintiffs Burchard and Laymon reported their concerns about the way they were being treated by Employee A, Mr. Hommel again took no action.

83.     On another occasion, Plaintiff Burchard was retaliated against because she raised an issue with respect to possible employee fraud by Employee A. In early September of 2021, Plaintiff Burchard investigated an expense reimbursement request submitted by Employee A that contained unreasonable expenses and improperly involved another employee in the false justification for the reimbursement.

84.     Upon her investigation, she discovered the request for reimbursement was based on a flatly false representation, which is a terminable offense. This was not the first time that Plaintiff Burchard had brought improper expense reports to Mr. Hommel's attention. The improper expense reports ranged from unapproved expenses, unreasonable expenses, no itemized receipts, to no receipts at all.

85.     As Chief Administrative Officer, Plaintiff Burchard had been actively involved in drafting personnel policies and training the staff, and knew that employee false statements was a terminable offense.

86.     The HR specialist with Insperity recommended that Employee A be terminated without severance.  When Plaintiff Burchard recommended that Employee A be terminated, Mr. Hommel began to retaliate against her by screaming at her, and later telling Plaintiff Burchard that she would have to do it herself, isolating her, and escalating hostility in meetings and phone calls.

87.     Despite the concerns raised by Plaintiff Burchard, Employee A was never informed of any of the issues from his expense reports by Mr. Hommel. From early September until mid-October, Mr. Hommel and Mr. Daniels failed to notify Employee A that his expense reports were problematic, leaving Plaintiff Burchard alone in having to deal with it. This issue sat unresolved by Mr. Hommel, his supervisor.

88.     The situation devolved to the point that Plaintiff Burchard informed the incoming CEO, Mr. Daniels, that she would rather resign than enable fraudulent behavior.  Mr. Daniels asked Plaintiff Burchard not to resign, and instead to give him a chance to resolve the situation. He promised resolution before his first official day as CEO, which was to be in four days.

89.     Immediately upon finding out that Plaintiff Burchard had spoken with Mr. Daniels about the employee misconduct, Mr. Hommel called Plaintiff Burchard and railed at her in a threatening, demeaning and denigrating way, asking her "why she wanted to burn down the village."

90.     Despite Mr. Daniels' representations to Plaintiff Burchard, he chose to do nothing about Employee A's submission of false expense reimbursement requests.  And rather than take seriously Plaintiff Burchard's concerns, as a senior and vital member of his staff, Mr. Daniels and Mr. Hommel started to push Plaintiff Burchard even further out from the decision-making process.

20

91.     On or about October 7, 2021, Mr. Daniels had a call with Plaintiff Burchard in which he asked her to act as his personal secretary by taking notes, keeping him on task, keeping his calendar and shadowing him throughout the day.  He said during the phone call that Plaintiff Burchard "needed to learn how to serve him".

92.     In response to Mr. Daniels' request, Plaintiff Burchard outlined for Mr. Daniels what her responsibilities actually were, the volume of work she did as part of her duties, and the portion of Mr. Hommel's and Mr. Giordano's duties that she actually carried out.

93.     Plaintiff Burchard indicated that if she were to take on the personal secretary role that Mr. Daniels had envisioned for her, she would have to be relieved of a substantial portion of her current workload.

94.     When Plaintiff Burchard suggested that Mr. Hommel take on the role that Mr. Daniels envisioned, since Mr. Hommel clearly had the time, Mr. Daniels declined, citing a concern for Mr. Hommel's feelings. Yet he clearly did not have the same concern regarding "feelings" in making the request of Plaintiff Burchard, because of her gender.

95.     From that point forward, Mr. Daniels evaded Plaintiff Burchard, refused to speak with her, excluded her from meetings and made clear that she was out of his favor, even telling her that he had "animosity" toward her since their first phone call.

96.     On or about December 1, 2021, on a senior team zoom call, Mr. Daniels announced an entirely new programming plan and timeline for the Foundation titled "Roadmap," with an ambitious funding schedule.

97.     At one point in the PowerPoint presentation, Mr. Daniels asked the team for any feedback with respect to obstacles or setbacks related to the plan. As the person with the most experience and knowledge about the federal procurement, funding and contracting cycle, Plaintiff

Burchard raised concerns about the timeline not being realistic with respect to the federal appropriations calendar, saying that tightening the timeline by even six months could be beneficial.

98.     Instead of taking Plaintiff Burchard's feedback as the valuable and necessary information it was, in front of the entire team, Mr. Daniels berated Plaintiff Burchard as "not a team player," and castigated her for undermining his plan, and said she didn't belong on his team.

99.     When Plaintiff Burchard tried to explain that she was simply pointing out a substantial and critical roadblock, as she felt she was obligated to do, she was again personally attacked and humiliated in front of her colleagues and forcefully told that the two of them would discuss the matter on a later call.

100.    Later on, Mr. Hommel called Plaintiff Burchard to criticize her for speaking up in the meeting, although he did not disagree with the substance of Plaintiff Burchard's comments.

101.    The following day, Plaintiff Burchard reached out to Mr. Daniels to follow-up with him, as he demanded.  In it, Mr. Daniels made several sexist and offensive comments, including asserting that Plaintiff Burchard was insufficiently loyal to him and his personal success, and accusing Plaintiff Burchard of not being sufficiently deferential in the way she spoke during the meeting, claiming that "there is a way that bosses liked to be talked to."

102.    When Plaintiff Burchard stated that her loyalty was as a fiduciary of the Foundation, Mr. Daniels clarified that her answer did not suit him, and that he wanted her to be loyal to him personally above the Foundation.

103.    Mr. Daniels further stated that he had disliked Plaintiff Burchard from their first phone call because she had stated she was willing to resign instead of enabling false statements and misconduct.  Mr. Daniels specifically expressed that in his view, standing on principle, as Plaintiff Burchard was doing, signified that she was not a "team player."

104.    Plaintiff Burchard asserts that Mr. Daniels never spoke to any male employee in such a manner, and that his demand of personal loyalty was predicated on a chauvinistic and sexist attitude towards female employees.

105.    On another occasion, Plaintiff Burchard was again placed in an untenable situation. Because Plaintiff Burchard was the staff person who paid invoices, she was directed by her superiors to pay more than $30,000 worth of invoices submitted by Employee A for which there were no contracts and no proof that work had been done.

106.    Plaintiff Burchard had already expressed her concern and disapproval of the invoices because there were no records to justify the payment, and payment would be contrary to process and procedures approved by the Audit and Finance Committee of the Foundation.

107.    Despite the concerns she and Plaintiff Garlock raised about the impropriety of paying such invoices, Mr. Hommel and Mr. Daniels insisted that the invoices be paid, and told Plaintiff Burchard that she just had to do what she was told.

108.    Plaintiff Burchard reported her concerns to Mr. Hommel and Dr. Rucci several times before she resigned.

109.    Once it became clear that Plaintiff Burchard was going to be forced to pay what she believed to be fraudulent invoices, she determined that she had no choice but to resign.

110.    Plaintiff Burchard resigned on or about December 6, 2021.


## FACTS RELEVANT TO PLAINTIFF GARLOCK'S CLAIMS

111.    Plaintiff Garlock references and incorporates all of the allegations in the preceding paragraphs as if fully restated herein.

112.    Plaintiff Garlock was at first retained as a part-time consultant by the Foundation in March of 2021, and hired as the Chief Legal Officer of the Foundation on or about August 15, 2021.  She is an attorney licensed to practice law since 1991.

113.    When Plaintiff Garlock was first interviewed by Dr. Rucci in February of 2021, he stated that as the Foundation had matured and began to assume most of its operational responsibilities for America 250, the volume of legal needs had significantly increased, which gave rise to potential for conflicts and workload issues. He further explained that the Foundation had a desperate need for processes and policies to be developed to ensure against conflicts of interest and allow for competitive bidding and diversity in all Foundation efforts.

114.    Plaintiff Garlock was initially offered the position of General Counsel to the Foundation despite the fact that the Foundation already had a General Counsel, Mr. Thomas McGarrigle.

115.    Dr. Rucci explained that while it was his plan to terminate Mr. McGarrigle's services and replace him with an in-house General Counsel, this was an extremely sensitive situation as both current General Counsels, Mr. Del Raso (Commission) and Mr. McGarrigle (Foundation) were personal friends with both the Commission Executive Director Giordano and Chairman DiLella.

116.    Not wanting to be in the middle of a sensitive situation, Plaintiff Garlock declined the General Counsel role but instead agreed to a short-term, part-time consultancy to define the needs, roles, and responsibilities of legal support for the Foundation.

117.    Two weeks after being brought on as a consultant, on March 18, 2021, Dr. Rucci resigned from the Foundation while the COO, Mr. Hommel, was appointed Interim CEO and Mr. McGarrigle remained General Counsel of the Foundation.

118.    As work within the Foundation was reaching a fever pitch during the "Summer Brand Launch" of America 250, Plaintiff Garlock was offered and accepted the full-time position of Chief Legal Officer in August of 2021, reporting directly to the CEO.

119.    This position was a peer to the other senior leadership Vice Presidents at the Foundation. Additionally, Mr. Hommel represented to Plaintiff Garlock that in accepting the position, she would also be compensated commensurate with her VP peers, which was in large measure why Plaintiff Garlock accepted the position.

120.    As explained by Mr. Hommel, until a time when a General Counsel would serve in-house, Plaintiff Garlock's role was distinct from that of General Counsel McGarrigle: she was to provide legal and business advice to the Foundation and report to the CEO. Mr. McGarrigle retained overarching responsibility; reporting directly to Mr. Giordano with the responsibility of attending the weekly Chairman's Group meetings. He also represented the Foundation at Board of Directors meetings.

121.    On information and belief, the deep personal ties between Mr. McGarrigle, Mr. Del Raso, Mr. DiLella, and Mr. Giordano were of a nature such that Mr. McGarrigle and Mr. Del Raso had an interest in personally protecting Mr. Giordano and Mr. DiLella.

122.    On numerous occasions, Plaintiff Garlock was informed that the Commission and the Foundation relied heavily on the counsel of Mr. McGarrigle and Mr. Del Raso, and that it would take no action without their sanction and approval.

123.    Moreover, on many issues of importance to the enterprise, Mr. McGarrigle and Mr. Del Raso communicated directly with Mr. Giordano and Mr. DiLella, thus circumventing Plaintiff Garlock, and acting outside of the typical confines of retained outside counsel.

124.    To the extent that Mr. McGarrigle and Mr. Del Raso were providing advice that contradicted the advice provided by Plaintiff Garlock, or provided counsel without Plaintiff Garlock's knowledge and participation, they were acting as business leaders rather than legal counsel and is therefore subject to discovery.

125.    Plaintiffs assert that neither the attorney-client privilege, nor the attorney work product privilege attach to work in furtherance of future potential unethical, non-compliant, or unlawful conduct, and thus, that much of Mr. McGarrigle and Mr. Del Raso's work in providing advice and justification to the Foundation and Commission regarding matters subject of this suit is subject to discovery.

126.    Plaintiff Garlock had limited exposure to the Foundation's Board of Directors and was not included in the executive leadership meetings regarding overarching operations, directions, strategy, or other matters concerning the Foundation and/or Commission.

127.    As she became more familiar with Foundation activities, Plaintiff Garlock began to voice her concerns regarding contemplated agreements, as well as those which predated her tenure at the Foundation, for a variety of reasons. As issues of concern were either discovered or were raised to Plaintiff Garlock by Foundation staff, she brought those concerns and/or objections to the COO, the CEO or other senior leaders, in an attempt to mitigate legal risks where possible.

128.    Plaintiff Garlock's role as Chief Legal Officer immediately changed once Mr. Daniels was hired as CEO. Plaintiff Garlock was no longer able to provide the benefit of an in-house counsel's independent opinion on proposed transactions, avoiding conflicts of interest, or mitigating emerging risks. Plaintiff Garlock could only present legal matters in a summarized form during a tightly scheduled, 30-minute one-way "briefing" once per week.  Often, Mr. Daniels cancelled even that minimal opportunity for Plaintiff Garlock to provide her input and advice.

129.    Despite Plaintiff Garlock's repeated efforts to meet with Mr. Daniels, and although he is an attorney himself, Mr. Daniels expressed little interest in learning about the Foundation's many legal obligations.

130.    Mr. Daniels instead instructed Plaintiff Garlock to immediately focus all of her attention on one discreet matter: dramatically expanding the size of the Foundation Board.  Mr. Daniels' myopia on this issue went so far that he told Plaintiff Garlock that he would hold her personally responsible for achieving his goal, despite a possible conflict of interest.

131.    Plaintiff Garlock tried to explain to Mr. Daniels her legitimate legal concerns about seeking this change in the Foundation Board, and tried to inform him of previous discussions with the Commission staff and executive leadership about this idea.

132.    Several discussions ensued on this topic and Mr. Daniels became increasingly hostile toward Plaintiff Garlock as he did not appreciate her considering the views of the Commission regarding any legal opinions she presented to him, especially if they appeared to be at odds with his own views.

133.    Plaintiff Garlock had to repeatedly explain to Mr. Daniels that as a sole-supporting nonprofit organization and a vendor to the Commission, the Foundation only existed at the pleasure and authority of the Commission, and that their views were critical and determinative in everything the Foundation did.

134.    Mr. Daniels became increasingly hostile to Plaintiff Garlock and started to retaliate against Plaintiff Garlock by isolating her and refusing to meet or engage with her on other legal issues, thus dramatically impacting her ability to do her job.  He began withholding key resources or information from her; removing/excluding her from meetings or going around her; denigrating her

substantial work that was previously approved by General Counsel and other executive leadership; and undermining her role with the Foundation.

135.    Over the next few weeks, Plaintiff Garlock began to notice that Mr. Daniels appeared only to accept and value the acquiescent opinions and input of the male senior leadership team members. They were rewarded with Mr. Daniels' professional (and personal) time and attention while he became openly hostile toward Plaintiffs Garlock and Burchard for fulfilling their compliance and regulatory roles, which sometimes included rendering professional opinions that may have been contrary to his desires, yet were still in the best interest of the Foundation.

136.    On or about December 1, 2021, Plaintiff Garlock met with Mr. Daniels and raised her concerns with him that he appeared only to accept and value the opinions and input of male colleagues as they agreed to everything Mr. Daniels proposed, without question. She reiterated that she saw them being rewarded with Mr. Daniels' time and attention on issues pertinent to their departments, while her role as Chief Legal Officer providing critical analysis was limited. Her objective was to bring his biases to his attention in order to repair the relationship, so she could effectively provide legal counsel where most appropriate.

137.    Mr. Daniels responded to Plaintiff Garlock that this was not a 'male-female issue' but then continued by making sexist remarks about how the men knew how to work with him and that she should use her "emotional intelligence" to learn to communicate to Mr. Daniels as "a person deserving of respect," among other statements.

138.    Mr. Daniels also stated in this meeting that he would not honor the salary commitments made by Dr. Rucci and Mr. Hommel to her as those pre-dated his arrival and would instead determine her value as time went on.

139.    Mr. Daniels further stated that while he knew Plaintiff Garlock was committed and loyal to the Foundation, he stated that he needed her to pledge her *personal loyalty to him*, and be loyal to his individual success – or there would no place for her on his team.

140.    Plaintiff Garlock made it clear to Mr. Daniels that as the Foundation's Chief Legal Officer, she represents the Foundation and not him personally as the CEO. She felt this demand put her in the untenable position of potentially violating her fiduciary obligations.

141.    On or about December 6, 2021, Plaintiff Burchard resigned from the Foundation, and sent a letter outlining reasons for her immediate resignation which included numerous allegations of mismanagement, hostile work environment, discrimination, and retaliatory conduct by Mr. Daniels and others.

142.    Plaintiff Burchard's letter alleged several concerns and/or incidents that Plaintiff Garlock could not refute, as she also knew them to be true.  Plaintiff Garlock knew that it would be a violation of ethics and professional conduct guidelines for her to have to respond to Plaintiff Burchard's letter on behalf of the Foundation by denying the truth of the matters asserted therein.

143.    Faced with the situation of having to lie to Commissioners or members of Congress to execute her duties, Plaintiff Garlock felt that she had no choice but to resign her employment because she could not engage or help promote unethical or potentially illegal conduct.  Instead, on or about December 8, 2021, Plaintiff Garlock resigned from her position as Chief Legal Officer to the Foundation.

144.    In final fulfillment of her fiduciary responsibilities to the Foundation, Plaintiff Garlock wrote to General Counsel McGarrigle recommending an independent investigation into the allegations in Plaintiffs Laymon, Potts, and Burchard's resignation letters.

## FACTS RELEVANT TO PLAINTIFF POTTS' CLAIMS

145.   Plaintiff Potts references and incorporates all of the allegations in the preceding paragraphs as if fully restated herein.

146.   Plaintiff Potts holds a bachelor's degree and master's degrees and has more than 20 years of corporate communications experience.

147.   Plaintiff Potts joined the Foundation in March of 2021.   Three days later, the then Foundation CEO, Dr. Rucci resigned.   Plaintiff Potts was initially told by Dr. Rucci that he was resigning for health reasons, but she would come to learn that the resignation was to make room for a senior leader at the Foundation who was supposedly going to be a diverse candidate selected through a rigorous and transparent process.

148.   As part of her new duties, Plaintiff Potts wrote a press release about Dr. Rucci's resignation as CEO, and how the search would "utilize industry best practices to identify a truly diverse candidate pool that reflects the Foundation's commitment to inclusion and representing all Americans."

149.   Plaintiff Potts was aware of the concerns that had been raised by Commissioners and others that the top leadership of the Commission and the Foundation was a small, close-knit group of wealthy white men who had known each other years, and that such was contrary to the role and mission of the Foundation and Commission.

150.   Plaintiff Potts discovered upon her arrival at the Foundation that all decisions were made by a small group of men, and despite their titles and the enormous amount of work and responsibility that was given to the women in leadership, women were excluded from the decision-making Chairman's Group.

151.    When the women in senior leadership attempted to provide their input and expertise, they were ignored, marginalized, or worse, shouted down and demeaned.

152.    During the period of the search for a new CEO, Plaintiff Potts reported to the interim CEO, Mr. Hommel, who was ordinarily the COO.

153.    Mr. Hommel was exceedingly deferential to the Chairman's Group, and served as note-taker during their meetings.  Mr. Hommel was part of the cabal of male leaders of America 250, and showed no willingness to move the organization into a more inclusive and diverse direction.

154.    Plaintiff Potts was hopeful that the new CEO would change this. Unfortunately, Plaintiff Potts' optimism about a change in leadership and leadership style was dashed when it was announced that Mr. Daniels, another white male with close ties to the Foundation and Commission chairs, was selected as the new CEO.

155.    This selection process was the opposite of what had been represented to the public. It was done in a closed, discriminatory manner.  The Diversity and Inclusion search firm that was supposed to be hired to guide the process was never retained, and instead, the search committee comprised only of Dr. Rucci, Mr. DiLella and Mr. Giordano.  No women were involved in the vetting of the candidate pool, and no women were advanced to the final round of five candidates.

156.    In order to appease "diversity" concerns created by the hiring of Mr. Daniels, a position was created for an SVP, which was going to be given to an African American man, and a Vice Chair of the Foundation position was also going to be given to an African American man.  Again, no women or women of color were considered for either role.

157.    The selection of Mr. Daniels as Chairman and CEO was a slap in the face to the women who had complained about the lack of diversity at the Foundation, and those inside and outside of the organization who had raised serious and reasonable concerns about the lack of diversity at

America 250.  It was also evidence to Plaintiff Potts that nothing at the Foundation was going to materially change, despite the concerns and complaints that she and her fellow female executives had raised.

158.    Plaintiff Potts inherited a contract with Communications Firm A, which was renewed two weeks before Plaintiff Potts' start date and which never went through an RFP or open bid process. Communications Firm A was the public relations firm that Mr. DiLella used for his real estate business in Philadelphia.

159.    Communications Firm A was charging in excess of $40,000 a month, with a guaranteed monthly retainer of $25,000-$30,000, without producing any substantial publicity results.  Plaintiff Potts asked Mr. Hommel about terminating the contract, but was warned against doing so because of the close personal relationship between Mr. DiLella and the President of Communications Firm A.

160.    Because the contract for Communications Firm A took up so much of Plaintiff Potts' budget, she was unable to hire additional staff, and was forced to do much of the work needed by herself, which caused her serious strain.  Plaintiff Potts was not compensated for doing this additional work.

161.    On information and belief, and despite numerous complaints about the lack of suitability and broad national expertise required for the scope of work that Communications Firm A was retained to execute, it nevertheless remains the communications firm for America 250.

162.    Plaintiff Potts was hamstrung in her ability to execute her duties by a lack of resources, and by having to train and assist the Employee A, a VP of the Foundation, who knew very little about traditional marketing campaigns, such as media buying and ad placement.  To help Employee A

in his role, Plaintiff Potts secured a former work colleague with subject matter expertise to mentor and assist him.

163.    Not only did Plaintiff Potts have to execute her own duties, she also had to step in to rewrite all the social media copy, as well as the radio copy for the brand launch campaign, both of which were Employee A's duties.

164.    Plaintiff Potts was working late into the evenings and virtually every weekend to keep up with the pace of the work.  Then, Employee A informed Plaintiff Potts that he did not work on Fridays.

165.    This shocked Plaintiff Potts, given the volume of work in their department.  When she asked Mr. Hommel to counsel Employee A about working a full week and picking up his fair share of duties, Mr. Hommel again indicated that Employee A was protected from discipline because Mr. DiLella and Mr. Giordano did not want to be bothered with the political blow-back of removing an African American employee.

166.    On another occasion, in the mid-Summer of 2021, Plaintiff Potts informed Mr. Hommel that she wanted to file a formal complaint against a Director-level staff member in the organization, hereinafter referred to as Employee B.

167.    Plaintiff Potts was being intentionally subverted in her work, and repeatedly subjected to sexist and discriminatory commentary, ridicule and condescending communication from Employee B, both in internal and external meetings.  Employee B's behavior was a hindrance because Plaintiff Potts needed his cooperation to complete her work.

168.    Employee B disparaged Plaintiff Potts in a drunken, sexist tirade to a work peer, calling her "a bitch" and saying he "hates her" and that she probably made up the claim she is a survivor of sexual assault. Plaintiff Potts is a well-documented survivor and victims' advocate.

169.    Instead of taking Plaintiff Potts' claim of gender-based hostility and discrimination seriously, Mr. Hommel minimized Employee B's behavior to dissuade Plaintiff Potts from filing an official report. Mr. Hommel promised to intervene on Plaintiff Potts behalf in lieu of her filing a complaint.

170.    Later, Employee B called Plaintiff Potts in an attempt to convince her that the sexist and condescending treatment she had endured was no big deal.  Plaintiff Potts was informed that Employee B was protected by a powerful Commissioner and former Congressman.

171.    Plaintiff Potts wanted to pursue the matter further, but feared that she would be retaliated against, and was profoundly discouraged when Mr. Hommel did not take her report of gender discrimination seriously, but instead made promises that never materialized.

172.    On several occasions over the Summer of 2021, Mr. Hommel approached Plaintiff Potts and asked her to hire a friend of his, a former Trump administration political appointee, for a position in her department that did not exist and for which there was no funding.

173.    Not only did Plaintiff Potts not have the resources to hire the person, but the person did not have any background or experience in public relations.

174.    Plaintiff Potts understood Mr. Hommel's "request" to be an expectation, but because she felt so uncomfortable with yet another out-of-process crony hire, she slow-walked the process for months until Mr. Hommel finally left Plaintiff Potts alone about it.

175.     In September of 2021, Plaintiff Potts was contacted by Plaintiff Burchard and asked about an expense reimbursement request that was requested by Employee A, which was ostensibly for a dinner and strategy session with Plaintiff Potts.  The receipt submitted was for a $200+ dinner at a restaurant and bar at 1:00 am on a Saturday.

176.    Plaintiff Potts was shocked because she had never had a weekend work meeting with Employee A of any kind, let alone at 1:00 am.  Moreover, on the date in question, Plaintiff Potts was out of town, which she could easily prove.

177.    Plaintiff Potts asserted emphatically that the claim was false, and that it should be investigated as such.  She was told not to approach Employee A about the situation, but to write a formal written response, which she did.

178.    Although it was established that the claim for reimbursement was improper, and Employee A's assertion that he had met with Plaintiff on a weekend for a "business strategy session" was patently false, nothing was done about the misrepresentation.

179.    When Plaintiff Potts attempted to ascertain why nothing was going to be done, she was told by Mr. Hommel that Mr. McGarrigle did not want action taken against Employee A because it would reflect poorly on Mr. DiLella and Mr. McGarrigle.  This proved to Plaintiff Potts that there was clearly a double standard at the Foundation, and that applicable policy would not apply to those protected from on high.

180.    It further created a hostile work environment for Plaintiff Potts as she had no recourse when her character and reputation was maligned by false claims and accusations against her.

181.    Plaintiff Potts found herself in the center of another controversy when she learned of a contract with Social Media Company A that was generated by Corporate Sponsorship Firm A, yet another contractor that was brought on due to a personal relationship with Mr. Giordano.

182.    Plaintiff Potts had multiple dealings with Corporate Sponsorship Firm A, and routinely raised her concerns to Mr. Hommel about their poor performance and sexist and dismissive put-downs, especially towards Plaintiff Laymon.

183.    The contract with Social Media Company A, procured and negotiated by Corporate Sponsorship Firm A, was of particular concern to Plaintiff Potts due to its promise of exclusive announcement rights that would prevent most media outlets from coverage opportunities, and its unequal and outsized offering of Foundation assets that other potential corporate sponsors of equal stature had not been offered.

184.    The battles with Corporate Sponsorship Firm A were so severe that eventually, it was decided that their contract would be terminated.  However, Mr. McGarrigle and Mr. Giordano interceded on behalf of Corporate Sponsorship Firm A to extend their contract by thirty (30) days, so that they could finalize a contract with Social Media Company A that multiple Foundation executives found to be extremely risky and objectionable.

185.    In doing so, Mr. McGarrigle exposed the Foundation to serious problems related to the non-compete clause in the contract for Social Media Company A, and preserved for Corporate Firm A a huge pay-day in the form of the 17% commission on the sponsorship contract.

186.    The contract with Social Media Company A was signed by Mr. Hommel without support of the team and over their passionate and vehement objection. It was an alarming experience for Plaintiff Potts.

187.    On or about September 9, 2021, during a quarterly commission meeting with federal agencies, three Commission members, Andrew Hohns, James Swanson and Noah Griffin, stopped the normal business of the meeting to list the deficiencies, waste, and potentially illegal activities of the Foundation.

188.    They ended their presentation with a call for Congress to investigate the Foundation and Commission for misuse of federal funds, dereliction of duty, violation of protocols and regulations, fraud, waste and misappropriation of federal funds.

189.    As the Vice President of Communications and Public Relations, Plaintiff Potts was the person who would have likely been tasked with responding to the allegations publicly.  She concluded that she could not refute them because they were largely true.

190.    Faced with the untenable situation of having to lie to Commissioners or members of Congress to execute her duties, Plaintiff Potts felt that she had no choice but to resign her employment because she could no longer work for an organization enabling unethical or potentially illegal conduct.

191.    On or about September 17, 2021, Plaintiff Potts resigned from the Foundation.

**FACTS RELEVANT TO PLAINTIFF LAYMON'S CLAIMS**

192.    Plaintiff Laymon references and incorporates all of the allegations in the preceding paragraphs as if fully restated herein.

193.    Prior to joining the Foundation, Plaintiff Laymon was employed by the Women's Suffrage Centennial Commission as Executive Director.

194.    She holds a bachelor's degree and a master's degree and has more than 10 years of experience in program planning.

195.    Plaintiff Laymon joined the Foundation as Vice President of Programs and Planning on or about January 4, 2021, having been hired by Dr. Rucci.

196.    One of the first challenges that Plaintiff Laymon ran into in executing her duties was a brewing conflict between a group of Commissioners, and the Foundation.  The Commissioners were objecting to the structure of the Foundation because of its opaqueness, which prohibited the Commission members from executing their oversight duties. Their objections extended to concerns over the very existence of the Foundation, with many Commissioners believing that the

Foundation has no authority to exist or spend federal funds. Mr. Giordano and Mr. DiLella would eventually begin referring to the group as "the Dissenters."

197.    Over the course of her tenure at America 250, the Foundation leadership team held dozens of meetings to devise a means to "cut these guys [the Dissenters] off at the knees."  Plaintiff Laymon was in a meeting when a plan was concocted to have Commissioner Andrew Hohns removed from the Commission.

198.    When Plaintiff Laymon expressed that she understood the Dissenters concerns and that their objections should be taken seriously, she was promptly excluded from all future meetings where the strategy for removing the Dissenters was discussed.

199.    Plaintiff Laymon's troubles continued when she raised concerns about excessive spending of the Commission and Foundation.  For example, upon information and belief, Mr. Giordano worked approximately ten (10) hours per week, but was earning a full-time Senior Executive Level Five (5) salary.

200.    When Plaintiff Laymon raised concerns about his salary, his work hours, and his seeming unilateral control of the Foundation, she was told by Mr. Hommel that Mr. Giordano was the head boss, and that "we all work for Frank, and that's just the way it is."   In truth, Plaintiff Laymon did not report to, or work for Mr. Giordano.

201.    Another issue that Plaintiff Laymon raised was the dubious partnership agreement she was asked to broker by Dr. Rucci and Mr. Hommel between the America 250 Foundation and the American Battlefield Trust (hereinafter "ABT").  Plaintiff Laymon was asked to work with ABT to find ABT-led programs with which America 250 could partner, in order to have a demonstrated reason to pay ABT $150,000 out of her departmental funds.

202.    Plaintiff Laymon was informed by Dr. Rucci, James Campi from ABT (hereinafter "Mr. Campi"), Mr. Hommel, and Mr. Giordano, that the $150,000 payment was some form of restitution for previous monies owed from the Foundation to ABT. From the time of Plaintiff Laymon's hiring to the time of her resignation, countless hours were spent by the Chairman's group negotiating the agreement.

203.    On information and belief, the efforts to transfer $150,000 to ABT were abandoned when Commissioner Hohns began inquiring publicly about the relationship between the organizations in September 2021.

204.    In another instance, Plaintiff Laymon raised concerns that Mr. DiLella and Mr. Giordano had transitioned an Equus employee (hereinafter Employee C) to be their assistant at the Commission, without posting the position or engaging in any competitive process. Equus is Mr. DiLella's private real estate business.

205.    Employee C is the daughter of Mr. DiLella's Equus business partner.  Employee C was made a federal employee, and given a salary and title inconsistent with her job duties and inconsistently high with pay equity across the organization. Employee C's work location was maintained at Mr. DiLella's office, and her reporting station was at Equus.

206.    On multiple occasions, work that ostensibly was in Employee C's job description was farmed out to Plaintiff Burchard, Plaintiff Potts, or others.  When Plaintiff Laymon sought clarification of what duties actually belonged to Employee C, Mr. Hommel indicated that he did not know.

207.    Plaintiff Laymon also raised concerns about a contract the Foundation had with Lobby Firm A.  On information and belief, the president of Lobbying Firm A is a personal friend of Mr.

Hommel and Commissioner Cathy Gillespie.  The Foundation paid Lobby Firm A $20,000 every month, even though it did little to no actual work for the Foundation.

208.   Despite Plaintiff Laymon's repeated inquiries about the contract for Lobbying Firm A and repeated recommendation that it be terminated because it was, at best, wasteful of taxpayer funds, and potentially a fraudulent and false claim, Plaintiff Laymon's legitimate concerns were ignored.

209.   Plaintiff Laymon raised additional concerns about the communications firm being used by the Foundation, Communications Firm A.  This firm was the same communications firm used by Mr. DiLella's real estate business, Equus.

210.   At the time Plaintiff Laymon raised her concerns, Communications Firm A was being paid $40,000+ a month to conduct America 250's social media and to write occasional press releases. This alarmed Plaintiff Laymon because there was nothing to show for such an expenditure. America 250 had only a few hundred social media followers.

211.   It was abundantly clear to Plaintiff Laymon that Communications Firm A was not only grossly underperforming, but was also grossly overpaid.

212.   Plaintiff Laymon was not only extremely troubled about these excessive and wasteful contracts themselves, but by the way she was ignored, marginalized and mistreated when she raised her legitimate concerns about them.  Put simply, these contracts were benefits given to friends of Mr. DiLella and other senior leaders that circumvented the open RFP process, and were treated as sacrosanct, no matter how absurd they were.

213.   Moreover, Plaintiff Laymon was told that legal counsel to the Commission and Foundation, Mr. McGarrigle and Mr. Del Raso, were hired to serve and protect Mr. DiLella and Mr. Giordano personally, and were not concerned with acting in the best interest of the Foundation.

214.    On information and belief, Dr. Rucci terminated Mr. McGarrigle of Reed Smith as General Counsel, but the firm was rehired by Mr. DiLella and Mr. Giordano, over the strenuous objection of Dr. Rucci.  Plaintiff Laymon was told that this was among the principal reasons Dr. Rucci resigned.

215.    Plaintiff Laymon ultimately discovered that while Mr. McGarrigle and Mr. Del Raso did not charge for their personal time, Reed Smith began billing the Foundation for the time of their associates in mid-2021.  It bears repeating that both Reed Smith and Troutman Pepper were retained as General Counsels without any sort of competitive or transparent process.

216.    Another example of a contract that was not properly bid was the contract with International Management Consulting Firm A.  The firm was retained for multiple scopes of work and paid hundreds of thousands of dollars.

217.    Plaintiff Laymon was required to use $70,000 of her budget to pay the firm to do an economic impact study for the semiquincentennial celebration.  She objected because she believed the price to be excessive and because she believed other firms would be more qualified to carry out the study.

218.    Although the fee was obligated when the contract was signed in the summer of 2021, on information and belief, no work has been done to date.

219.    Plaintiff Laymon asserts that International Management Consulting Firm A was retained because of the personal relationship between Mr. DiLella and Mr. Giordano, and executives at the firm.

220.    Plaintiff Laymon inherited another dubious contract, this time with Corporate Sponsorship Firm A.  On information and belief, Mr. Giordano had a friendship with the partners of the firm, and signed them to a contract that gave them a 17% commission, with no competitive bid.

221.    Plaintiff Laymon was confronted with the difficulties of working with the partners of Corporate Sponsorship Firm A when the liaison at The Home Depot reached out to her and indicated that it would no longer continue working with partners in the firm and would prefer to interface directly with Plaintiff Laymon.

222.    Shortly thereafter, the liaison at Walmart made a similar request, asserting that it would prefer to no longer work with the firm as a business agent or partner. It is worth noting that the liaisons for both Walmart and The Home Depot are female.

223.    Plaintiff Laymon not only had difficulty cleaning up the messes created by the partners of Corporate Sponsorship Firm A, tasks which were not within her job duties, but she had to endure constant sexist, demeaning and hostile treatment during meetings with them.

224.    After meetings with the partners of the Corporate Sponsorship Firm A, Mr. Hommel would often apologize to Plaintiff Laymon for not intervening on her behalf as her supervisor. Eventually, Plaintiff Laymon informed Mr. Hommel that she would no longer meet with either partner because she could no longer tolerate their sexist, hostile, and demeaning treatment of her. Mr. Hommel asked Plaintiff Laymon to continue meeting with the partners and ensured her that he would intervene when necessary. He did not.

225.    In one of the very few occasions when Mr. Hommel was responsive and took action to benefit the Foundation, Mr. Hommel terminated the relationship with Corporate Sponsorship Firm A.

226.    However, because of the personal relationship between the firm's partners and Mr. Giordano, they were invited to a "Pig Roast" and party at Mr. Giordano's home.

227.    Thereafter, Mr. Giordano informed the Foundation that it had to rehire Corporate Sponsorship Firm A, despite its demonstrated lack of results and blatant disrespect and denigration

of Plaintiff Laymon, and Mr. Hommel capitulated. Although they'd previously been removed from two accounts, after the "Pig Roast," they were again permitted to contact the women executives of The Home Depot and Walmart, despite those executives having been assured that the firm was no longer representing their accounts with America 250.

228.    As with the other Plaintiffs, Plaintiff Laymon raised multiple vigorous objections to the Foundation's contract with Social Media Company A.  Plaintiff Laymon's concerns centered on the fact that as part of the verbal negotiation, America 250 agreed to use its federal influence and relationship with the Department of the Interior to arrange, secure, and facilitate a meeting between Social Media Company A and the National Park Service that would ensure that the company would have access to America's national parks in order to film footage for its use with its latest technology. Functionally, the deal turned the Commission and Foundation into lobbyists for Social Media Company A, and Plaintiff Laymon raised concerns that this was selling access to governmental decision makers to a private company.

229.    In fact, America 250's obligation to seemingly lobby on behalf of Social Media Company A to the National Park Service was among the only clear deliverables established in the relationship.

230.    The internal objections of the female executives to the contract between Social Media Company A and America 250 were so strident and significant that Mr. Hommel signed the contract in secret, and revealed to the executive team that it was done deal days after the fact.

231.    In March of 2021, Employee A was hired as a Vice President.  It soon became clear that he lacked sufficient experience for the role, and despite having no background in corporate sponsorships, Plaintiff Laymon was tasked with executing a portion of his duties.

232.     Dozens of staff meetings were held in which issues with Employee A's skills and knowledge were raised, and the fact that Foundation work was suffering because too much of Employee A's work was being placed on Plaintiff Laymon, Plaintiff Potts, and Plaintiff Burchard.

233.     While Plaintiff Laymon was required to do her job, and a substantial portion of Employee A's job, Plaintiff Laymon was subjected to ridicule, bullying, and disrespectful comments from Employee A in full view of her colleagues and senior leadership.

234.     In one instance, Plaintiff Laymon and Plaintiff Burchard were referred to by Employee A as a part of "the devil's triangle," in a message seen by several employees.

235.     When Plaintiff Laymon and others asked Mr. Hommel to replace Employee A or to get him help, training or support, they were told that such would cause bad public relations for Mr. DiLella and Mr. Giordano.

236.     Plaintiff Laymon had only been on the job for nine months when the constant belittling, denigration and humiliation became too much for her.  The final straw was when she finally came to understand that nothing she said or did would change the way the Foundation operated, and that it would continue to demand that she accept and participate in potentially unlawful, unethical, fraudulent and wasteful spending.

237.     She was further motivated to resign when the organization displayed a complete disregard for hiring best practices during the CEO search when it did not advance a single woman in the top-five candidates, inserted a male SVP above her as part of a political quid-pro-quo, and then fully and completely disregarded her concerns and objections about the gendered disparities.

238.     It became clear that despite the fact that she was carrying an enormous workload, she was being paid less than her male colleagues, indeed, was among the lowest paid members of the

executive team, and that none of her complaints about disparate pay or inequity of opportunity were going to be heeded.

239.    On or about September 17, 2021, Plaintiff Laymon resigned from the Foundation.

## CLAIMS COMMON TO ALL PLAINTIFFS

### CLAIMS AGAINST THE AMERICA 250 FOUNDATION AND THE U.S. SEMIQUINCENTENNIAL COMMISSION

### COUNT I

**Violation of the False Claims Act, 31 U.S.C. §§ 3729 et seq. & 3730(h)(2)**

*(Whistleblower Protection)*

240.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

241.    Plaintiffs were all employed by a non-profit organization controlled and directed by a federal Commission created by an act of Congress, that procured contracts and transacted business with federally appropriated funds on behalf of the American people.

242.    Plaintiffs each actively investigated, sought information regarding, questioned other employees and attempted to verify invoices and claims for payment that they reasonably believed were fraudulent, noncompliant, and/or without merit.

243.    Plaintiffs each raised their concerns to their immediate supervisors and superiors of what they believed to be false claims, and that they strongly objected to the payment of such claims.

244.    On several occasions, Plaintiffs informed their immediate supervisors and superiors that payment of such claims would expose the Foundation to possible allegations of noncompliance, audit issues, fraud and misappropriation of federal funds.

245.    Immediately after conducting their investigation and/or raising their concerns of potential false claims, and revealing to their superiors that they believed the invoices, reimbursement requests, contracts and other instruments to be false, fraudulent or without basis in fact, each Plaintiff was retaliated against in the form of the creation and escalation of a hostile and toxic work environment.

246.    Plaintiffs were removed from meetings, deprived of information and resources, isolated and undermined by their superiors, humiliated and denigrated in front of colleagues.

247.    Despite Plaintiffs repeated and vehement objections to making payments they believed to be fraudulent, they either had to look the other way as leadership enabled potential fraud, or forfeit their employment.

248.    In lieu of being part of an organization that condoned potentially fraudulent activity, Plaintiffs resigned their employment, believing they had no choice, inasmuch as their superiors refused to heed any of their warnings or advice.

249.    The stress, anxiety and mental and emotional anguish caused by the retaliation they were subjected to, and the constant fear of exposing themselves to legal jeopardy, were severe and debilitating.

250.    As a direct and proximate cause of the retaliation they were subjected to, and being forced to resign in lieu of engaging in unlawful and noncompliant conduct, Plaintiffs suffered financial, emotional and mental losses, for which they now seek damages in an amount of not less than $250,000 each.

## COUNT II

### Violation of the District of Columbia Human Rights Act

### D.C. Code § 2-1401, et seq.

*(Violation of the Fair Pay Act as incorporated into the DCHRA)*

251.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

252.    Plaintiffs were each at-will executive employees of the Foundation during all times relevant to this matter.

253.    Plaintiffs were paid less than their commensurate male colleagues.

254.    Plaintiffs were forced and required to take on and execute substantial portions of the duties of their male counterparts and superiors, for which they were not compensated from the Commission or the Foundation.

255.    Plaintiffs were made to work excessive hours, including on nights and weekends, when their male colleagues did not have to do so.

256.    When Plaintiffs raised concerns about the salary inequities, they were initially ignored. Thereafter, they were retaliated against, in the form of the creation and escalation of a hostile work environment.

257.    Plaintiffs were removed from meetings, deprived of information and resources, isolated and undermined by their superiors, humiliated and denigrated in front of colleagues.

258.    As a direct and proximate cause of the Foundation's discriminatory pay practices, Plaintiffs suffered lost wages for which they seek compensation of not less than $180,000 each.

259.    As a direct and proximate cause of the Foundation's retaliation against them for seeking fair pay, Plaintiffs suffered stress, anxiety and mental and emotional anguish that was both severe and debilitating, for which Plaintiffs seek compensation of not less than $300,000 each.

## COUNT III

## Violation of the District of Columbia Human Rights Act

## D.C. Code § 2-1401, et seq.

*(Gender Discrimination-Hostile Work Environment)*

260.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

261.    Plaintiffs were subjected to a work environment in which a small group of men made all the decisions.

262.    Despite each Plaintiff having years of experience and expertise, and the fact that the enterprise relied heavily on their knowledge and productivity, Plaintiffs were clearly and intentionally denied the authority that should have come with their positions.

263.    Instead of being treated like their male executive colleagues, Plaintiffs were given an unreasonable workload, repeatedly marginalized in team meetings, denied staff and resources, isolated and ignored, spoken to in an antagonistic and demeaning manner, and harshly and openly criticized in front of colleagues.

264.    Requests were made of Plaintiffs that were never made to their male colleagues, and Plaintiffs were expected to do the work of their male colleagues.

265.    When Plaintiffs tried to raise legitimate concerns about the actions of the Foundation, they were ignored, marginalized and retaliated against.

266.    Foundation CEO Daniels, on several occasions, made clear that he expected the executive women on the team to act in a supportive or subordinate role.  He further demanded of the female executives that they be loyal to him personally, rather than to the Foundation.  On information and belief, CEO Daniels did not make such a demand of the male executives of the Foundation.

267.    Plaintiffs assert that their warnings and concerns about Foundation activities were ignored in part, because of their gender.

268.    Plaintiffs assert that they were marginalized, devalued, underpaid, ignored, under-resourced, and over-worked because of their gender.

269.    As a direct and proximate cause of the Foundation's discrimination based on gender, Plaintiffs suffered stress, anxiety and mental and emotional anguish that was both severe and debilitating, for which Plaintiffs seek compensation of not less than $300,000 each.


## COUNT IV

## Wrongful Termination

*(Constructive Discharge--Plead in the Alternative)*

270.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

271.    Plaintiffs witnessed what they believed to be fraudulent claims on federally appropriated funds.  Plaintiffs each repeatedly and vehemently objected to payment of invoices, execution of contracts, payment of expense reimbursement requests and other acts of the Foundation they believed to be unlawful.

272.    When Plaintiffs demonstrated to their superiors that the invoices, claims, requests or contracts at issue were improper, they were ignored and subjected to retaliation.

273.    Despite their best efforts, nothing they said or demonstrated to the upper chain of command dissuaded the Foundation from engaging in unlawful practices.

274.    Upon leadership's direction, Plaintiffs were placed in a position where they either would have to silently accede and/or participate in noncompliance, fraud, and misappropriation of government funds, or relinquish their employment.

275.    Plaintiffs opted to resign their employment because the stress and anxiety of being part of an organization that condoned potentially fraudulent activity and/or being forced to engage in potentially unlawful conduct was severe, extreme and intolerable.

276.    Plaintiffs thus assert that they acted in the taxpayer interest and yet were constructively discharged from their employment, and that such was against public policy.

277.    Plaintiffs further assert that such constructive discharge fits the purpose of the common law cause of action for wrongful discharge.

278.    As a direct and proximate cause of the hostility and retaliation they were subjected to, and being forced to resign in lieu of engaging in unlawful conduct, Plaintiffs suffered financial, emotional and mental losses, for which they now seek damages in an amount of not less than $500,000 each.

## COUNT V

### Negligence

*(Negligent Infliction of Emotional Distress)*

279.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

280.    Plaintiffs assert that the Foundation owed them a duty to ensure that they were not forced to engage in unlawful or harmful conduct.

281.     Plaintiffs assert that forcing employees to engage in potentially unlawful conduct, and to approve fraudulent invoices over their well-founded and strenuous objections was beyond the pale, and put them in an untenable position.

282.     The Foundation knew, or should have known, that its employees would suffer extreme anxiety and emotional distress when they were forced to enable or turn a blind eye to potentially unlawful and counter-productive contracts, invoices, reimbursement requests and other financial transactions.

283.     On multiple occasions, Plaintiffs complained to their superiors that what the Foundation was doing was wrong.  In several extremely heated and charged senior staff meetings, Plaintiffs expressed to their superiors the severe toll that the Foundation's actions were taking on them.

284.     At least one Plaintiff informed CEO Daniels that she was going to resign in lieu of supporting, enabling or participating in fraud, which served as clear notice of the nature and extent of the distress felt by Plaintiffs.

285.     Plaintiffs assert that any reasonable, law-abiding person in the same or similar circumstances would have felt the same severe emotional distress that they did in having to engage in potentially unlawful activity.

286.     The Foundation was placed on notice that its actions were causing its employees severe emotional distress after the first Plaintiff resigned, and yet, it took no corrective action.

287.     As a direct and proximate cause of the Foundation's negligence, Plaintiffs severe emotional and mental anguish, which resulted in anxiety, depression, loss of sleep, loss of appetite, high blood pressure, and other physical manifestations of stress, for which they now seek damages of not less than $250,000 each.

## COUNT VI

## Defamation of Character

288.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

289.    On information and belief, on or about February 19, 2022, Chairman DiLella sent a formal letter to the America 250 Foundation Board of Directors, Senator Casey, Congresswoman Watson Coleman, and Congressman Evans implying that Plaintiffs initiated contact with the Foundation without provocation as an attempt to extort America 250.

290.    In fact, the Plaintiffs' initial letter was a response to a harassing cease-and-desist letter sent by the Foundation lawyers to Plaintiff Burchard on January 7, 2022.

291.    In support of this assertion, Chairman DiLella provided the recipients with information contained in a confidential letter from counsel for Plaintiffs to counsel for the Defendant.

292.    In the letter to the Board and Members of Congress, America 250 attempted to tarnish Plaintiffs credibility and make it appear as if Plaintiffs had no reason or basis to obtain counsel and to further intimidate and silence the Plaintiffs.

293.    This same letter was then sent on to Commission *ex officio* federal agencies.

294.    Chairman DiLella knew that the information provided to the Board and Members of Congress was untrue, and/or acted with reckless disregard for its truth.

295.     Chairman DiLella, who provided the false narrative to the Board and to Members of Congress, engaged in defamation.

296.    Plaintiffs assert that Chairman DiLella, who provided the false and misleading narrative to the Board and Members of Congress, did so for the express purpose of undermining their credibility, and tarnishing their personal and professional reputations.

297.    As a direct and proximate cause of the defamation engaged in by the Foundation and Commission's agent within the course of his duties, Plaintiffs are entitled to liquidated and immediate damages of not less than $500,000.00 each.

## COUNT VII

### Negligence

*(Negligent Supervision by the Commission)*

298.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

299.    The Commission was tasked by Congress to oversee and supervise the activities of the Foundation.  It was the responsibility and duty of Commissioners to exercise oversight of the Foundation's operations, actions, personnel and progress.  Thus, the Commission had a statutory duty to the Foundation and its employees.

300.    It was the responsibility of Commissioner David Cohen and Commissioner Rios to engage their committees, exercise their judgement, and provide oversight and corrective action if and when policies and practices were not followed, or were not in the best interest of America 250 and its continued mission and strategies.

301.    Mr. Giordano is Executive Director of the Commission, and as such, had a fiduciary duty to keep the Commissioners informed about Foundation activities of which he was aware or should have been aware.

302.    As alleged above, Mr. Giordano sat in on the regular Chairman's Group meetings, and thus was privy to all activities of the Foundation.

303.    In some instances, Mr. Giordano inserted himself in Foundation business to curry favor for an entity or person with whom he had a pre-existing personal relationship.

304.    On information and belief, Mr. Giordano and Mr. DiLella had a personal friendship and relationship with Mr. McGarrigle, General Counsel of the Foundation, and with Mr. Del Raso, General Counsel of the Commission.

305.    Plaintiffs assert that Mr. Giordano knew, or should have known of the pay discrepancies between male and female executives at the Foundation.

306.    Plaintiffs assert that Mr. Giordano knew, or should have known about the hostile work environment for executive women that was being fostered at the Foundation.

307.    Plaintiffs assert that Mr. Giordano knew, or should have known about the dubious contracts, false and fraudulent invoices, fraudulent reimbursement requests and other unlawful activities at the Foundation.

308.    Plaintiffs assert that Mr. Giordano knew, or should have known about the lack of transparency and adherence to Foundation policy of several personnel hires.

309.    Plaintiffs assert that any reasonable Commissioner, with the same access to information, and acting with the same knowledge as Mr. Giordano, would have taken action to stop the harmful and unlawful conduct of the Foundation.

310.    Plaintiffs assert that Mr. Giordano, Mr. DiLella, Commissioner Cohen, Commissioner Rios, and the entire Commission owed Plaintiffs a duty to supervise and intervene in Foundation business that was potentially fraudulent, and to protect Plaintiffs from discriminatory and retaliatory practices.

311.    Plaintiffs further assert that the harm they suffered was predictable, and squarely within the realm of harm that would ensue from being discriminated and retaliated against, and being forced to participate in unlawful practices.

312.    Plaintiffs assert that the Commission's failure to take any corrective action regarding the unlawful, discriminatory, retaliatory, disparate and fraudulent acts of the Foundation constitutes negligent supervision.

313.    As a direct and proximate cause of the discrimination in pay, hostile work environment, harassment, and retaliation Plaintiffs endured at the Foundation, they suffered financial losses, and emotional and mental anguish, for which they now seek damages of not less than $250,000 each.

## CLAIM AGAINST AMERICAN BATTLEFIELD TRUST

### COUNT VIII

### Negligence

*(Negligent Supervision by the American Battlefield Trust)*

314.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

315.    Pursuant to the Public Law creating the Commission, the ABT was selected by the U.S. Department of Interior, National Park Service, to serve as the Administrative Secretariat of the Commission.

316.    As an ABT representative, Mr. Campi, sits on the America 250 Foundation Board of Directors.

317.    On or about April 10, 2019, ABT and the National Park Service signed a memorandum of understanding transferring ABT's operational and fundraising support responsibilities as the Commission's Administrative Secretariat to the Foundation.

318.    ABT's role as Administrative Secretariat was never properly sunsetted and it remains responsible for oversight and supervision of the activities of the Foundation.

319.    As such, it was ABT's responsibility to exercise its oversight of the Foundation's actions, personnel and progress.  Thus, ABT has a statutory duty to the Foundation and its employees.

320.    Mr. Campi had a fiduciary duty to keep ABT informed about Foundation activities of which he was aware.

321.    Plaintiffs assert that Mr. Campi, as the ABT representative, knew, or should have known of the pay discrepancies between male and female executives at the Foundation.

322.    Plaintiffs assert that Mr. Campi knew or should have known about the hostile work environment for executive women that was being fostered at the Foundation.

323.    Plaintiffs assert that Mr. Campi, the ABT representative on the Foundation Board, knew, or should have known about the dubious contracts, false and fraudulent invoices, fraudulent reimbursement requests and other potentially unlawful activities at the Foundation.

324.    Plaintiffs assert that Mr. Campi, the ABT representative on the Foundation Board, knew, or should have known about the lack of transparency and adherence to Foundation policy violations.

325.    Plaintiffs assert that any reasonable entity with oversight responsibilities, with the same access to information, and acting with the same knowledge as Mr. Campi, would have taken action to stop the harmful and unlawful conduct of the Foundation.

326.    Plaintiffs assert that ABT owed Plaintiffs a duty to oversee and intervene in Foundation business that was potentially fraudulent, and to protect Plaintiffs from discriminatory and retaliatory practices.

327.    Plaintiffs further assert that the harm they suffered was predictable, and squarely within the realm of harm that would ensue from being discriminated and retaliated against and being forced to participate in potentially unlawful practices.

328.    Plaintiffs assert that ABT's failure to take any corrective action regarding the unethical, discriminatory, retaliatory, disparate and fraudulent acts of the Foundation constitutes negligent supervision.

329.    As a direct and proximate cause of the discrimination in pay, hostile work environment, harassment, and retaliation Plaintiffs endured because of the lack of oversight by the American Battlefield Trust, they suffered financial losses, and emotional and mental anguish, for which they now seek damages of not less than $250,000 each.


ADDITIONAL CLAIM OF PLAINTIFFS GARLOCK AND BURCHARD AGAINST THE AMERICA 250 FOUNDATION

**COUNT IX**

**Defamation of Character**

*(Defamation Per Se)*

330.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

331.    On information and belief, on or about February 1, 2022, one or more Foundation executives were interviewed by a reporter from a national news organization and syndicated

newspaper with a monthly online readership of over 40 million to comment for a newspaper article that they knew would be published.

332.    On information and belief, in that interview, a Foundation executive alleged that Plaintiffs Garlock and Burchard had approved payment of more than $30,000 in invoices that Plaintiffs believed to be noncompliant and possibly fraudulent.

333.    In support of their false assertion, a Foundation executive provided the reporter with documents related to a separate, expired contract that had been completed, fulfilled and closed out, as evidence that Plaintiffs Garlock and Burchard had approved of the expenditure.

334.    The reporter contacted Plaintiffs Burchard and Garlock asking for their on-the-record response to America 250's assertions.

335.    The documents provided to the reporter did not relate to the questionable invoices, which the Foundation executive knew or should have known when he made the false representation.

336.    The Foundation was well aware of the fact that both Plaintiffs Garlock and Burchard had strenuously objected to the payment of the dubious invoices, and that they mentioned these potentially unlawful acts in their respective resignation letters.

337.    The Foundation executive who provided the misleading and false information to the reporter knew that the information was untrue, and/or acted with reckless disregard for its truth.

338.     The Foundation executive who provided the false narrative and documents to the reporter engaged in defamation *per se*, alleging that Plaintiffs Garlock and Burchard had engaged in and approved potentially illegal activity, causing clear and irreparable harm to their personal and professional reputations.

339.    Inasmuch as this publication has a massive readership, the Foundation executive who provided the false and defamatory information to the reporter, knew or should have known that

the damage to Plaintiff Garlock and Plaintiff Burchard's reputations would be significant and irreparable.

340.    Plaintiffs Garlock and Burchard assert that the Foundation executive who provided the false and misleading narrative to the reporter did so for the express purpose of undermining their credibility, and tarnishing their reputations.

341.    As a direct and proximate cause of the per se defamation engaged in by the Foundation's agent within the course of his/her duties, Plaintiffs Garlock and Burchard are entitled to liquidated and immediate damages of not less than $1,000,000.00 each.

## PRAYER FOR RELIEF

Plaintiffs ask this Court for an ORDER granting them all the compensation they seek in this Complaint.  They further ask this Court for declaratory relief in the form of an ORDER mandating a full, forensic and transparent investigation into the Commission and Foundation, including a full audit of the Foundation's financial transactions, and any further ORDER that this Court deems appropriate to address and rectify the issues raised in this Complaint.  Plaintiffs further asks this Court for any and all additional remedies it deems appropriate to make them whole.

## JURY DEMAND

Plaintiffs herein demand trial by jury of all claims so triable.

Respectfully submitted,

*/s/Donald M. Temple*
Donald Temple, Esq.
Pamela Keith, Esq.
TEMPLE LAW OFFICES
1310 L St. NW
Suite 750
Washington, DC 20005
(202) 628-1101 (O)
(202) 302-0383 (M)
pamkeithtemplelaw@gmail.com
dtemplelaw@gmail.com
*Counsel for Plaintiffs*