## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RENEE BURCHARD, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No.  1:22-CV- 00497 (JMC) |
| | ) | |
| AMERICA 250 FOUNDATION, | ) | |
| *et al.*, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| and | ) | |
| | ) | |
| DANIEL DILELLA, | ) | |
| In his Individual Capacity, | ) | |
| | ) | |
| FRANK GIORDANO, | ) | |
| In his Individual Capacity, | ) | |
| | ) | |
| ROSIE RIOS, | ) | |
| In her Individual Capacity, | ) | |
| | ) | |
| Serve Department of Justice | ) | |
| MATTHEW M. GRAVES | ) | |
| BRIAN P. HUDAK | ) | |
| Chief, Civil Division | ) | |
| Assistant United States Attorney | ) | |
| 601 D Street, NW | ) | |
| Washington, DC 20530 | ) | |
| | ) | |
| SCOTTSDALE INDEMNITY CO. | ) | |
| Insurance Policy No. EKI3322773 | ) | |
| Serve:  General Counsel | ) | |
| One Nationwide Plaza | ) | |
| Columbus, OH 43215 | ) | |
| | ) | |
| *Defendants*. | ) | |

1

## AMENDED COMPLAINT

Comes now Plaintiffs, **Renee Burchard** (hereinafter "Plaintiff Burchard"), **Kirsti Garlock** (hereinafter "Plaintiff Garlock"), **Anna Laymon** (hereinafter "Plaintiff Laymon"), and **Keri Potts** (hereinafter "Plaintiff Potts"), collectively "Plaintiffs," by and through undersigned counsel with the following AMENDED COMPLAINT for declaratory and compensatory relief, and state as follows:

## INTRODUCTION

Plaintiffs are a group of four women who were the entire cadre of executive women employed by the America 250 enterprise from its inception in 2019 to their respective resignations in 2021. Plaintiffs hold the shared belief that the work of America 250 is work worth doing, and that the nation's semiquincentennial can honor the past, inspire the future, and leave a proud legacy for the next 250 years. Plaintiffs, however, recognize that their service to the mission must now take a different form: calling attention to the mismanagement and discrimination of America 250, to make the organization better for all Americans.

The America 250 Foundation (hereinafter "the Foundation") is a non-profit organization overseen by the U.S. Semiquincentennial Commission (hereinafter "the Commission"), created by Congress to design and implement programing for the celebration of the semiquincentennial of the founding of the United States of America. The Foundation and the Commission are hereinafter referred to collectively as "America 250". The Foundation is funded by both federal appropriations and from donations and corporate sponsorships. To date, The Foundation has received approximately $20 million in federal funds.

During their tenure, Plaintiffs were retaliated against and subjected to escalating hostility due to their complaints and opposition to noncompliant, unlawful and/or wasteful business practices that resulted in the potential squandering of federal funds; were subjected to a hostile work environment based on their gender; and were systematically and intentionally underpaid and tasked with the work of their better-paid male colleagues.  All four Plaintiffs were constructively discharged and forced to resign from their respective positions because they could no longer participate in noncompliant, unlawful and/or fraudulent use of taxpayer funds, and could no longer endure a toxic and volatile work environment.

Despite their repeated and vociferous objections to the cronyism, self-dealing, mismanagement of funds, potentially unlawful contracting practices and wasteful spending, Plaintiffs' efforts were rebuffed and ignored.  Instead, they were belittled and humiliated in front of their co-workers, kept out of key decision-making meetings, usurped of resources and authority, systematically undermined and subjected to constant demeaning language.  While they were being marginalized by the leaders of the Foundation, they were given enormous workloads, and were forced to actually execute large portions of the duties that were the responsibilities of male co-workers, who were paid more than Plaintiffs and/or enjoyed significantly fewer responsibilities and duties.

Plaintiffs herein assert the following claims against the Foundation and Commission: Violation of the whistleblower protection provision within the False Claims Act, 31 U.S.C. § 3729 *et seq.*; and claims against the Foundation, Commission and individual defendants for gender discrimination based on a hostile work environment and retaliation, and violation of the Equal Pay Act, as incorporated into the District of Columbia Human Rights Act, D.C. Code § 2-1401, *et seq.*, and common law claims of defamation, negligent infliction of emotional distress and wrongful

discharge. Plaintiffs' claims against the Commission and American Battlefield Trust are based on common-law negligent supervision.

Plaintiffs herein seek declaratory relief in the form of a Court-mandated full forensic investigation of the Foundation and Commission with respect to pay practices, employment policies and financial transactions and contracts. Plaintiffs also seek financial compensation for lost wages and the pain and suffering and harm they endured as a result of the potentially unlawful practices of Defendants.

## THE PARTIES

1.     Plaintiff Renee Burchard is a resident of the Commonwealth of Virginia.  She was first retained as a consultant and then hired as the Chief Administrative Officer and Chief of Staff of the Foundation.  She worked from April 1, 2020, until her resignation on or about December 6, 2021.

2.     Plaintiff Kirsti Garlock is a resident of the Commonwealth of Virginia.  She was first retained as a part-time consultant by the Foundation in March of 2021, and hired as the Chief Legal Officer of the Foundation on or about August 15, 2021.  She resigned on or about December 8, 2021.

3.     Plaintiff Anna Laymon is a resident of the State of Alabama.  She was employed as the Vice President of Programs and Planning at the Foundation from on or about January 4, 2021, until her resignation on or about September 17, 2021.

4.     Plaintiff Keri Potts is a resident of the District of Columbia.  She was employed as the Vice President of Communications and Public Relations of the Foundation from on or about March 15, 2021, until her resignation on or about September 17, 2021.

5.      The United States Semiquincentennial, a U.S. Congressional commemorative commission, was created in 2016 pursuant to the United States Semiquincentennial Commission Act of 2016, Public Law 114-196, whose purpose is "to provide for the observance and commemoration of the 250th anniversary of the founding of the United States through local, State, national and international activities planned, encouraged, developed and coordinated by a national commission representative of appropriate public and private authorities and organizations." Technical amendments to the Act were authorized in Public Law 116-282.

6.      The American Battlefield Trust is an independent 501(c)(3) charitable non-profit organization that the Secretary of the Interior selected as the non-profit Administrative Secretariat for the Commission in 2018.  The primary role of the Administrative Secretariat was to administer the legislative charge of the Commission to determine the most effective way to discharge the responsibilities of the Commission as stipulated under Public Law 114-196.

7.      The America 250 Foundation, Inc., created in 2019, is a Delaware non-profit corporation and recognized as exempt from federal income taxation as a charity under section 501c(3) of the Internal Revenue Code and classified as a Type II sole-supporting organization under section 509(a)(3) of the Code to further the Commission's purpose of facilitating, planning, developing, promoting, and coordinating observances and activities that are and will be associated with America 250. It was created solely to support and act on behalf of the Commission and conducts no other business.

8.      Scottsdale Indemnity Company is a resident of Ohio, and is the insurance carrier contracted with the Foundation to indemnify and insure them against claims filed by employees against the Foundation related to their employment.  It is impleaded into this action to ensure that Defendant

Foundation does not avoid judgment by the inevitable sunsetting of the Commission and Foundation.

9.      Defendant Dan DiLella is the Chair of the Commission.  He is a resident of Pennsylvania. He is not a federal employee, and is not paid a salary for his work on the Commission.

10.     Defendant Rosie Rios is the Treasurer of the Commission.   She is a resident of California. She is not a federal employee, and is not paid a salary for her work on the Commission.

11.     Defendant Frank Giordano serves as the Executive Director of the Commission.  He is a resident of Pennsylvania. He is paid a salary for his work as Executive Director.

## JURISDICTION & VENUE

12.     This honorable Court enjoys original jurisdiction over the matters asserted herein because they assert claims under the laws of the United States of America, to wit:  False Claims Act, 31 U.S.C. §§ 3729 (a) & 3730(h)(1) & (2).  This Court also enjoys diversity jurisdiction pursuant to 28 U.S.C. §1332, because there is complete diversity of residency between the litigants and the matter in controversy exceeds the statutory threshold.[1] The Court further enjoys pendant jurisdiction over the pendant state law claims herein because they arise out of the same facts and involve the same actors as the federal claim.

13.     Venue is proper in this Court because all acts, omissions, and decisions that form the basis of Plaintiffs' claims took place in the District of Columbia.

## FACTS RELEVANT TO ALL PLAINTIFFS

14.     In 2016, by act of legislation, the United States Congress created the United States Semiquincentennial Commission, a U.S. Congressional commemorative commission, to provide

---

[1] Plaintiff Potts has recently relocated her residency outside of the District of Columbia.

for the observance and commemoration of the 250th anniversary of the founding of the United States.

15.     There are two pieces of Congressional legislation that govern the creation of the Commission, Public Law 114-196 and 116-282 (hereinafter collectively "the Public Laws"). Neither Public Law contains any language conferring on the Commission the status of a sovereign of the United States or to make it a federal agency.  *See* EXHBITS 1 & 2.

16.     According to the Public Laws, the Commission automatically sunsets on December 31, 2027.

17.     The Commission does not hold meetings that are open to the public, and is not subject to the Federal Advisory Committee Act (hereinafter "FACA"), or the Freedom of Information Act (hereinafter "FOIA").  In fact, there is no way for the public to be informed of how the Commission spends federal appropriations, other than by the limited annual reports filed by the Commission to Congress and the President.

18.     The America 250 Foundation is designated as a Type II sole-supporting organization under section 509(a)(3) of the Internal Revenue Code, and as such, must be supervised or controlled by the Commission by having Commissioners serve as a majority of the directors of the supporting Foundation. The Foundation cannot exist on its own – it exists solely to support the Commission.

19.     As recently admitted by the Chair of the Commission, it operates like a "board of trustees" of a private business, more so than an agency, department or division of the United States Government.  *See* EXHIBIT 3.

20.     The Foundation is the operational arm of the Commission and responsible for entering into public-private partnerships to fund and execute programming. The Foundation is funded by federal

appropriations and from donations and corporate sponsorships. To date, The Foundation has received approximately $20 million in federal funds.

1.      It is the Foundation employees – who actually execute the contracts and spend the money appropriated to the Commission – that are in the best position to raise the alarm about fraud, waste and abuse of federal appropriations.   This is because the Commission is a hybrid; with members appointed from the three Branches of Government, yet arguably it lacks accountability to any single governmental authority.

21.

22.      While the Foundation employees are not coextensively Commission employees, the Commission, in its oversight function, must approve and ratify all of the personnel and financial decisions of the Foundation.

23.      At a recent Board meeting, Commission Chair DiLella attempted to pass a resolution that retroactively approved and ratified all of the acts and decisions of the Foundation.  The measure lacked sufficient support of the Board members, but the attempt shows how intimately involved the Commission is, in the functioning and actions of the Foundation.   *See generally,* EXHIBIT 4.

24.      The Foundation is indemnified by, and holds a policy issued by Defendant Scottsdale Indemnity Company (hereinafter "Defendant Insurer").

25.      Pursuant to District of Columbia law, Defendant Insurer has an affirmative duty to indemnify and defend the Foundation in this matter.

26.      Because the Foundation will sunset no later than December 31, 2027, and because it can be dissolved at any time by an act of Congress, Plaintiffs have a right to ensure that Defendant Insurer is cognizant of the instant litigation and participates herein to ensure that Plaintiffs are not left with an insolvent or nonexistent Defendant.

27.     Because Congress is not obligated to fund the programs and budget recommended by the Foundation, and because the Foundation has not been successful to date in raising private funds, there is a good chance that it will be insolvent or unable to pay any judgment in Plaintiffs' favor.

28.     Defendant Insurer's obligation to defend and indemnify the Foundation extends for the duration of any litigation against the Foundation, even if such extends beyond the existence of the Foundation.

29.     Despite the fact that the Foundation was formed to execute a Congressional Mission, the Foundation is a private non-profit entity, subject to the laws of the District of Columbia.

30.     Plaintiffs herein were employees of the Foundation, and no other entity.  For all times relevant to the Amended Complaint, they were not and could not be viewed as "federal employees."

31.     Plaintiffs were not paid from the U.S. Treasury and were not subject to federal pay scales or pay practices.

32.     Plaintiffs were not Civil Servants as defined by the Civil Service Reform Act. They  could not avail themselves of federal job protections, were not able to access the Merit System Protection Board to adjudicate their grievances, and were not required to exhaust administrative remedies before bringing tort claims against the Foundation or Commission.

33.     As stated in the First Report to the President published in 2019, "The Commission envisions America 250 (the brand name and commonly accepted alternative to the formal Semiquincentennial) as a monumental initiative—engaging all Americans in the largest and most inclusive celebration and commemoration in our nation's history—with the potential to:

> • Inspire the American spirit to deepen understanding of our history and the democratic process through education; increase engagement in our communities and governing affairs; and foster unity that includes the "many" Americans in our "one" nation;

• Engage nearly 350,000,000 Americans and millions of friends worldwide by 2026;

• Produce more than 100,000 programs engaging participants at the local, territorial, state, tribal, regional, national, and international levels;

• Attract billions of dollars in resources that will ripple through our national, state, and local economies to positive effect, and

• Extend over a multiyear crescendo reaching its peak on the Fourth of July 2026."

34. The Secretary of the Interior selected the American Battlefield Trust (hereinafter "ABT"), through a competitive bidding process, to be the non-profit Administrative Secretariat for the Commission in 2018.

35. ABT served as an operational incubator, handling many of the operational and organizational expenses, and then applied for reimbursement from the Commissions for funds it spent in that capacity.

36. Thus, it was the work of ABT to hire the initial consultants, and set up the initial structures that would eventually launch the Foundation.

37. For example, all the expenses related to the initial Commission meetings were handled by ABT, and then reimbursed by funds distributed from the Commission.

38. In 2019, the Department of the Interior and ABT then entered into a Memorandum of Understanding approving the creation of the America 250 Foundation.  Until that time, all of the initial consultants were retained and paid by ABT.

39. In the Summer of 2020, a forensic audit was conducted by Ernst & Young, with the assistance of Jim Campi (hereinafter "Mr. Campi"), Chief Policy and Communications Officer for ABT, Ruth Hudspeth (hereinafter "Ms. Hudspeth") the Chief Financial Officer for ABT, Dr. Tony Rucci (hereinafter "Dr. Rucci"), the CEO and President of the America 250 Foundation, and

Plaintiff Burchard, which was supposed to unravel the financial transactions between ABT and the Commission, with respect to the creation of the Foundation.

40.     As a result of that audit, it was discovered that ABT overcharged the Commission by approximately $12,167.00.  But since ABT could not write a check to the Commission, it was resolved that ABT would pay that amount as a donation to the Foundation.

41.     In response, ABT insisted that it was not being compensated for sweat equity and in-kind work on behalf of the Commission, alleging that it was instrumental in key operational decisions and programmatic work of the Foundation.

42.     ABT therefore insisted that it was entitled to approximately $300,000 from the Commission in compensation for its operational and supervisory work in setting up and operating the functions and programming of the Foundation.

43.     In the course of discussions and negotiations between Dr. Rucci and Mr. Campi, it was decided that the Foundation would attempt to compensate ABT to the sum of $150,000.

44.     Thereafter, much staff effort was put into divining a mechanism and justification for the Foundation to pay ABT $150,000, which included masking the payment as being related to some form of an America 250 programming partnership.

45.     This attempt at reimbursement slight-of-hand, made Plaintiffs very uncomfortable, and was one of the many issues in which they felt their advice was being ignored and their integrity was being compromised.

46.     For the vast majority of the time in which Plaintiffs were employed by the Foundation, Mr. Campi, an executive with ABT, was sitting in on leadership meetings of the Foundation, was intimately involved in key personnel, marketing and communications decisions, and even participated in hiring of several of the Plaintiffs.

11

47.     So involved was Mr. Campi in the operations of the Foundation, that he was listed as a staff member and had his own staff email address.  No other Board member had a Foundation email address, or was compensated for their work for the Foundation.

48.     In his oversight capacity on behalf of ABT, Mr. Campi was actively involved in reviewing invoices, and even interviewing Foundation employees, as late as December of 2020.  *See* EXHIBIT 5.

49.     Mr. Campi was not conducting Foundation Board business, was not a Board Member of the Commission, and was not paid by the Foundation to conduct any business.

50.     Thus, all of his work was through his ABT role, and was in fulfillment of ABT's oversight obligations.  He was consistently introduced in Commission meetings as the "Secretariat Lead." This is why ABT sought reimbursement for his time.

51.     In March of 2020, the Foundation and ABT began working on plans to transition certain functions to the Foundation and to sunset ABT's oversight role.  The plan called for an amendment to the Foundation by laws, and tri-lateral agreements to define the oversight and management functions between ABT, the Foundation and the Commission.

52.     The plans to do so, however, never fully came to fruition, and such agreements were never signed. Thus, for all times relevant to the Amended Complaint, ABT remained the Administrative Secretariat to the Commission, despite the creation of the Foundation. Current law remains that ABT is the statutorily directed administrative secretariat; while the Foundation has also entered into an agreement to perform administrative secretariat functions.  *See* EXHIBIT 6.

53.     The Congressionally created Commission is a bipartisan group of twenty-four Commissioners, and is composed of the following members: Four members of the Senate of which two are appointed by the Majority Leader of the Senate and two appointed by the Minority Leader

of the Senate. Four members of the House of Representatives of which two are appointed by the Speaker of the House and two are appointed by the Minority Leader of the House.

54.     There are sixteen private citizens serving on the Commission. Four of which have been appointed by the Majority Leader of the Senate, four appointed by the Senate Minority Leader, four appointed by the Speaker of the House of Representatives and four appointed by the Minority Leader of the House, respectively.

55.     None of the Commission members are paid for their services.  Public Law 116-282 provides that the "private citizen" members of the Commission can be removed by a 2/3rds vote of the rest of the Commission members.

56.     Nowhere in the Public Laws does it state, or even suggest, that the private citizen members of the Commission become federal employees by their appointment thereto.

57.     To date, there have only been a handful of meetings of the Commission, and upon information and belief, no Board member has spent more than a dozen hours in a given week on Board business or work.  Commission members are thus not full time employees.

58.     Pursuant to the authorizing statute, one of the private citizen commissioners is to be designated Chairman by the President of the United States. Mr. Daniel DiLella was designated Chairman by President Donald Trump in 2018, and re-designated as Chairman by President Joseph Biden in 2021.

59.     Current voting members of the Commission include:

    a.      Senator Robert Casey, Jr. of Pennsylvania
    b.      (resigned)
    c.      Senator Jeanne Shaheen of New Hampshire
    d.      Senator Patrick Toomey of Pennsylvania
    e.      Representative Robert Aderholt of Alabama
    f.      Representative Dwight Evans of Pennsylvania
    g.      Representative Maria Salazar of Florida
    h.      Representative Bonnie Watson Coleman of New Jersey

    i.      Congressman Robert A. Brady of Pennsylvania (Ret.)
    j.      Ambassador David L. Cohen of Pennsylvania
    k.     Val Crofts of Wisconsin
    l.      Former Congressman Joseph Crowley of New York
    m.    Daniel M. DiLella of Pennsylvania (Chairman)
    n.     Cathy Gillespie of Virginia
    o.     Noah Griffin of California
    p.     Ambassador Amy Gutmann, Ph.D. of Pennsylvania (resigned)
    q.     Andrew Hohns, Ph.D. of Pennsylvania
    r.      Jim Koch of Massachusetts
    s.     Lucas Morel, Ph.D. of Virginia
    t.      Wilfred M. McClay, Ph.D. of Oklahoma
    u.     Former U.S. Treasurer Rosie Rios of California
    v.     James L. Swanson of Washington, D.C.
    w.    Thomas Walker, Jr. of Alabama
    x.     Lynn Forney Young of Texas

60.    The Act also calls for Executive, Judicial, and Legislative branch, and other governmental and non-profit heads to serve as non-voting *ex officio* members of the Commission. Additional governmental departments were added as *ex officio* members of the Commission with the passage of a technical amendment package, Public Law 116-282.

61.    Current *ex officio* non-voting members of the Commission include:

    a.     Secretary of the Interior Deb Haaland
    b.     Secretary of State Antony J. Blinken
    c.     Attorney General Merrick Garland
    d.     Secretary of Defense Lloyd Austin III
    e.     Secretary of Education Dr. Miguel Cardona
    f.      Associate Justice of the Supreme Court Anthony M. Kennedy (Ret.)
    g.     Director of the Institute of Museum and Library Services Crosby Kemper
    h.     Librarian of Congress Dr. Carla Hayden
    i.      Archivist of the United States David Ferriero
    j.      Chairperson of the National Endowment for the Arts Dr. Maria Rosario Jackson
    k.     Acting Chairperson of the National Endowment for the Humanities Adam Wolfson
    l.      Secretary of the Smithsonian Institution Dr. Lonnie Bunch

62.    The Executive leadership of the Commission includes Daniel DiLella (hereinafter "Mr. DiLella") as Chair, Tom Walker as Vice Chair, Rosie Rios as Treasurer and Lynn Young as

Secretary.  Mr. Frank Giordano (hereinafter "Mr. Giordano") serves as the Executive Director of the Commission.

63.    The Executive Director is a paid position, but is not subject to the strictures of Civil Service compensation and employment rules.  The Chair is the only member of Commission leadership (other than the members of Congress) who could conceivably be viewed as a "federal employee."

64.    The remaining "private citizen" members of the Commission, including the Chair, are not federal employees, and thus are not acting in an official capacity when they act on behalf of the Commission, and make decisions that directly impact and/or ratify Foundation decisions and actions.

65.    At the time of the original Complaint's filing, there were ten staff at the Commission, engaged in government relations, administrative, legal, and financial activities.

66.    The Foundation had twenty-nine (29) employees at the time the Complaint was filed, and provides operational and programmatic support to the Commission.  A Master Services Agreement governs the relationship between the Commission and the Foundation.

67.    From the creation of the Foundation until December of 2021, only four women served in executive leadership roles. All four are Plaintiffs in this case. Since the time the first Plaintiff resigned, a total of nine women have resigned in the past few months.

68.    The Foundation Board of Directors was established in 2019. As directed by the Foundation's Bylaws, a majority of the Board must be Commissioners and the Executive Director of the Commission. This Board membership was designed to ensure oversight and the ongoing, collaborative relationship needed between the Commission and the Foundation. The Foundation Board of Directors consists of:

     a.    Lynn Forney Young
     b.    Former Treasurer Rosie Rios

    c.      Ambassador David L. Cohen
    d.      James Campi, as a representative of ABT
    e.      Daniel M. DiLella (Chairperson)
    f.      Representative Dwight Evans
    g.      Frank Giordano
    h.      President/CEO Joseph C. Daniels
    i.      Tom Walker
    j.      Dalila Wilson-Scott

69.    From its inception, the Foundation's General Counsel has been Thomas McGarrigle of the law firm Reed Smith, LLP.

70.    From its inception, the Commission's General Counsel has been Joseph Del Raso of the law firm Troutman Pepper, LLP.

71.    Mr. Del Raso and Mr. McGarrigle have been the only counsel allowed in most Chairman or Executive Director level decision-making meetings, and conferences of the Foundation and the Commission.

72.    Former Treasurer Rios (hereinafter "Defendant Rios") serves as the Chairman of the Commission Finance Committee and the Foundation Audit and Finance Committee.

73.    Ambassador David Cohen (hereinafter "Commissioner Cohen") serves as the Chairman of the Social Responsibility Committee of the Foundation, and the Chair of the Development Committee of the Commission with oversight of corporate sponsorships.

74.    Dr. Rucci served as the President and CEO of the Foundation and hired each of the Plaintiffs. He resigned from the role of CEO in March 2021, but continues as a *pro bono* senior advisor to the Commission and Foundation. He led the search process for his replacement CEO at the direction of Mr. DiLella and Mr. Giordano, and currently serves as a member of the Commission Finance Committee.

75.    In March of 2021, Scott Hommel was appointed Interim President and CEO of the Foundation upon Dr. Rucci's resignation. He has served as COO for the entirety of his tenure at America 250.

76.    Plaintiffs assert that they have very little access to the Commissioners, and were specifically instructed by both Mr. Daniels and Mr. Hommel that they were not to go directly to the Commissioners with concerns about the Foundation.   Nevertheless, when they had the opportunity, Plaintiffs raised their concerns with the Commission, and were repeatedly told by Mr. Hommel that he shared their complaints and concerns with the leadership of the Commission.

77.    All positions of actual power and authority at America 250, from the time of its inception through resignation of Plaintiffs, have been held exclusively by men, including but not limited to: the Chair, Vice Chair, Executive Director, and General Counsel of the Commission; and the Chair, Vice Chair, CEO, COO, SVPs, Chief Development Officer, Chief Communications Officer and General Counsel of the Foundation. This disparity created value gaps inconsistent with America 250's public facing representations.

78.    Instead of executing a nationwide search for a diverse candidate via a specialized diversity search firm, as had been promised to staff and the American public, Chairman DiLella asked Dr. Rucci to spearhead the search, with himself and Mr. Giordano rounding out the all-male search committee.

79.    Counter to America 250's public position, the CEO position was given to a white male personal friend and associate of Commissioner Rios.  No women were in the final group of candidates advanced from the search committee to the Executive Committee for interview and consideration.

80.     The Foundation's Executive Committee subsequently hired Joe Daniels (hereinafter "Mr. Daniels") as its new President and CEO in October 2021.

81.     To address the concerns about diversity at the Foundation, and to appease those on the Commission who were unhappy about the hiring of Mr. Daniels, an African American male was hired as the Senior Vice President at the Foundation, at the same time as Mr. Daniels was hired.

82.     Importantly, the SVP position was created in secrecy and never posted or publicized in way, in order for any of the Plaintiffs to have been able to apply for it.

83.     At the time there was no SVP position in the organizational structure or approved budget of the Foundation, and the new SVP was not given any specific duties or even a job description. He was, however, given a higher salary and title than each of the Plaintiffs.

84.     Plaintiffs clarify and assert that had they been informed of an SVP opening, and had the position been posted, with a list of duties, they would have applied for the position, because each was functioning at the SVP level, albeit without the title or the pay.

85.     When Plaintiffs raised concerns about the hiring of someone without any specific duties, they were each told that the new SVP was hired as a political favor, and that it was a trade-off for hiring a white male CEO.

86.     Plaintiffs were offended and flabbergasted at the obvious contempt displayed for diversity by Foundation leadership, and the tokenism at work in hiring the new SVP, even if he could potentially grow into a valuable contributor.  Their concerns were ignored by Foundation and Commission leadership.

87.     Over the course of 2021, the Foundation began ramping up for its national brand launch, and in the Summer of 2021, dozens of contracts were in the pipeline for review and execution. The volume of the workload on Plaintiffs was enormous.  All Plaintiffs were regularly working

late into the evenings, and on weekends.  All Plaintiffs repeatedly asked for additional staff support and resources to handle the workload.

88.     Plaintiffs' workload issues were compounded by the fact that they were all forced to take on duties that were supposed to be carried out by male colleagues.  The factual paragraphs below outline the ways in which Plaintiffs were expected to complete the additional workload of their male colleagues.

89.      As the volume of Foundation contracts increased, so too did Plaintiffs' concerns with respect to many of the contracts.  Plaintiffs observed that several of the contracts were with entities with which Mr. DiLella and Mr. Giordano had personal dealings or relationships that created a potential conflict of interest and/or had questionable prices and services.

90.     In addition, Plaintiffs observed that several contracts with entities with which Mr. DiLella and Mr. Giordano had personal dealings or relationships that were initially fashioned as "*pro bono*" contracts to evade the Foundation's RFP process but then morphed into lucrative paid contracts with no oversight.  Despite hundreds of thousands in expenditures being spent from the budget on those service contracts, they were nevertheless being described as "*pro bono*."

91.     As an entity disbursing federal funds, the Foundation put in place a process by which it abided by federal contracting and procurement regulations that ensured competitive bidding and avoided waste of government resources.  Repeatedly, when Plaintiffs attempted to raise concerns about a contract because the pricing was inexplicable, or because the bidding process was improper, they were shut down by senior leadership.

92.     Mr. McGarrigle was part of a small group of decision-makers (hereinafter "the Chairman's Group") of the Foundation, which was made up of Mr. DiLella, Mr. Del Raso, Mr. McGarrigle,

Mr. Daniels, Mr. Hommel and Mr. Giordano, the Executive Director of the Commission and Foundation Board member.

93.     On information and belief, Mr. Giordano and Mr. DiLella are long-time associates and close personal friends. Mr. DiLella is the former Chairman of the Board, and current Board member of the "Philly Pops" orchestra, and Mr. Giordano is the current President and CEO of the Philly Pops.  Mr. Del Raso is the current Chairman of the Board of the Philly Pops.

94.     On information and belief, all four men, Mr. DiLella, Mr. Del Raso, Mr. McGarrigle and Mr. Giordano are all members of the Union League of Philadelphia, where they have conducted business and meetings on behalf of America 250.

95.     Not only were Plaintiffs ignored when they raised concerns about noncompliance, fraud, waste and abuse, but they were retaliated against.  The retaliation took the form of excluding them from further meetings about the contracts at issue, undermining and humiliating them with their colleagues and subordinates, and denigrating their work, all of which cumulatively created a hostile work environment.

96.     The ongoing hostility Plaintiffs were made to endure, and the incessant conflict over potentially unlawful and plainly unethical contracting practices, caused Plaintiffs extreme emotional and psychological duress.  They each, individually, and of their own accord, believed the work environment was so hostile and treacherous, that they chose to resign rather than be forced to continue working at an organization engaging in unethical practices.

97.     All Plaintiffs assert that they attempted to inform senior and executive leadership that some of the Foundation's activities were noncompliant, potentially unlawful and/or detrimental to the mission, and that in doing so, they were acting as whistleblowers, attempting to prevent fraud, waste and abuse of federal funds.

98.    All Plaintiffs assert that in addition to being retaliated against, shunned, isolated, humiliated and undermined because of their activities as whistleblowers, they were also subjected to a hostile work environment because of their gender.

99.    All Plaintiffs assert that the Chairman's Group acted as a "boys club," freezing out the women who were given titles and large responsibilities, but no authority or input into key decisions of the Foundation.

100.    Plaintiffs assert that when they attempted to be included in such decision-making, they were shut-down, ignored, and retaliated against.

101.    Plaintiffs assert that the following men were paid more than they were for similar duties: Scott Hommel, Matt Schatzel, Michael Frazier, Kyle Anderson, and Jesse Askew.

102.    The person who replaced Plaintiff Laymon, Glen Stack, was paid thirty thousand ($30,000) more than Plaintiff Laymon, and was made the off on the day after Plaintiff Laymon notified the Foundation that her resignation was in part, due to serious gender discrimination and inequity.

103.    Plaintiffs assert that they were routinely subjected to a work environment where the women were held to a harsher and more taxing standard than the men.

104.    Plaintiffs assert that the male employees of the Foundation were given more favorable terms and conditions of employment, including in setting their own schedules and hours, and were not held to the same disciplinary standards as the women.

105.    Since Plaintiff Laymon resigned, a total of nine (9) women have resigned in nine (9) months, representing approximately a third of the total staff of the Foundation.

106.    Upon information and belief, the Foundation is offering male employees who are separating from the Foundation severance and/or consulting contracts, that it is not offering women in the same or similar circumstances.

**FACTS RELEVANT TO PLAINTIFF BURCHARD'S CLAIMS**

107.    Plaintiff Burchard references and incorporates all of the allegations in the preceding paragraphs as if fully restated herein.

108.    Plaintiff Burchard was first hired in April of 2020 as a contract consultant to the Foundation.  She was originally hired to provide support to the CEO and COO.  As Dr. Rucci, Mr. Hommel, and Mr. Giordano began to see the scope of her competencies, she was quickly assigned additional roles and duties.

109.    Plaintiff Burchard set up all of the finance, accounting, HR/payroll and organizational structure, policies and procedures, and operations of the Foundation.

110.    On or about September 1, 2020, Plaintiff Burchard, as well as several other contract consultants, became full-time salaried employees of the Foundation.  At that time, there were a total of eight (8) employees.  Plaintiff Burchard's role was in administration and operations,  but there were no official titles yet.

111.    In February of 2021, Plaintiff Burchard was given the official title of Chief Administrative Officer, with the continued responsibility of executing the administrative functions of the Foundation.

112.    Once again, however, she was performing additional responsibilities far beyond the scope and scale of her stated duties, including banking and finance, operations, compliance, and HR, as well as setting up the development function of the foundation and directing the development consulting firm and directing the new messaging agency contract and leading the organization through the organizational structure process and an overall strategy plan over the summer of 2021.

113.    In addition to all of her work and responsibilities at the Foundation, Plaintiff Burchard also ran all of the federal administration, operational, HR, finance and back-office functions of the Commission until November 2021.

114.    She wrote federal job descriptions, handled all GSA communications and related activities, and co-developed and presented the Commission organizational structure and staffing options.  Plaintiff Burchard was never compensated for her work for the Commission.

115.    Plaintiff Burchard began to have serious concerns about the functioning of the Foundation when it became clear that despite weekly meetings of executive staff to make important decisions, all final decisions were actually made by the Chairman's Group, and reported back to the staff by Mr. Hommel as *fait accomplish*. These decisions were made without the input, opinions, concerns and work of staff that were experts in their fields.

116.    Frequently, the final decisions of the Chairman's Group resulted in a benefit to an entity, person or group with direct personal ties to members of the Chairman's Group or specific Commissioners without consideration of the overall mission and strategy.

117.    For example, on information and belief, the partners of the 21 Marketing were personal friends and associates of Mr. Giordano. The firm was brought on as a contractor for the procurement of corporate sponsorships, without any RFP or open competition for the role.  Their contract required that they hit key benchmarks in the generation of corporate revenue by certain dates.

118.    Despite not even coming close to those benchmarks and badly underperforming, and being given an extension of time to produce under the contract, by the Spring of 2021, it became clear that the 21 Marketing could not produce the corporate revenue necessary for Foundation programming.

119.    Even worse, multiple potential corporate partners expressed to Plaintiff Laymon that they did not want to work with or communicate with the partners of 21 Marketing ever again.

120.    Despite the termination of their contract, and the communication from Mr. Hommel to 21 Marketing that their contract would end on June 30, 2021, due to lack of results, Mr. Giordano and Mr. McGarrigle personally interceded on behalf of 21 Marketing to reinstate their contract.

121.    Furthermore, Mr. McGarrigle and Mr. Giordano had several potential corporate partners carved out of the termination arrangement, so that 21 Marketing would get paid 17% of those lucrative contracts without being involved in the solicitation or negotiation of these other successful partnership contracts.

122.    These were the exact corporations that said they didn't want to work with or communicate with 21 Marketing ever again.  They only wanted to communicate directly with us at America 250. So 21 Marketing would be getting paid for work they didn't do and for work that they actually almost lost due to their involvement in the first place.

123.    The only corporate partnership that 21 Marketing produced was a $10 million contract with Facebook that violated multiple Foundation strategies and policies, and was predicated on what Plaintiff Burchard was concerned was a potentially unlawful quid-pro-quo.

124.    In a verbal agreement, America 250 promised Facebook access to the National Park Service relationships that would allow the company the opportunity to launch a drone-based mapping project for its own business purposes, under the pretense that it would be a program of America 250.

125.    Moreover, total control of the announcement and publication of the America 250's partnership with Facebook was reserved to them, to be used for its own purposes, when it deemed it appropriate and timely.

126.    When Commissioner Cohen gave his formal development report to the Commissioners in September 2021, he stated that Facebook would control the timing of the sponsorship announcement and asked the Commissioners to keep information internal.

127.    The contract with Facebook also contained a vast and highly restrictive non-compete provision that prohibited the Foundation from contracting with any entity that might be competitive with any of its seventy (70) plus brands, across dozens of markets and industries, thus utterly hamstringing the Foundation's ability to contract with multiple potential companies.

128.    This restrictive covenant was in direct opposition to the goals and plans of the Foundation to partner with American companies in each economic industry/sector.

129.    Mr. McGarrigle and Mr. Giordano, with the approval of Mr. DiLella, inserted themselves to protect the financial interest of 21 Marketing, which would receive 17% of the contract with Facebook, over the vociferous and well-founded objections of the Foundation staff, who were tasked with making sure the Foundation was able to maneuver and make new contracts and relationships to fulfill its purpose.

130.    McGarrigle, Giordano and DiLella had acting CEO Scott Hommel sign the contract without any of the senior staff knowing about it and not signing it through the usual process with Docusign initiated by Plaintiff Burchard.

131.    Other examples of Mr. DiLella and Mr. Giordano skirting the competitive bid process include, but are not limited to, the retention of Troutman Pepper, Reed Smith, M&T Bank, Ernst & Young and Maven Communications.

132.    Mr. Daniels has also improperly inserted himself into contracting with the Foundation by bringing on McKinsey & Company, again without using a competitive or transparent process, and

without disclosing that Mr. Daniels, himself, is affiliated with McKinsey & Company presently as a senior advisor, and thus has a potential conflict of interest.

133.    All of the firms connected to Mr. DiLella, Mr. Giordano, and Mr. Daniels start as *pro bono* contracts, thus evading the America 250 competitive bid process, and then conveniently convert into a lucrative sole source contract due to their extreme knowledge base of the organizations and mission.

134.    Repeatedly, Plaintiff Burchard raised her concerns about these and many other questionable, wasteful, expensive, duplicative, or problematic contracts with Mr. Hommel and Mr. Daniels, but to no avail.

135.    In July of 2021, Mr. Askew, was tasked with making a presentation to Bank of America.  The presentation went badly, and as a result, Mr. Hommel tasked Plaintiff Burchard and Plaintiff Laymon with producing presentations and proposals to Walmart, The Home Depot, and Bank of America, to reflect the Foundation's programming plan.

136.    They were to present the corporate partner strategy that was approved in the beginning by Mr. DiLella, Mr. Giordano, and Commissioner Cohen wherein each corporation would be given industry/sector exclusivity for a total $10 million contribution. With over 30+ sectors, this strategy was set to produce more than $250 million for America 250.

137.    Both Plaintiff Burchard and Plaintiff Laymon insisted that Mr. Hommel inform Mr. Askew about this reassignment of tasks, so it was clear that this change was at Mr. Hommel's request. He agreed to do so immediately.

138.    Mr. Hommel failed to inform Mr. Askew of the reassignment, allowing him to believe that Plaintiff Burchard and Plaintiff Laymon had undermined him of their own volition.  From that

point forward, Mr. Askew was defamatory, rude, hostile, taciturn, uncooperative and disrespectful of both Plaintiff Burchard and Plaintiff Laymon.[2]

139.    In multiple meetings, Mr. Hommel and Mr. Giordano witnessed Mr. Askew's unprofessional, defamatory, denigrating and humiliating behavior towards Plaintiffs Burchard and Laymon, and said nothing.  When Plaintiffs Burchard and Laymon reported their concerns about the way they were being treated by Mr. Askew, Mr. Hommel again took no action.

140.    On another occasion, Plaintiff Burchard was retaliated against because she raised an issue with respect to possible employee fraud by Mr. Askew.  In early September of 2021, Plaintiff Burchard investigated an expense reimbursement request submitted by Mr. Askew that contained unreasonable expenses and improperly involved Plaintiff Potts in the false justification for the reimbursement.

141.    Upon her investigation, she discovered the request for reimbursement was based on a flatly false representation, which is a terminable offense. This was not the first time that Plaintiff Burchard had brought improper expense reports to Mr. Hommel's attention.  The improper expense reports ranged from unapproved expenses, unreasonable expenses, no itemized receipts, to no receipts at all.

142.    As Chief Administrative Officer, Plaintiff Burchard had been actively involved in drafting personnel policies and training the staff, and knew that employee false statements was a terminable offense.

143.    The HR specialist with Insperity recommended that Mr. Askew be terminated without severance.  When Plaintiff Burchard recommended that Mr. Askew be terminated, Mr. Hommel began to retaliate against her by screaming at her, and later telling Plaintiff Burchard that if that

---

[2] Upon information and belief, Mr. Askew was separated from the Foundation prior to the instant filing.

decision was approved that she would have to do it herself, isolating her, and escalating hostility in meetings and phone calls.

144.    Despite the concerns raised by Plaintiff Burchard, Mr. Askew was never informed of any of the issues from his expense reports by Mr. Hommel. From early September until mid-October, Mr. Hommel and Mr. Daniels failed to notify Mr. Askew that his expense reports were problematic, leaving Plaintiff Burchard alone in having to deal with it. This issue sat unresolved by Mr. Hommel, his supervisor.

145.    The situation devolved to the point that Plaintiff Burchard informed the incoming CEO, Mr. Daniels, that she would rather resign than enable fraudulent behavior.  Mr. Daniels asked Plaintiff Burchard not to resign, and instead to give him a chance to resolve the situation. He promised resolution before his first official day as CEO, which was to be in four days.

146.    Immediately upon finding out that Plaintiff Burchard had spoken with Mr. Daniels about the employee misconduct, Mr. Hommel called Plaintiff Burchard and railed at her in a threatening, demeaning and denigrating way, asking her "why she wanted to burn down the village."

147.    Despite Mr. Daniels' representations to Plaintiff Burchard, he chose to do nothing about Mr. Askew's submission of false expense reimbursement requests.

148.    Rather than take seriously Plaintiff Burchard's concerns, as a senior and vital member of his staff, Mr. Daniels and Mr. Hommel started to push Plaintiff Burchard even further out from the decision-making process.

149.    On or about October 7, 2021, Mr. Daniels had a call with Plaintiff Burchard in which he asked her to act as his personal secretary by taking notes, keeping him on task, keeping his calendar and shadowing him throughout the day.  He said during the phone call that Plaintiff Burchard "needed to learn how to serve him".

150.    In response to Mr. Daniels' request, Plaintiff Burchard outlined for Mr. Daniels what her responsibilities actually were, the volume of work she did as part of her duties, and the portion of Mr. Hommel's and Mr. Giordano's duties that she actually carried out.

151.    Plaintiff Burchard indicated that if she were to take on the personal secretary role that Mr. Daniels had envisioned for her, she would have to be relieved of a substantial portion of her current workload.

152.    When Plaintiff Burchard suggested that Mr. Hommel take on some of the duties that Mr. Daniels envisioned, since Mr. Hommel clearly had the time, Mr. Daniels declined, citing a concern for Mr. Hommel's feelings. Yet he clearly did not have the same concern regarding "feelings" in making the request of Plaintiff Burchard, because of her gender.

153.    From that point forward, Mr. Daniels evaded Plaintiff Burchard, refused to speak with her, excluded her from meetings and made clear that she was out of his favor, even telling her that he had "animosity" toward her since their first phone call.

154.    On or about December 1, 2021, on a senior team zoom call, Mr. Daniels announced an entirely new programming plan and timeline for the Foundation titled "Roadmap," with an ambitious funding schedule.

155.    At one point in the PowerPoint presentation, Mr. Daniels asked the team for any feedback with respect to obstacles or setbacks related to the plan. As the person with the most experience and knowledge about the federal procurement, funding and contracting cycle, Plaintiff Burchard raised concerns about the timeline not being realistic with respect to the federal appropriations calendar, saying that tightening the timeline by even six months could be beneficial.

156.    Instead of taking Plaintiff Burchard's feedback as the valuable and necessary information it was, in front of the entire team, Mr. Daniels berated Plaintiff Burchard as "not a team player," and castigated her for undermining his plan, and said she didn't belong on his team.

157.    When Plaintiff Burchard tried to explain that she was simply pointing out a substantial and critical roadblock, as she felt she was obligated to do, she was again personally attacked and humiliated in front of her colleagues and forcefully told that the two of them would discuss the matter on a later call.

158.    Later on, Mr. Hommel called Plaintiff Burchard to criticize her for speaking up in the meeting, although he said that he did not disagree with the substance of Plaintiff Burchard's comments.

159.    Several other senior management team members called her to see if she was okay, stating that they had never seen anyone treat a colleague with such disrespect and so unprofessionally as Mr. Daniels did to her.  They all said that is why they don't speak or ever give feedback that could be seen as negative by Mr. Daniels.

160.    The following day, Plaintiff Burchard reached out to Mr. Daniels to follow-up with him, as he demanded.  In it, Mr. Daniels made several sexist and offensive comments, including asserting that Plaintiff Burchard was insufficiently loyal to him and his personal success, and accusing Plaintiff Burchard of not being sufficiently deferential in the way she spoke during the meeting, claiming that "there is a way that bosses liked to be talked to."

161.    When Plaintiff Burchard stated that her loyalty was as a fiduciary of the Foundation, Mr. Daniels clarified that her answer did not suit him, and that he wanted her to be loyal to him personally above the Foundation.

162.    Mr. Daniels further stated that he had disliked Plaintiff Burchard from their first phone call because she had stated she was willing to resign instead of enabling false statements and misconduct.

163.    Mr. Daniels specifically expressed that in his view, standing on principle, as Plaintiff Burchard was doing, signified that she was not a "team player."  Mr. Daniels also told Plaintiff Burchard that he heard things differently when she spoke.

164.    For instance when she said that she was concerned about the timeline not leaving any room for issues that might delay any steps, Mr. Daniels stated that what he heard was that his previous success was not good enough and that she was not giving him the benefit of that tremendous success.

165.    Plaintiff Burchard asserts that Mr. Daniels never spoke to any male employee in such a manner, that his assertion of what was said vs. how he internalized it and that his demand of personal loyalty was predicated on a chauvinistic and sexist attitude towards female employees.

166.    On another occasion, Plaintiff Burchard was again placed in an untenable situation. Because Plaintiff Burchard was the staff person who paid invoices, she was directed by her superiors to pay more than $30,000 worth of invoices submitted by Mr. Askew for which there were no contracts and no proof that work had been done.

167.    This was not the first time that Mr. Askew had presented invoices out of nowhere.  Earlier in June, he had presented an invoice for G Haze for radio mentions that had never been discussed, budgeted or contracted.  Mr. Hommel did not approve that invoice to be paid.

168.    Mr. Askew and all staff were trained on the policies and procedures for department plans, budgets and contracts.

31

169.    Plaintiff Burchard had already expressed her concern and disapproval of these over $30,000 of invoices because there were no records or contracts to justify the payment, and payment would be contrary to process and procedures approved by the Audit and Finance Committee of the Foundation.

170.    Despite the concerns she and Plaintiff Garlock raised about the impropriety of paying such invoices, Mr. Hommel and Mr. Daniels insisted that the invoices be paid, and told Plaintiff Burchard that she just had to do what she was told.

171.    Plaintiff Burchard would have had to break policies and procedures and direct the Director of Finance to as well.  This would have created an issue for the auditors as well as for the Audit and Finance Committee as well as the reimbursement process for Treasury money.

172.    In response to the September Commission meeting, in October, Dr. Rucci was spearheading a process to write a progress report for the Foundation to be presented to the Commissioners that would include financial information as well as programming and communication information.  Mr. Rucci pulled together a group to work on this that included Mr. Campi.

173.    As late as December of 2021, Mr. Campi's sign off was still required on Foundation financial reports and matters, because he remained in his ABT oversight role.

174.    Plaintiff Burchard was the key and only person that could make any payments from the Foundation accounts and the key and only person that created reimbursement requests for the Commission from June 2020 until November 2021.

175.    Plaintiff Burchard reported her concerns to Mr. Hommel and Dr. Rucci several times before she resigned. She was told by Mr. Hommel that although he didn't particularly like Mr. Daniels style either, we were all going to have to get used to it since he was the new boss.

176.    Plaintiff Burchard reached out to Dr. Rucci several times in the weeks before she resigned to report to the Commission what was going on, and he said he knew very well the problems at the Foundation and Commission because he was being overwhelmed with calls by staff.

177.    He stated that both Mr. DiLella and Mr. Giordano knew of the untenable situations and were working on a solution.  I made it clear to both Mr. Hommel and Dr. Rucci that I was being asked to participate in activities that I knew were unethical and illegal and ultimately would not do it.

178.    Plaintiff Burchard never had access to Chairman DiLella, Commissioner Rios and Commissioner Cohen. She was directed to not reach out to them directly but to always go through the CEO.  As the fiduciary officer of the Foundation and as the single person working on reimbursements from the Treasury account, she never had any one on one or small group meetings with Commissioner Rios.

179.    In the time that Plaintiff Burchard worked for the Foundation and set up the accounts on Quickbooks, Commissioner Rios never asked for a Quickbooks generated report or asked for access to Quickbooks or the bank accounts.  She relied on excel spreadsheets and PowerPoint slides.

180.    Commissioner Rios never requested or had any meetings with the finance team at Ernst & Young, as the Plaintiffs were working on and preparing the financial reports for 2018-2021.

181.    Once it became clear that Plaintiff Burchard was going to be forced to pay what she believed were fraudulent invoices, she determined that she had no choice but to resign.

182.    Plaintiff Burchard resigned on or about December 6, 2021.

## FACTS RELEVANT TO PLAINTIFF GARLOCK'S CLAIMS

183.     Plaintiff Garlock references and incorporates all of the allegations in the preceding paragraphs as if fully restated herein.

184.     Plaintiff Garlock was at first retained as a part-time consultant by the Foundation in March of 2021, and hired as the Chief Legal Officer of the Foundation on or about August 15, 2021.  She is an attorney licensed to practice law since 1991.

185.     When Plaintiff Garlock was first interviewed by Dr. Rucci in February of 2021, he stated that as the Foundation had matured and began to assume most of its operational responsibilities for America 250, the volume of legal needs had significantly increased, which gave rise to potential for conflicts and workload issues.

186.     He further explained that the Foundation had a desperate need for processes and policies to be developed to ensure against conflicts of interest and allow for competitive bidding and diversity in all Foundation efforts.

187.     Plaintiff Garlock was initially offered the position of General Counsel to the Foundation despite the fact that the Foundation already had a General Counsel, Mr. Thomas McGarrigle.

188.     Dr. Rucci explained that while it was his plan to terminate Mr. McGarrigle's services and replace him with an in-house General Counsel, this was an extremely sensitive situation as both current General Counsels, Mr. Del Raso (Commission) and Mr. McGarrigle (Foundation) were personal friends with both the Commission Executive Director Giordano and Chairman DiLella.

189.     Not wanting to be in the middle of a sensitive situation, Plaintiff Garlock declined the General Counsel role but instead agreed to a short-term, part-time consultancy to define the needs, roles, and responsibilities of legal support for the Foundation.

190.    Two weeks after being brought on as a consultant, on March 18, 2021, Dr. Rucci resigned from the Foundation while the COO, Mr. Hommel, was appointed Interim CEO and Mr. McGarrigle remained General Counsel of the Foundation.

191.    As work within the Foundation was reaching a fever pitch during the "Summer Brand Launch" of America 250, Plaintiff Garlock was offered and accepted the full-time position of Chief Legal Officer in August of 2021, reporting directly to the CEO.

192.    This position was a peer to the other senior leadership Vice Presidents at the Foundation. Additionally, Mr. Hommel represented to Plaintiff Garlock that in accepting the position, she would also be compensated commensurate with her VP peers, which was in large measure why Plaintiff Garlock accepted the position.

193.    As explained by Mr. Hommel, until a time when a General Counsel would serve in-house, Plaintiff Garlock's role was distinct from that of General Counsel McGarrigle: she was to provide legal and business advice to the Foundation and report to the CEO. Mr. McGarrigle retained overarching responsibility; reporting directly to Mr. Giordano with the responsibility of attending the weekly Chairman's Group meetings. He also represented the Foundation at Board of Directors meetings.

194.    On information and belief, the deep personal ties between Mr. McGarrigle, Mr. Del Raso, Mr. DiLella, and Mr. Giordano were of a nature such that Mr. McGarrigle and Mr. Del Raso had an interest in personally protecting Mr. Giordano and Mr. DiLella.

195.    On numerous occasions, Plaintiff Garlock was informed that the Commission and the Foundation relied heavily on the counsel of Mr. McGarrigle and Mr. Del Raso, and that it would take no action without their sanction and approval.

196.    Moreover, on many issues of importance to the enterprise, Mr. McGarrigle and Mr. Del

Raso communicated directly with Mr. Giordano and Mr. DiLella, thus circumventing Plaintiff

Garlock, and acting outside of the typical confines of retained outside counsel.

197.    To the extent that Mr. McGarrigle and Mr. Del Raso were providing advice that

contradicted the advice provided by Plaintiff Garlock, or provided counsel without Plaintiff

Garlock's knowledge and participation, they were acting as business leaders rather than legal

counsel, and their work in that capacity is therefore subject to discovery.

198.    Plaintiffs assert that neither the attorney-client privilege, nor the attorney work product

privilege attach to work in furtherance of future potential unethical, non-compliant, or unlawful

conduct, and thus, that much of Mr. McGarrigle and Mr. Del Raso's work in providing advice and

justification to the Foundation and Commission regarding matters subject of this suit is subject to

discovery.

199.    Plaintiff Garlock had limited exposure to the Foundation's Board of Directors and was not

included in the executive leadership meetings regarding overarching operations, directions,

strategy, or other matters concerning the Foundation and/or Commission.

200.    As she became more familiar with Foundation activities, Plaintiff Garlock began to voice

her concerns regarding contemplated agreements, policies and practices of the Foundation, as well

as those which predated her tenure at the Foundation, for a variety of reasons. As issues of concern

were either discovered or were raised to Plaintiff Garlock by Foundation staff, she brought those

concerns and/or objections to the COO, the CEO or other senior leaders of both the Foundation

and Commission, in an attempt to mitigate legal risks where possible.

201.    Plaintiff Garlock's role as Chief Legal Officer immediately changed once Mr. Daniels was

hired as CEO. Plaintiff Garlock was no longer able to provide the benefit of an in-house counsel's

independent opinion on proposed transactions, avoiding conflicts of interest, or mitigating emerging risks. Plaintiff Garlock could only present legal matters in a summarized form during a tightly scheduled, 30-minute one-way "briefing" once per week. Often, Mr. Daniels canceled even that minimal opportunity for Plaintiff Garlock to provide her input and advice.

202.    Despite Plaintiff Garlock's repeated efforts to meet with Mr. Daniels, and although he is an attorney himself, Mr. Daniels expressed little interest in learning about the Foundation's many legal obligations.

203.    Rather than to spend time learning about the Foundation's pressing legal issues, Mr. Daniels instead instructed Plaintiff Garlock to immediately focus all of her attention on one discreet matter: dramatically expanding the size of the Foundation Board. Mr. Daniels' myopia on this issue went so far that he told Plaintiff Garlock that he would hold her personally responsible for achieving his goal, despite a possible personal conflict of interest.

204.    Plaintiff Garlock tried to explain to Mr. Daniels her legitimate legal concerns about seeking this change in the Foundation Board, and tried to inform him of previous discussions with the Commission staff and executive leadership about this idea.

205.    Several discussions ensued on this topic and Mr. Daniels became increasingly hostile toward Plaintiff Garlock as he did not appreciate her considering the views of the Commission regarding any legal opinions she presented to him, especially if they appeared to be at odds with his own views.

206.    Plaintiff Garlock had to repeatedly explain to Mr. Daniels that as a sole-supporting nonprofit organization and a vendor to the Commission, the Foundation only existed at the pleasure and authority of the Commission, and that their views were critical and determinative in everything the Foundation did.

207.    Mr. Daniels became increasingly hostile to Plaintiff Garlock and started to retaliate against Plaintiff Garlock by isolating her and refusing to meet or engage with her on other legal issues, thus dramatically impacting her ability to do her job.

208.    He began withholding key resources or information from her; removing/excluding her from meetings or going around her; denigrating her substantial work that was previously approved by General Counsel and other executive leadership; and undermining her role with the Foundation.

209.    Plaintiff Garlock soon found that she was completely foreclosed from executing her duties, circumvented and undermined at every turn, and left in a position where she was counsel in name only to the Foundation.

210.    Over the next few weeks, Plaintiff Garlock began to notice that Mr. Daniels appeared only to accept and value the acquiescent opinions and input of the male senior leadership team members.

211.    They were rewarded with Mr. Daniels' professional (and personal) time and attention while he became openly hostile toward Plaintiffs Garlock and Burchard for fulfilling their compliance and regulatory roles, which sometimes included rendering professional opinions that may have been contrary to his desires, yet were still in the best interest of the Foundation.

212.    Plaintiff Garlock raised these issues with the COO, Mr. Hommel, asking for help with the hostile environment created by Mr. Daniels. Mr. Hommel expressed concern over what he saw happening and asked that Ms. Garlock 'hang in there' and shared that he was essentially underwater himself supporting Mr. Daniels.

213.     Mr. Hommel stated that Mr. Daniels was the boss now, and since he (Mr. Hommel) also needed to keep his own job, he suggested she simply agree to whatever he asked her to do. He stated that due to the hiring of the SVP for political reasons, he would ensure that the rest of the

women VPs would have their compensation plans readjusted once he was onboard as he understood the disparity. That never occurred.

214.    On or about December 1, 2021, Plaintiff Garlock met with Mr. Daniels and raised her concerns with him that he appeared only to accept and value the opinions and input of male colleagues as they agreed to everything Mr. Daniels proposed, without question.

215.    She reiterated that she saw them being rewarded with Mr. Daniels' time and attention on issues pertinent to their departments, while her role as Chief Legal Officer providing critical analysis was limited. Her objective was to bring his biases to his attention in order to repair the relationship, so she could effectively provide legal counsel where most appropriate.

216.    Mr. Daniels responded to Plaintiff Garlock that this was not a 'male-female issue' but then continued by making sexist remarks about how "the men knew how to work with him" and that she should use her "emotional intelligence" to learn to communicate to Mr. Daniels as "a person deserving of respect," among other statements.

217.    Mr. Daniels also stated in this meeting that he would not honor the salary commitments made by Dr. Rucci and Mr. Hommel to her as those pre-dated his arrival and would instead determine her value to him personally as time went on.

218.    Mr. Daniels further stated that while he knew Plaintiff Garlock was committed and loyal to the Foundation, he stated that he needed her to pledge her *personal loyalty to him*, and be loyal to his individual success – or there would be no place for her on his team.

219.    Plaintiff Garlock made it clear to Mr. Daniels that as the Foundation's Chief Legal Officer, she represents the Foundation and not him personally as the CEO. She felt this demand put her in the untenable position of potentially violating her fiduciary obligations.

220.    On or about December 6, 2021, Plaintiff Burchard resigned from the Foundation, and sent a letter outlining reasons for her immediate resignation which included numerous allegations of mismanagement, waste, fraud and abuse, hostile work environment, discrimination, and retaliatory conduct by Mr. Daniels and others.

221.    Plaintiff Burchard's letter alleged several concerns and/or incidents that Plaintiff Garlock could not refute, as she also knew them to be true.

222.    Plaintiff Garlock knew that it would be a violation of ethics and professional conduct guidelines for her to have to respond to Plaintiff Burchard's letter on behalf of the Foundation by denying the truth of the matters asserted therein.

223.    Faced with the situation of having to lie to Commissioners or members of Congress to execute her duties, Plaintiff Garlock felt that she had no choice but to resign her employment because she could not engage or help promote unethical or potentially illegal conduct.  Instead, on or about December 8, 2021, Plaintiff Garlock resigned from her position as Chief Legal Officer to the Foundation.

224.    In final fulfillment of her fiduciary responsibilities to the Foundation, Plaintiff Garlock wrote to General Counsel McGarrigle recommending an independent investigation into the allegations in Plaintiffs Laymon, Potts, and Burchard's resignation letters.

**FACTS RELEVANT TO PLAINTIFF POTTS' CLAIMS**

225.    Plaintiff Potts references and incorporates all of the allegations in the preceding paragraphs as if fully restated herein.

226.    Plaintiff Potts holds a bachelor's degree and master's degrees and has more than 20 years of corporate communications experience.

227.    Plaintiff Potts joined the Foundation in March of 2021.  Three days later, the then Foundation CEO, Dr. Rucci resigned.  Plaintiff Potts was initially told by Dr. Rucci that he was resigning for health reasons, but she would come to learn that the resignation was to make room for a senior leader at the Foundation who was supposedly going to be a diverse candidate selected through a rigorous and transparent process.

228.    As part of her new duties, Plaintiff Potts wrote a press release about Dr. Rucci's resignation as CEO, and how the search would "utilize industry best practices to identify a truly diverse candidate pool that reflects the Foundation's commitment to inclusion and representing all Americans."

229.    Plaintiff Potts was aware of the concerns that had been raised by Commissioners and others that the top leadership of the Commission and the Foundation was a small, close-knit group of wealthy white men who had known each other for years, and that such was contrary to the role and mission of the Foundation and Commission.

230.    Plaintiff Potts discovered upon her arrival at the Foundation that all decisions were made by a small group of men, and despite their titles and the enormous amount of work and responsibility that was given to the women in leadership, women were excluded from the decision-making Chairman's Group.

231.    When the women in senior leadership attempted to provide their input and expertise, they were ignored, marginalized, or worse, shouted down and demeaned.

232.    During the period of the search for a new CEO, Plaintiff Potts reported to the interim CEO, Mr. Hommel, who was ordinarily the COO.

233.   Mr. Hommel was exceedingly deferential to the Chairman's Group, and served as note-taker during their meetings.  Mr. Hommel was part of the cabal of male leaders of America 250, and showed no willingness to move the organization into a more inclusive and diverse direction.

234.   Plaintiff Potts was hopeful that the new CEO would change this. Unfortunately, Plaintiff Potts' optimism about a change in leadership and leadership style was dashed when it was announced that Mr. Daniels, another white male with close ties to the Foundation and Commission chairs, was selected as the new CEO.

235.   This selection process was the opposite of what had been represented to the public. It was done in a closed, discriminatory manner.  The Diversity and Inclusion search firm that was supposed to be hired to guide the process was never retained, and instead, the search committee consisted only of Dr. Rucci, Mr. DiLella and Mr. Giordano.  No women were involved in the vetting of the candidate pool, and no women were advanced to the final round of five candidates.

236.   In order to appease "diversity" concerns created by the hiring of Mr. Daniels, a position was created for an SVP, which was going to be given to an African American man, and a Vice Chair of the Foundation position was also going to be given to an African American man.  Again, no women or women of color were considered for either role.

237.   The selection of Mr. Daniels as Chairman and CEO was a slap in the face to the women who had complained about the lack of diversity at the Foundation, and those inside and outside of the organization who had raised serious and reasonable concerns about the lack of diversity at America 250.  It was also evidence to Plaintiff Potts that nothing at the Foundation was going to materially change, despite the concerns and complaints that she and her fellow female executives had raised.

238.     Plaintiff Potts inherited the contract with Maven Communications, which was renewed two weeks before Plaintiff Potts' start date and which never went through an RFP or open bid process.

239.     Maven was the public relations firm that Mr. DiLella used for his real estate business in Philadelphia.  It had no experience whatsoever with large national marketing campaigns, and little experience with growing a la

240.     Maven was charging in excess of $40,000 a month, with a guaranteed monthly retainer of $25,000-$30,000, without producing any substantial publicity results.

241.     Plaintiff Potts asked Mr. Hommel about terminating the contract, but was warned against doing so because of the close personal relationship between Mr. DiLella and the President of Maven.

242.     Because the contract with Maven took up so much of Plaintiff Potts' budget, she was unable to hire additional staff, and was forced to do much of the work needed by herself, which caused her serious strain.  Plaintiff Potts was not compensated for doing this additional work.

243.     On information and belief, and despite numerous complaints about the lack of suitability and broad national expertise required for the scope of work that Maven was retained to execute, it nevertheless remains the communications firm for America 250.

244.     Plaintiff Potts was hamstrung in her ability to execute her duties by a lack of resources, and by having to train and assist Mr. Askew, a VP of the Foundation, who knew very little about traditional marketing campaigns, such as media buying and ad placement.  To help Mr. Askew in his role, Plaintiff Potts secured a former work colleague with subject matter expertise to mentor and assist Mr. Askew.

245.    Not only did Plaintiff Potts have to execute her own duties, she also had to step in to rewrite all the social media copy, as well as the radio copy for the brand launch campaign, both of which were Mr. Askew's duties.

246.    Plaintiff Potts was working late into the evenings and virtually every weekend to keep up with the pace of the work.  Then, Mr. Askew informed Plaintiff Potts that he did not work on Fridays.

247.    No other employee of the Foundation was permitted to only work four days a week, and to unilaterally choose to not work on Fridays, and certainly, Plaintiff Potts was not allowed to do that. It was obvious that Mr. Askew was given more favorable terms and conditions of employment.

248.    This shocked Plaintiff Potts, given the volume of work in their department.  When she asked Mr. Hommel to counsel Mr. Askew about working a full week and picking up his fair share of duties, Mr. Hommel again indicated that Mr. Askew was protected from discipline because Mr. DiLella and Mr. Giordano did not want to be bothered with the political blow-back of removing an African American employee.

249.    On another occasion, in the mid-Summer of 2021, Plaintiff Potts informed Mr. Hommel that she wanted to file a formal complaint against a Director-level staff member in the organization, Richard Subbio (hereinafter "Mr. Subbio").

250.    Plaintiff Potts was being intentionally subverted in her work, and repeatedly subjected to sexist and discriminatory commentary, ridicule and condescending communication from Mr. Subbio, both in internal and external meetings.

251.    Mr. Subbio's behavior was a hindrance because Plaintiff Potts needed his cooperation, as someone tasked with communications for the Commission,  to complete her work.

252.    Mr. Subbio disparaged Plaintiff Potts in a drunken, sexist tirade to a work peer, calling her "a bitch" and saying he "hates her" and that she probably made up the claim she is a survivor of sexual assault. Plaintiff Potts is a well-documented survivor and victims' advocate.

253.    Plaintiff Potts reported Mr. Subbio's sexist, misogynistic, hostile and insulting behavior and comments to Mr. Hommel, who was acting as head of the Foundation at the time.

254.    Instead of taking Plaintiff Potts' claim of gender-based hostility and discrimination seriously, Mr. Hommel minimized Mr. Subbio's behavior to dissuade Plaintiff Potts from filing EEOC claim. Mr. Hommel promised to intervene on Plaintiff Potts behalf in lieu of her filing a complaint.

255.    Mr. Hommel apparently spoke to Mr. Subbio, but Mr. Hommel took no steps to have Plaintiff Potts claims properly investigated, and did not give Mr. Subbio any instructions about not retaliating against Plaintiff Potts.

256.    Later, Mr. Subbio called Plaintiff Potts in an attempt to convince her that the sexist and condescending treatment she had endured was no big deal.  Plaintiff Potts was informed that Mr. Subbio was protected by a powerful Commissioner and former Congressman Bob Brady, and that because of that political relationship, nothing was going to be done about Mr. Subbio's offensive and unlawful behavior.

257.    Plaintiff Potts wanted to pursue the matter further, but feared that she would be retaliated against, and was profoundly discouraged when Mr. Hommel did not take her report of gender discrimination seriously, but instead made promises that never materialized.

258.    On several occasions over the Summer of 2021, Mr. Hommel approached Plaintiff Potts and asked her to hire a friend of his – a former Trump administration political appointee – for a position in her department that did not exist and for which there was no funding.

259.   Not only did Plaintiff Potts not have the resources to hire the person, but the person did not have any background or experience in public relations.

260.   Plaintiff Potts understood Mr. Hommel's "request" to be a demand, but because she felt so uncomfortable with yet another out-of-process crony hire, she slow-walked the hiring process for months until Mr. Hommel finally left Plaintiff Potts alone about it.

261.   In September of 2021, Plaintiff Potts was contacted by Plaintiff Burchard and asked about an expense reimbursement request that was requested by Mr. Askew, which was ostensibly for a dinner and strategy session with Plaintiff Potts.  The receipt submitted was for a close to $300 dinner at a restaurant and bar at 1:00 am on a Saturday.

262.   Plaintiff Potts was shocked because she had never had a weekend work meeting with Mr. Askew, of any kind, let alone at 1:00 am.  Moreover, on the date in question, Plaintiff Potts was out of town, which she could easily prove.

263.   Plaintiff Potts asserted emphatically that the claim was false, and that it should be investigated as such.  She was told not to approach Mr. Askew about the situation, but to write a formal written response, which she did.

264.   Although it was established that the claim for reimbursement was false, and Mr. Askew's assertion that he had met with Plaintiff on a weekend for a "business strategy session" was patently untrue, nothing was done about the misrepresentation or about paying the invoice.

265.   Plaintiff asserts that she was falsely and fraudulently included in a scheme to wrongfully obtain reimbursement of expenses from federal funds, and that when she opposed the fraudulent scheme, she was retaliated against by being subjected to a hostile work environment.

266.   When Plaintiff Potts attempted to ascertain why nothing was going to be done, she was told by Mr. Hommel that Mr. McGarrigle did not want action taken against Mr. Askew because it

would reflect poorly on Mr. DiLella and Mr. McGarrigle. This proved to Plaintiff Potts that there was clearly a double standard at the Foundation, and that applicable policy would not apply to those protected from on high.

267.    It further created a hostile work environment for Plaintiff Potts as she had no recourse when her character and reputation was maligned by false claims and accusations against her.

268.    Plaintiff Potts found herself in the center of another conflict when she learned of a contract with Facebook that was generated by 21 Marketing, yet another contractor that was brought on due to a personal relationship with Mr. Giordano.

269.    Plaintiff Potts had multiple dealings with 21 Marketing, and routinely raised her concerns to Mr. Hommel about their poor performance and sexist and dismissive put-downs, especially towards Plaintiff Laymon.

270.    The contract with Facebook, procured and negotiated by 21 Marketing, was of particular concern to Plaintiff Potts due to its promise of exclusive announcement rights that would prevent most media outlets from coverage opportunities, and its unequal and outsized offering of Foundation assets that other potential corporate sponsors of equal stature had not been offered.

271.    She warned that this contract would undermine the entire communications strategy that Plaintiff Potts was hired to develop and execute.

272.    Specifically, Plaintiff Potts warned that the Facebook contract would give Facebook exclusivity over six of fifteen platforms for 2 million dollars, when the Foundation was asking other companies such as Home Depot to pay $10,000,000 for exclusivity over a single platform.

273.    In essence, because of the personal relationship between 21 Marketing, Mr. Giordano, Mr. DiLella and Facebook, the Foundation was going to be stymied to the point where it would be all but impossible to bring on other substantial corporate sponsorships.

274.     Additionally, Plaintiff Potts was extremely concerned by the fact that the majority of the terms that had been discussed and negotiated were kept out of the written contract, in order to evade scrutiny and questions from auditors.

275.     Since the filing of the initial Complaint in this matter, Plaintiff Potts' concern has been borne out, and the Foundation has struggled to bring on any new corporate sponsorships.

276.     The battles with 21 Marketing were so severe that eventually, it was decided that their contract would be terminated.

277.     However, Mr. McGarrigle and Mr. Giordano interceded on behalf of 21 Marketing to extend their contract by thirty (30) days, so that they could finalize a contract with Facebook that multiple Foundation executives found to be unlawful, contrary to stated policy and otherwise objectionable.

278.     In doing so, Mr. McGarrigle exposed the Foundation to serious problems related to the non-compete clause in the Facebook contract, and preserved for 21 Marketing a huge pay-day in the form of the 17% commission on the sponsorship contract.

279.     The contract with Facebook was signed by Mr. Hommel without support of the team and over their passionate and vehement objection.

280.     Plaintiff Potts was so distraught about the contract, that during a senior staff call, with Plaintiffs Garlock and Burchard in attendance, Plaintiff Potts insisted that Mr. Hommel undo the contract.

281.     Plaintiff Potts asked Mr. Hommel to tell Chairman DiLella that the deal was bad, and to make clear that the deal ruined America 250's future, and put them all in a legally dangerous situation.  In every way that she knew how, Plaintiff Potts attempted to tell senior Foundation leadership that the Facebook deal was unlawful and harmful to the America 250 mission.

282.    Plaintiff Potts asserts that, based on her experience and expertise, the Facebook contract was wrongfully procured, wrongfully executed, likely to bind the Commission and Foundation in ways that were contrary to their mandates, and in complete contravention with federal contracting practices.

283.    Mr. Hommel refused to listen, and repeatedly stated that because Defendants DiLella and Giordano wanted the Facebook deal to happen, there was nothing that would sway their opinions, including the objections of Plaintiff Potts.

284.    In mid-August of 2021, Plaintiff Potts was tasked with drafting and disseminating the press release and strategy announcing Mr. Daniels as the new CEO of the Foundation.  In the process, Plaintiff Potts learned that the search was not done in accordance with federal hiring practices.

285.    Plaintiff Potts also was concerned that women candidates were not given full and fair consideration for the role.

286.    Even worse, Plaintiff Potts learned that to appease a member of Congress, a Senior Vice President position was going to be created, but not posted, or open for application to anyone, and that the person who was going to be placed in that position was going to make in excess of $230,000/ per year.

287.    Plaintiff Potts raised her complaints and concerns about the hiring practice and the pay and gender inequity because both the CEO and the new SVP were men, and women were not allowed to compete for those roles.

288.    Plaintiff reached out to Defendant Giordano, and Dr. Rucci directly to express her concerns, and raise her complaint.

289.    Defendant Giordano stated that because Executive Committee members of the Commission, Rios and Lynn Young signed off on the plan, Plaintiff's concerns about gender and pay equity were of no moment.

290.    Mr. Hommel also made clear that he had communicated Plaintiffs' concerns about the Facebook deal to Defendants DiLella and Giordano, and that their concerns were rejected.

291.    On or about September 9, 2021, during a quarterly commission meeting with federal agencies, three Commission members, Andrew Hohns, James Swanson and Noah Griffin, stopped the normal business of the meeting to list the deficiencies, waste, and illegal activities of the Foundation.

292.    They ended their presentation with a call for Congress to investigate the Foundation and Commission for misuse of federal funds, dereliction of duty, violation of protocols and regulations, fraud, waste and misappropriation of federal funds.

293.    As the Vice President of Communications and Public Relations, Plaintiff Potts was the person who would have likely been tasked with responding to the allegations publicly.  She concluded that she could not refute them because they were largely true.

294.    Faced with the untenable situation of having to lie to Commissioners or members of Congress to execute her duties, Plaintiff Potts felt that she had no choice but to resign her employment because she could no longer work for an organization enabling unethical or potentially illegal conduct.

295.    On or about September 17, 2021, Plaintiff Potts resigned from the Foundation.

## FACTS RELEVANT TO PLAINTIFF LAYMON'S CLAIMS

296.    Plaintiff Laymon references and incorporates all of the allegations in the preceding paragraphs as if fully restated herein.

297.    Prior to joining the Foundation, Plaintiff Laymon was employed by the Women's Suffrage Centennial Commission as Executive Director.

298.    She holds a bachelor's degree and a master's degree and has more than 10 years of experience in program planning.

299.    Plaintiff Laymon joined the Foundation as Vice President of Programs and Planning on or about January 4, 2021, having been hired by Dr. Rucci.

300.    One of the first challenges that Plaintiff Laymon ran into in executing her duties was a brewing conflict between a group of Commissioners, and the Foundation.  The Commissioners were objecting to the structure of the Foundation because of its opaqueness, which prohibited the Commission members from executing their oversight duties. Their objections extended to concerns over the very existence of the Foundation, with many Commissioners believing that the Foundation has no authority to exist or spend federal funds. Mr. Giordano and Mr. DiLella would eventually begin referring to the group as "the Dissenters."

301.    Over the course of her tenure at America 250, the Foundation leadership team held dozens of meetings to devise a means to "cut these guys [the Dissenters] off at the knees."  Plaintiff Laymon was in a meeting when a plan was concocted to have Commissioner Andrew Hohns removed from the Commission.

302.    When Plaintiff Laymon expressed that she understood the Dissenters concerns and that their objections should be taken seriously, she was promptly excluded from all future meetings where the strategy for removing the Dissenters was discussed.

303.   Plaintiff Laymon's troubles continued when she raised concerns about excessive spending of the Commission and Foundation.  For example, upon information and belief, Mr. Giordano worked approximately ten (10) hours per week, but was earning a full-time Senior Executive Level Five (5) salary.

304.   When Plaintiff Laymon raised concerns about his salary, his work hours, and his seeming unilateral control of the Foundation, she was told by Mr. Hommel that Mr. Giordano was the head boss, and that "we all work for Frank, and that's just the way it is."   In truth, Plaintiff Laymon did not report to, or work for Mr. Giordano.

305.   Plaintiff Laymon also raised concerns about Mr. Giordano and Foundation and Commission mismanagement directly to Commissioner Rios. In summer 2021, Plaintiff Laymon scheduled a secret phone call with Commissioner Rios to share her concerns about mismanagement and fraud, waste, and abuse. Commissioner Rios and Plaintiff Laymon had previously worked together while Plaintiff Laymon was the Executive Director of the Women's Suffrage Centennial Commission.

306.   As such, Plaintiff Laymon was hopeful that if Commissioner Rios was made aware of the serious problems within America 250, she would act to ensure the mismanagement and fraud, waste, and abuse were corrected.

307.   Plaintiff Laymon scheduled the call by email, and asked to meet with Commissioner Rios to discuss state partnerships. Plaintiff Laymon disguised the purpose of the call because Foundation staff were not permitted to directly communicate with Commissioners without the knowledge and oversight of Interim CEO Scott Hommel.

308.   By stating in email that the call was to discuss state partnerships, Plaintiff Laymon was protected should anyone ask why she had communicated directly with Commission Rios.

309.    In that phone call, Plaintiff Laymon informed Commissioner Rios that she had not called to discuss state partnerships, but instead she had scheduled the call to discuss the mismanagement of America 250 and fraud, waste, and abuse she was uncovering.

310.    Plaintiff Laymon informed Commissioner Rios that Mr. Giordano did not have the requisite experience to serve as Executive Director and that he was working very few hours per week. She shared that the result of Mr. Giordano's ill fit for the position was an organization that had descended fully into chaos.

311.    Commissioner Rios informed Plaintiff Laymon that she had no confidence in Mr. Giordano, that he was "an idiot," and that she had expressed her concerns to Mr. DiLella. She stated that she did not understand Mr. DiLella's insistence that Mr. Giordano serve as Executive Director.

312.    Commissioner Rios then stated that because Mr. Giordano was working pro-bono as Executive Director, she did not feel that she could press further for his resignation.

313.    On information and belief, at the time of this phone call, Mr. Giordano was collecting a full-time Senior Executive Level salary plus benefits. At the time, Commissioner Rios, Chair of the Finance Committee, was unaware of that highest ranking staff member of the U.S. Semiquincentennial Commission was collecting a salary.

314.    As the phone call concluded, Plaintiff Laymon was left feeling hopeless. Her efforts to whistleblow to her former colleague and a Commissioner who sat on the Executive Committee were met with extreme indifference and apathy.

315.    Another issue that Plaintiff Laymon raised was the dubious partnership agreement she was asked to broker by Dr. Rucci and Mr. Hommel between the America 250 Foundation and the American Battlefield Trust (hereinafter "ABT").

316.    Plaintiff Laymon was asked to work with ABT to find ABT-led programs with which America 250 could partner, in order to have a demonstrated reason to pay ABT $150,000 out of her departmental funds.

317.    Plaintiff Laymon was informed by Dr. Rucci, James Campi from ABT (hereinafter "Mr. Campi"), Mr. Hommel, and Mr. Giordano, that the $150,000 payment was some form of restitution for previous monies owed from the Foundation to ABT.

318.    From the time of Plaintiff Laymon's hiring to the time of her resignation, countless hours were spent by the Chairman's group negotiating the agreement.

319.    On information and belief, the efforts to transfer $150,000 to ABT were abandoned when Commissioner Hohns began inquiring publicly about the relationship between the organizations in September 2021.

320.    In another instance, Plaintiff Laymon raised concerns that Mr. DiLella and Mr. Giordano had transitioned an Equus employee, Stephanie Kilkur (hereinafter Ms. Kilkur") to be their assistant at the Commission, without posting the position or engaging in any competitive process. Equus is Mr. DiLella's private real estate business.

321.    Ms. Kilkur is the daughter of Mr. DiLella's Equus business partner.  She was made a federal employee, and given a salary and title inconsistent with her job duties and substantially higher and out of pay equity norms across the organization.

322.    Ms. Kilkur's work location was maintained at Mr. DiLella's office, and her reporting station was at Equus.

323.    On multiple occasions, work that ostensibly was in Ms. Kilkur's job description was farmed out to Plaintiff Burchard, Plaintiff Potts, or others.  When Plaintiff Laymon sought

clarification of what duties actually belonged to Ms. Kilkur, Mr. Hommel indicated that he did not know.

324.    Plaintiff Laymon raised additional concerns about the communications firm being used by the Foundation, Maven.  This firm was the same communications firm used by Mr. DiLella's real estate business, Equus.

325.    At the time Plaintiff Laymon raised her concerns, Maven was being paid $40,000+ a month to conduct America 250's social media and to write occasional press releases.

326.    This alarmed Plaintiff Laymon because there was nothing to show for such an expenditure. At the time, America 250 had only a few hundred social media followers.

327.    It was abundantly clear to Plaintiff Laymon that Maven was not only grossly underperforming, but was also grossly overpaid.

328.    Plaintiff Laymon was not only extremely troubled about these excessive and wasteful contracts themselves, but by the way she was ignored, marginalized and mistreated when she raised her legitimate concerns about them.  Put simply, these contracts were benefits given to friends of Mr. DiLella and other senior leaders that circumvented the open RFP process, and were treated as sacrosanct, no matter how absurd they were.

329.    Moreover, Plaintiff Laymon was told that legal counsel to the Commission and Foundation, Mr. McGarrigle and Mr. Del Raso, were hired to serve and protect Mr. DiLella and Mr. Giordano personally, and were not concerned with acting in the best interest of the Foundation.

330.    On information and belief, Dr. Rucci terminated Mr. McGarrigle of Reed Smith as General Counsel, but the firm was rehired by Mr. DiLella and Mr. Giordano, over the strenuous objection of Dr. Rucci.  Plaintiff Laymon was told that this was among the principal reasons Dr. Rucci resigned.

331.    Plaintiff Laymon ultimately discovered that while Mr. McGarrigle and Mr. Del Raso did not charge for their personal time, Reed Smith began billing the Foundation for the time of their associates in mid-2021.  It bears repeating that both Reed Smith and Troutman Pepper were retained as General Counsels without any sort of competitive or transparent process.

332.    Another example of a contract that was not properly bid was the contract with EY, formerly known as Ernst and Young.  The firm was retained for multiple scopes of work and hundreds of thousands of dollars were obligated to EY.

333.    Plaintiff Laymon was required to use $70,000 of her budget to pay the firm to do an economic impact study for the semiquincentennial celebration.  She objected because she believed the price to be excessive and because she believed other firms would be more qualified to carry out the study.

334.    Although the fee was obligated when the contract was signed in the summer of 2021, on information and belief, no work has been done to date.

335.    On information and belief, Plaintiff Laymon asserts that Ernst and Young was retained because of the personal relationship between Mr. DiLella and Mr. Giordano, and executives at the firm.

336.    Plaintiff Laymon inherited another dubious contract, this time with 21 Marketing.  On information and belief, Mr. Giordano had a friendship with the partners of the firm, and signed them to a contract that gave them a 17% commission, with no competitive bid.

337.    Plaintiff Laymon was confronted with the difficulties of working with the partners of  21 Marketing when the liaison at The Home Depot reached out to her and indicated that it would no longer continue working with partners in the firm and would prefer to interface directly with Plaintiff Laymon.

338.    Shortly thereafter, the liaison at Walmart made a similar request, asserting that it would prefer to no longer work with the firm as a business agent or partner. It is worth noting that the liaisons for both Walmart and The Home Depot are female.

339.    Plaintiff Laymon not only had difficulty cleaning up the problems created by the partners of 21 Marketing, tasks which were not within her job duties, but she had to endure constant sexist, demeaning and hostile treatment during meetings with them.

340.    After meetings with the partners of the 21 Marketing, Mr. Hommel would often apologize to Plaintiff Laymon for not intervening on her behalf as her supervisor. Eventually, Plaintiff Laymon informed Mr. Hommel that she would no longer meet with either partner because she could no longer tolerate their sexist, hostile, and demeaning treatment of her. Mr. Hommel asked Plaintiff Laymon to continue meeting with the partners and assured her that he would intervene when necessary. He did not.

341.    In one of the very few occasions when Mr. Hommel was responsive and took action to benefit the Foundation, Mr. Hommel terminated the relationship with 21 Marketing.

342.    However, because of the personal relationship between the firm's partners and Mr. Giordano, they were invited to a "Pig Roast" and party at Mr. Giordano's home.

343.    Thereafter, Mr. Giordano informed the Foundation that it had to rehire 21 Marketing, despite its demonstrated lack of results and blatant disrespect and denigration of Plaintiff Laymon, and Mr. Hommel capitulated. Although they'd previously been removed from two accounts, after the "Pig Roast," they were again permitted to contact the women executives of The Home Depot and Walmart, despite those executives having been assured that the firm was no longer representing their accounts with America 250.

344.    As with the other Plaintiffs, Plaintiff Laymon raised multiple vigorous objections to the Foundation's contract with Facebook.  Plaintiff Laymon's concerns centered on the fact that as part of the verbal negotiation, America 250 agreed to use its federal influence and relationship with the Department of the Interior to arrange, secure, and facilitate a meeting between Facebook and the National Park Service that would ensure that the company would have access to America's national parks in order to film footage for its use with its latest technology. Functionally, the deal turned the Commission and Foundation into lobbyists for Facebook, and Plaintiff Laymon raised concerns that America 250 was selling access to governmental decision makers to a private company.

345.    In fact, America 250's obligation to lobby on behalf of Facebook to the National Park Service was among the only clear deliverables established in the relationship.

346.    The internal objections of the Plaintiffs to the contract between Facebook and America 250 were so strident and significant that Mr. Hommel signed the contract in secret, and revealed to the executive team that it was a done deal days after the fact.

347.    In March of 2021, Mr. Askew was hired as a Vice President.  It soon became clear that he lacked sufficient experience for the role, and despite having no background in corporate sponsorships, Plaintiff Laymon was tasked with executing a portion of his duties.

348.    Dozens of staff meetings were held in which issues with Mr. Askew's skills and knowledge were raised, and the fact that Foundation work was suffering because too much of Mr. Askew's work was being placed on Plaintiff Laymon, Plaintiff Potts, and Plaintiff Burchard.

349.    While Plaintiff Laymon was required to do her job, and a substantial portion of Mr. Askew's job, Plaintiff Laymon was subjected to ridicule, bullying, and disrespectful comments from Mr. Askew in full view of her colleagues and senior leadership.

350.    In one instance, Plaintiff Laymon and Plaintiff Burchard were referred to by Mr. Askew as a part of "the devil's triangle," in a message seen by several employees.

351.    When Plaintiff Laymon and others asked Mr. Hommel to replace Mr. Askew or to get him help, training or support, they were told that such would cause bad public relations for Mr. DiLella and Mr. Giordano.

352.    Plaintiff Laymon had only been on the job for nine months when the constant belittling, denigration and humiliation became too much for her.  The final straw was when she finally came to understand that nothing she said or did would change the way the Foundation operated, and that it would continue to demand that she accept and participate in unlawful, unethical, fraudulent and wasteful spending.

353.    She was further motivated to resign when the organization displayed a complete disregard for hiring best practices during the CEO search when it did not advance a single woman in the top-five candidates, inserted a male SVP above her as part of a political quid-pro-quo, and then fully and completely disregarded her concerns and objections about the gendered disparities.

354.    Plaintiff Laymon was informed by Mr. Hommel that the organization had hired Mr. Daniels as CEO while together on a work trip to Philadelphia in September 2021. Mr. Hommel told Plaintiff Laymon that he was shocked that the organization did not prioritize diversity in its hiring, and that the hiring of a non-diverse candidate after such a problematic search process would "cause problems."

355.    After returning home, Plaintiff Laymon received a phone call from Mr. Hommel in which he stated that several commissioners had raised concerns about the hiring of Mr. Daniels, citing the internal and external promises the organization had made to hire a woman and/or person of color for the position.

356.   Mr. Hommel stated that in order to appease those commissioners' concerns, a Senior Vice President position had been created for the favored candidate of those concerned commissioners.

357.   Plaintiff Laymon was then told by Mr. Hommel, "We don't know what his job will be yet. I have to figure that out. But I have been told that he has to have a higher title than you and a higher salary than you, and you're just going to have to be OK with it."

358.   Plaintiff Laymon called former CEO and President Emeritus Tony Rucci to share her concerns about the CEO search, about the ways that all best practices for inclusive hiring practices were ignored, the ways that diversity was being weaponized, and the inequity of the Senior Vice President hire. Plaintiff Laymon informed Mr. Rucci about the phone call she had just received from Mr. Hommel.

359.   Further still, Plaintiff Laymon urged Mr. Rucci to intervene in the mismanagement and the fraud, waste, and abuse running rampant through America 250. Plaintiff Laymon informed Mr. Rucci that there were serious ethical and policy violations, and that under the leadership of Interim CEO Scott Hommel, a culture of toxicity and hostility had thrived.

360.   Plaintiff Laymon informed Mr. Rucci that she was beginning to feel that she had no choice but to resign, as she could no longer be witness to the fraud, waste, and abuse or the victim of such a gendered and toxic work environment.

361.   Over the course of the next several days, Plaintiff Laymon and Mr. Rucci exchanged several phone calls. In each phone call, Plaintiff Laymon repeatedly expressed the same sentiments, and urged Mr. Rucci to intervene and raise her concerns with Mr. DiLella and Mr. Giordano.

362.   It became clear that despite the fact that she was carrying an enormous workload, she was being paid less than her male colleagues, including Mr. Askew, and indeed, was among the lowest

paid members of the executive team.  None of her complaints about disparate pay or inequity of opportunity were heeded by Defendant Foundation.

363.    On or about September 17, 2021, Plaintiff Laymon resigned from the Foundation.

364.    Two days following her resignation, on September 19, 2021, Commissioner Rios reached out to Plaintiff Laymon by phone. She asked Plaintiff Laymon why she had resigned and wanted details about "what was going on inside of America 250." Plaintiff Laymon again informed Commissioner Rios of the extreme mismanagement, fraud, waste, and abuse.  Commissioner Rios was unconcerned.

365.    Plaintiff Laymon told Commissioner Rios about the denigration of female employees that was creating a toxic and retaliatory work environment. Commissioner Rios was unconcerned. Plaintiff Laymon told Commissioner Rios about the fraud, waste, and abuse of millions in taxpayer dollars that was going unchecked. Commissioner Rios was unconcerned.

366.    In a particularly tense moment, Plaintiff Laymon warned Plaintiff Rios that she could no longer "rubber stamp" financial reports, and that her oversight and the oversight of all of the Commissioners was essential should America 250 wish to operate transparently and ethically. Commissioner Rios was unconcerned.

367.    Commissioner Rios informed Plaintiff Laymon that the new CEO, Joseph Daniels, would fix all of the problems at America 250. Commissioner Rios informed Plaintiff Laymon that Mr. Daniels was her former colleague, and that he had been hired at her suggestion. Commissioner Rios said that "Joe is my guy."

368.    Plaintiff Laymon informed Commissioner Rios that the mismanagement at America 250 was too deep and widespread for one person alone to fix, and that as long as Mr. Hommel, Mr. Giordano, and Mr. DiLella were leading the organization, the issues would only get worse.

61

Commissioner Rios repeated that she was unconcerned, and that Mr. Daniels would solve all issues with mismanagement, the toxic work culture, and fraud, waste, and abuse.

369.    Once again, Plaintiff Laymon was shocked by the indifference and apathy expressed by Commissioner Rios.

370.    Plaintiff Laymon also raised concerns about a contract the Foundation had with DMM Strategies.  On information and belief, the president of DMM Strategies, Daniel McCarthy, is a personal friend of Mr. Hommel and Commissioner Cathy Gillespie.

371.    The Foundation paid DMM Strategies $20,000 every month, even though it did little to no actual work for the Foundation.

372.    In fact, in the entire nine months of Plaintiff Laymon's tenure at America 250, DMM Strategies completed no projects, tasks, or work for America 250 but was paid $180,000.

373.    Despite Plaintiff Laymon's repeated inquiries about the contract for DMM Strategies and repeated recommendation that it be terminated because it was wasteful and potentially a fraudulent and false claim, Plaintiff Laymon's legitimate concerns were ignored.

374.    In addition to her concerns about the waste of DMM Strategies monthly retainer, towards the end of her tenure at America 250, Plaintiff Laymon was made aware of a very serious America 250 policy violation concerning DMM Strategies.

375.    Plaintiff Laymon was told by Mr. Hommel that DMM Strategies had secured $20,000 in funding from Anheuser-Busch. Plaintiff Laymon was shocked by this statement, as America 250 had a policy based on federal government norms and practices, that it would not accept donations from alcohol, tobacco, or firearms companies.

376.    Plaintiff Laymon called Plaintiff Burchard to inquire about the donation and ask if America 250 had changed its donation policy.

377.    Plaintiff Burchard, who processed all donations on behalf of America 250, stated that the policy had not been changed and that no such donation had been made.

378.    Plaintiff Laymon continued to inquire, and again was told that no donation had been made to America 250 by Anheuser-Busch. Plaintiff Laymon believed something unethical and possibly illegal had taken place with the donation, which created serious mental and emotional dissonance for Plaintiff Laymon.

379.    The fact that her inquiries were not being taken seriously by Mr. Hommel, caused Plaintiff Laymon to believe that she could be violating federal law if she continued to work at the Foundation.  She felt she had no choice but to resign her employment.

380.    Plaintiff Laymon learned shortly after her resignation that Anheuser-Busch, a client of DMM Strategies, made a $20,000 donation to the America 250 Foundation at the recommendation of DMM Strategies.

381.    The physical check was given to DMM Strategies. Upon receipt of the "donation," Mr. Hommel went to the offices of DMM Strategies and signed the check directly over to the lobbying firm.

382.    America 250 had run out of private funds, and because lobbyists cannot be paid by federal funds, Mr. Hommel violated multiple America 250 policies to ensure that his friend was paid.


## CLAIMS COMMON TO ALL PLAINTIFFS

### CLAIM AGAINST THE FOUNDATION AND THE COMMISSION

### COUNT I

### Violation of the False Claims Act, 31 U.S.C. §§ 3729 et seq. & 3730(h)(2)

*(Whistleblower Protection)*

63

383.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

384.    Plaintiffs bring their whistleblower retaliation claim against the Foundation and Commission under the laws of the United States because their whistleblowing activity was about fraud, waste and abuse of federal appropriations.  No other statute addresses whistleblowing in the name of protecting the public interest in stewardship of federal tax dollars.

385.    Plaintiffs are not free to bring claims for whistleblower retaliation under the CSRA because they are not federal employees.

386.    Plaintiffs assert that the Public Laws that created the Commission did not confer on the Commission the status of a sovereign of the United States, and that it is not entitled to the protection of sovereign immunity in its dealings.

387.    Plaintiffs assert that Commission members do not become federal employees by the mere act of their appointment to the Commission, and that their acts and omissions are not subject to qualified immunity.

388.    Plaintiffs assert that by virtue of the fact that the Commission is an independent operating and advisory committee, it is a subcontractor to the government, rather than an arm of the government itself, as commissions that are under the direct supervision and control of Congress might be.

389.    Plaintiffs were all employed by a non-profit organization controlled and directed by a federal Commission created by an act of Congress, that procured contracts and transacted business with federally appropriated funds on behalf of the American people.

390.    Plaintiffs each actively investigated, sought information regarding, questioned other employees and attempted to verify invoices and claims for payment that they reasonably believed were fraudulent, noncompliant, and/or without merit.

391.    Because the fraudulent expense reports, invoices, contracts, and improperly executed hires that are referenced herein were all paid for out of federally appropriated funds, Plaintiffs were whistleblowing in the context of the False Claims Act.

392.    The only reason that the federal government appropriated the funds to pay for the fraudulent expense reports, invoices, contracts and improperly executed hires that are referenced herein is because leadership of both the Foundation and the Commission improperly represented to Congress that payment was warranted.

393.    Plaintiffs each raised their concerns to their immediate supervisors and superiors of what they believed to be false claims, and that they strongly objected to the payment of such claims, and in so doing, engaged in statutorily protected whistleblowing activity.

394.    On several occasions, Plaintiffs informed their immediate supervisors and superiors that payment of such claims would make the Foundation noncompliant with applicable law, would create audit issues, and constituted fraud and misappropriation of federal funds.

395.    Immediately after conducting their investigation and/or raising their concerns of potential false claims, and revealing to their superiors that they believed the invoices, reimbursement requests, contracts and other instruments to be false, fraudulent or without basis in fact, each Plaintiff was retaliated against in the form of the creation and escalation of a hostile and toxic work environment.

396.    Plaintiffs were removed from meetings, deprived of information and resources, isolated and undermined by their superiors, humiliated and denigrated in front of colleagues.

397.   Despite Plaintiffs repeated and vehement objections to making payments they believed to be fraudulent, they either had to look the other way as leadership enabled potential fraud, or forfeit their employment.

398.   In lieu of being part of an organization that condoned potentially fraudulent activity, Plaintiffs resigned their employment, believing they had no choice, inasmuch as their superiors refused to heed any of their warnings or advice.   The stress, anxiety and mental and emotional anguish caused by the retaliation they were subjected to, and the constant fear of exposing themselves to legal jeopardy, were severe and debilitating.

399.   As a direct and proximate cause of the retaliation they were subjected to, and being forced to resign in lieu of engaging in unlawful and noncompliant conduct, Plaintiffs suffered financial, emotional and mental losses, for which they now seek damages in an amount of not less than $250,000 each.

### CLAIM AGAINST THE FOUNDATION, COMMISSION AND INDIVIDUAL DEFENDANTS

### COUNT II

### Violation of the District of Columbia Human Rights Act

### D.C. Code § 2-1401, et seq.

*(Violation of the Fair Pay Act as incorporated into the DCHRA)*

400.   Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

401.   Plaintiffs assert that the Public Laws that created the Commission did not confer on the Commission the status of a sovereign of the United States, and that it is not entitled to the protection of sovereign immunity in its dealings.

402.    Plaintiffs assert that Commission members do not become federal employees by the mere act of their appointment to the Commission.

403.    Plaintiffs assert that by virtue of the fact that the Commission is an independent operating and advisory committee, it is a subcontractor to the government, rather than an arm of the government itself, as compared to commissions that are under the direct supervision and control of Congress might be.

404.    Plaintiffs were each at-will executive employees of the Foundation, which was created solely to support, and was controlled and directed by the Commission during all times relevant to this matter.

405.    As described herein, Plaintiffs were paid less than their commensurate male colleagues, and more specifically, were made to complete the work of their male colleagues who were being paid more than they were, and doing less work.

406.    Plaintiffs assert that they were paid less than Scott Hommel, Matt Schatzel, Michael Frazier, Kyle Anderson, and Jesse Askew, while often having to do their work.

407.    Plaintiffs further assert that they were never given the opportunity to apply or compete for the VP and SVP positions of Mr. Askew and Mr. Anderson, even though they already carried out the duties of those positions.

408.    Plaintiffs were forced and required to take on and execute substantial portions of the duties of their male counterparts and superiors, for which they were not compensated from the Commission or the Foundation.

409.    Plaintiffs were made to work excessive hours, including on nights and weekends, when their male colleagues did not have to do so.

410.    When Plaintiffs raised concerns about the salary inequities, they were initially ignored. Thereafter, they were retaliated against, in the form of the creation and escalation of a hostile work environment.

411.    Plaintiffs were removed from meetings, deprived of information and resources, isolated and undermined by their superiors, humiliated and denigrated in front of colleagues.

412.    As a direct and proximate cause of the Foundation's discriminatory pay practices, Plaintiffs suffered lost wages for which they seek compensation of not less than $180,000 each.

413.    As a direct and proximate cause of the Foundation's retaliation against them for seeking fair pay, Plaintiffs suffered stress, anxiety and mental and emotional anguish that was both severe and debilitating, for which Plaintiffs seek compensation of not less than $300,000 each.

## CLAIM AGAINST THE FOUNDATION, COMMISSION AND INDIVIDUAL DEFENDANTS

## COUNT III

## Violation of the District of Columbia Human Rights Act

## D.C. Code § 2-1401, et seq.

*(Gender Discrimination-Hostile Work Environment)*

414.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

415.    Plaintiffs assert that the Public Laws that created the Commission did not confer on the Commission the status of a sovereign of the United States, and that it is not entitled to the protection of sovereign immunity in its dealings.

416.    Plaintiffs assert that Commission members do not become federal employees by the mere act of their appointment to the Commission.

417.    Plaintiffs assert that by virtue of the fact that the Commission is an independent operating and advisory committee, it is a subcontractor to the government, rather than an arm of the government itself, as commissions that are under the direct supervision and control of Congress might be.

418.    Plaintiffs were subjected to a work environment in which women were entirely excluded from the decision-making process and a small group of men made all the decisions.

419.    Despite each Plaintiff having years of experience and expertise, and the fact that the enterprise relied heavily on their knowledge and productivity, Plaintiffs were clearly and intentionally denied the authority that should have come with their positions.

420.    Instead of being treated like their male executive colleagues, Plaintiffs were given an unreasonable workload, repeatedly marginalized in team meetings, denied staff and resources, isolated and ignored, spoken to in an antagonistic and demeaning manner, and harshly and openly criticized in front of colleagues.

421.    Requests were made of Plaintiffs that were never made to their male colleagues, and Plaintiffs were expected to do the work of their male colleagues.

422.    When Plaintiffs tried to raise legitimate concerns about the actions of the Foundation, they were ignored, marginalized and retaliated against.

423.    Foundation CEO Daniels, on several occasions, made clear that he expected the executive women on the team to act in a supportive or subordinate role.  He further demanded of the female executives that they be loyal to him personally, rather than to the Foundation.  On information and belief, CEO Daniels did not make such a demand of the male executives of the Foundation.

424.    Plaintiffs assert that their warnings and concerns about Foundation activities were ignored in part, because of their gender.

425.   Plaintiffs assert that they were marginalized, devalued, underpaid, ignored, under-resourced, and over-worked because of their gender.

426.   As a direct and proximate cause of the Foundation's discrimination based on gender, Plaintiffs suffered stress, anxiety and mental and emotional anguish that was both severe and debilitating, for which Plaintiffs seek compensation of not less than $300,000 each.

<u>CLAIM AGAINST THE FOUNDATION,</u>
<u>THE COMMISSION & THE INDIVIDUAL DEFENDANTS</u>

**COUNT IV**

**Wrongful Termination**

*(Constructive Discharge--Plead in the Alternative)*

427.   Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

428.   Plaintiffs were hired by the Foundation because they were subject matter experts, and they had a special and unique relationship to both the Foundation and the Commission, because they were the employees with the most knowledge about how federal appropriations work.

429.   The Foundation and Commission relied on Plaintiffs to execute unique duties and access, and as such, Defendants knew that Plaintiffs were bound to find out about fraudulent and improper acts and transactions executed by Defendants.

430.   Plaintiffs witnessed what they believed to be fraudulent claims on federally appropriated funds.  Plaintiffs each repeatedly and vehemently objected to payment of invoices, execution of contracts, payment of expense reimbursement requests and other acts of the Foundation they believed to be unlawful.

431.    When Plaintiffs demonstrated to their superiors that the invoices, claims, requests or contracts at issue were improper, they were ignored and subjected to retaliation.

432.    Despite their best efforts, nothing they said or demonstrated to the upper chain of command dissuaded the Foundation from engaging in unlawful practices.

433.    Plaintiffs were being forced to act and/or were at risk to act in unethical and/or unlawful ways by the Foundation, which was created solely to support and was controlled and directed by the Commission, and which enabled and ratified the hostile work environment and intolerable situation in which Plaintiffs were placed.

434.    Upon leadership's direction, Plaintiffs were placed in a position where they either would have to silently accede and/or participate in noncompliance, fraud, and misappropriation of government funds, or relinquish their employment.

435.    Plaintiffs opted to resign their employment because the stress and anxiety of being part of an organization that condoned fraudulent activity and/or being forced to engage in unlawful conduct was severe, extreme and intolerable.

436.    Plaintiffs thus assert that they acted in the taxpayer interest and yet were constructively discharged from their employment, and that such was against public policy.

437.    Plaintiffs further assert that such constructive discharge fits the purpose of the common law cause of action for wrongful discharge.

438.    As a direct and proximate cause of the hostility and retaliation they were subjected to, and being forced to resign in lieu of engaging in unlawful conduct, Plaintiffs suffered financial, emotional and mental losses, for which they now seek damages in an amount of not less than $500,000 each.

CLAIM AGAINST THE FOUNDATION, COMMISSION
AND INDIVIDUAL DEFENDANTS

**COUNT V**

**Negligence**

*(Negligence)*

439.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

440.    Plaintiffs assert that the Foundation owed them a duty to ensure that they worked in a tolerable environment, free from abuse, retaliation and mental torment.

441.    Plaintiffs assert that every act and omission of the Foundation, was shared via the Chairman's group with the Commission, was enabled and ratified by the Commission, and was funded because of the Commission's representations to Congress in the appropriations process.

442.    Plaintiffs assert that the Defendants breached their duty to Plaintiffs by making them engage in business practices that Defendants knew or should have known were fraudulent, unlawful and/or unethical, and that by doing so, Defendants knew or should have known that they would cause Plaintiffs severe mental stress.

443.    Plaintiffs assert that forcing employees to engage in potentially unlawful conduct, and to approve fraudulent invoices over their well-founded and strenuous objections was them extreme mental pain and anguish, and put them in an untenable position.  It further caused them mental and emotional harm that was entirely foreseeable.

444.    The Foundation knew, or should have known, that its employees would suffer extreme anxiety and emotional distress when they were forced to enable or turn a blind eye to potentially unlawful and counter-productive contracts, invoices, reimbursement requests and other financial transactions.

445.    On multiple occasions, Plaintiffs complained to their superiors that what the Foundation was doing was wrong.  In several extremely heated and charged senior staff meetings, Plaintiffs expressed to their superiors the severe toll that the Foundation's actions were taking on them.

446.    At least one Plaintiff informed CEO Daniels that she was going to resign in lieu of supporting, enabling or participating in fraud, which served as clear notice of the nature and extent of the distress felt by Plaintiffs.

447.    Plaintiffs assert that any reasonable, law-abiding person in the same or similar circumstances would have felt the same severe emotional distress that they did in having to engage in potentially unlawful activity.

448.    The Foundation was placed on notice that its actions were causing its employees severe emotional distress after the first Plaintiff resigned, and yet, it took no corrective action.

449.    As a direct and proximate cause of the Foundation's negligence, Plaintiffs severe emotional and mental anguish, which resulted in anxiety, depression, loss of sleep, loss of appetite, high blood pressure, and other physical manifestations of stress, for which they now seek damages of not less than $250,000 each.


## CLAIM AGAINST THE FOUNDATION, COMMISSION AND INDIVIDUAL DEFENDANTS

## COUNT VI

## Negligence

### *(Negligent Infliction of Emotional Distress)*

450.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

451.   Plaintiffs assert that the Foundation owed them a duty to ensure that they worked in a tolerable environment, free from abuse, retaliation and mental torment.

452.   Plaintiffs assert that every act and omission of the Foundation, was shared via the Chairman's group with the Commission, was enabled and ratified by the Commission, and was funded by the Commission's representations to Congress in the appropriations process.

453.   Plaintiffs assert that forcing employees to engage in potentially unlawful conduct, and to approve fraudulent invoices over their well-founded and strenuous objections by making them engage in business practices that Defendants knew or should have known were fraudulent, unlawful and/or unethical, and that by doing so they would cause Plaintiffs severe mental stress.

454.   The Foundation knew, or should have known, that its employees would suffer extreme anxiety and emotional distress when they were forced to enable or turn a blind eye to potentially unlawful and counter-productive contracts, invoices, reimbursement requests and other financial transactions.

455.   Severe mental anxiety and stress is as much an injury as a physical wound, and can cause long lasting physical consequences and symptoms, and can cause panic and anxiety responses long after the traumatic events occurred.

456.   Plaintiffs assert that they have suffered such substantial anxiety, fear, stress and panic that they have lost sleep, suffered from panic reactions, suffered extreme anxiety, have suffered exacerbation of underlying health conditions, and exacerbation of emotional stress from past traumas.

457.   On multiple occasions, Plaintiffs complained to their superiors that what the Foundation was doing was causing them extreme anxiety and emotional distress.  In several extremely heated

and charged senior staff meetings, Plaintiffs expressed to their superiors the severe toll that the Foundation's actions were taking on them.

458.    At least one Plaintiff informed CEO Daniels that she was going to resign in lieu of supporting, enabling or participating in fraud, which served as clear notice of the nature and extent of the distress felt by Plaintiffs.

459.    Plaintiffs assert that any reasonable, law-abiding person in the same or similar circumstances would have felt the same severe emotional distress that they did in having to engage in potentially unlawful activity.

460.    The Foundation was placed on notice that its actions were causing its employees severe emotional distress after the first Plaintiff resigned, and yet, it took no corrective action.

461.    As a direct and proximate cause of the Foundation's negligence, Plaintiffs severe emotional and mental anguish, which resulted in anxiety, depression, loss of sleep, loss of appetite, high blood pressure, and other physical manifestations of stress, for which they now seek damages of not less than $250,000 each.


## CLAIM AGAINST DEFENDANT DILELLA AND THE COMMISSION

### COUNT VII

### Defamation of Character

462.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

463.    On or about February 19, 2022, Chairman DiLella sent a formal letter to the America 250 Foundation Board of Directors, Senator Casey, Congresswoman Watson Coleman, and Congressman Evans stated that Plaintiffs initiated contact with the Foundation by way of a

settlement demand, without provocation, as an attempt to "extort" America 250.  This statement was patently false and defamatory.

464.    In fact, on or about January 7, 2022, _Defendants initiated contact_ with Plaintiff Burchard by sending her an accusatory and inflammatory cease and desist letter, alleging that Plaintiff Burchard was tortiously interfering with Foundation business relationships, and demanding that she cease doing so.

465.    Other Board members were copied on this January 7, 2022, false, inflammatory and defamatory letter, that was designed to defame and intimidate Plaintiff Burchard.

466.    Thus, the statement that Plaintiff Burchard's demand letter was "_without provocation_," and an effort to "extort," are patently false statements, made with the knowledge of their falsity.

467.    Furthermore, Defendant DiLella was informed of the reasons for Plaintiffs' resignations because they all tendered resignation letters.  Which further establishes that his use of the terms "without provocation," and "extort," was in bad faith, with absolute knowledge that all four Plaintiffs had expressed their concerns directly to him before they filed suit in this case.

468.    Defendant DiLella, and the other Defendants told lies about Plaintiffs in order to paint themselves, and the America 250 Foundation and Commission in a stronger, more sympathetic light.

469.    In the letter to the Board and Members of Congress, the Foundation and the Commission attempted to tarnish Plaintiffs credibility and make it appear as if Plaintiffs had no reason or basis to obtain counsel and to further intimidate and silence the Plaintiffs.

470.    This same letter was then sent on to Commission _ex officio_ federal agencies.

471.    Defendant DiLella knew that the information provided to the Board and Members of Congress was untrue, and/or acted with reckless disregard for its truth.

472.    Defendant DiLella, who provided the false narrative to the Board and to Members of Congress, engaged in defamation.

473.    Plaintiffs assert that Defendant DiLella, who provided the false and misleading narrative to the Board and Members of Congress, did so for the express purpose of undermining their credibility, and tarnishing their personal and professional reputations.

474.    As a direct and proximate cause of the defamation engaged in by the Foundation and Commission's agent within the course of his duties, Plaintiffs are entitled to liquidated and immediate damages of not less than $500,000.00 each.


## CLAIM AGAINST THE COMMISSION AND INDIVIDUAL DEFENDANTS

### COUNT VIII

### Negligence

*(Negligent Supervision by the Commission)*

475.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

476.    The Commission was tasked by Congress to oversee and supervise the activities of the Foundation.  It was the responsibility and duty of Commissioners to exercise oversight of the Foundation's operations, actions, personnel and progress.  Thus, the Commission had a statutory duty to the Foundation and its employees.

477.    The Commission, through the mandate of Congress, had a duty to oversee and supervise the Foundation, and to ensure that it remained a work environment free from discrimination and retaliation.

478.    As such, the Commission, and the individual Commissioners owed a clear duty to Plaintiffs to ensure that they were not subjected to unlawful discriminatory practices, or retaliation at the hands of the Foundation.

479.    Plaintiffs were precisely the workforce class who would be harmed by the Commission's negligent acts and omissions, and the harm that was caused to them was clearly foreseeable.

480.    In failing to properly execute its oversight duties, the Commission permitted Plaintiffs to be harmed in material ways by the acts of the Foundation.

481.    It was the responsibility of Commissioner David Cohen and Commissioner Rios to engage their committees, exercise their judgment, and provide oversight and corrective action if and when policies and practices were not followed, or were not in the best interest of America 250 and its continued mission and strategies.

482.    Mr. Giordano is Executive Director of the Commission, and as such, had a fiduciary duty to keep the Commissioners informed about Foundation activities of which he was aware or should have been aware.

483.    As alleged above, Mr. Giordano sat in on the regular Chairman's Group meetings, and thus was privy to all activities of the Foundation.

484.    In some instances, Mr. Giordano inserted himself in Foundation business to curry favor for an entity or person with whom he had a pre-existing personal relationship.

485.    On information and belief, Mr. Giordano and Mr. DiLella had a personal friendship and relationship with Mr. McGarrigle, General Counsel of the Foundation, and with Mr. Del Raso, General Counsel of the Commission.

486.    Plaintiffs assert that Mr. Giordano knew, or should have known of the pay discrepancies between male and female executives at the Foundation.

487.    Plaintiffs assert that Mr. Giordano knew, or should have known about the hostile work environment for executive women that was being fostered at the Foundation.

488.    Plaintiffs assert that Mr. Giordano knew, or should have known about the dubious contracts, false and fraudulent invoices, fraudulent reimbursement requests and other unlawful activities at the Foundation.

489.    Plaintiffs assert that Mr. Giordano knew, or should have known about the lack of transparency and adherence to Foundation policy of several personnel hires.

490.    Plaintiffs assert that any reasonable Commissioner, with the same access to information, and acting with the same knowledge as Mr. Giordano, would have taken action to stop the harmful and unlawful conduct of the Foundation.

491.    Plaintiffs assert that Mr. Giordano, Mr. DiLella, Commissioner Cohen, Commissioner Rios, and the entire Commission owed Plaintiffs a duty to supervise and intervene in Foundation business that was potentially fraudulent, and to protect Plaintiffs from discriminatory and retaliatory practices.

492.    Plaintiffs further assert that the harm they suffered was predictable, and squarely within the realm of harm that would ensue from being discriminated and retaliated against, and being forced to participate in unlawful practices.

493.    Plaintiffs assert that the Commission's failure to take any corrective action regarding the unlawful, discriminatory, retaliatory, disparate and fraudulent acts of the Foundation constitutes negligent supervision.

494.    As a direct and proximate cause of the discrimination in pay, hostile work environment, harassment, and retaliation Plaintiffs endured at the Foundation, they suffered financial losses, and emotional and mental anguish, for which they now seek damages of not less than $250,000 each.

CLAIM AGAINST AMERICAN BATTLEFIELD TRUST

## COUNT IX

### Negligence

*(Negligent Supervision by the American Battlefield Trust)*

495.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

496.    Pursuant to the Public Law creating the Commission, the ABT was selected by the U.S. Department of Interior, National Park Service, to serve as the Administrative Secretariat of the Commission. This provision directing ABT as Administrative Secretariat is controlling law today and has not been modified or sunsetted.

497.    As an ABT representative, Mr. Campi, sits on the America 250 Foundation Board of Directors.

498.    On or about April 10, 2019, ABT and the National Park Service signed a memorandum of understanding transferring ABT's operational and fundraising support responsibilities as the Commission's Administrative Secretariat to the Foundation. At that time, Mr. Campi was provided a seat on the Foundation board of directors to continue to represent ABT's interests in Foundation work.

499.    ABT's role as Administrative Secretariat was never properly sunsetted and it remains responsible for oversight and supervision of the activities of the Foundation.

500.    As such, it was ABT's responsibility to exercise its oversight of the Foundation's actions, personnel and progress.  Thus, ABT has a statutory duty to the Foundation and its employees.

501.     Mr. Campi had a fiduciary duty to keep ABT informed about Foundation activities of which he was aware.

502.     ABT, in its oversight role, had a duty to the employees of the Foundation, and specifically to Plaintiffs, to ensure that they be treated equitably and in a manner free from discrimination and retaliation.

503.     As employees of the Foundation, Plaintiffs were squarely in the field of persons who would be harmed if ABT was negligent in its oversight capacities, and it was clearly foreseeable that Plaintiffs would be harmed by ABT allowing for discrimination and retaliation to take place at the Foundation.

504.     Plaintiffs assert that Mr. Campi, as the ABT representative, was a regular participant in Foundation staff and leadership meetings including hiring new employees. As a result, he knew, or should have known of the pay discrepancies between male and female executives at the Foundation.

505.     Plaintiffs assert that as Mr. Campi was a regular participant in Foundation staff and leadership meetings, he knew or should have known about the hostile work environment for executive women that was being fostered at the Foundation.

506.     Plaintiffs assert that as Mr. Campi, the ABT representative on the Foundation Board, was a regular participant in Foundation staff and leadership meetings, knew, or should have known about the dubious contracts, false and fraudulent invoices, fraudulent reimbursement requests and other potentially unlawful activities at the Foundation.

507.     Plaintiffs assert that as Mr. Campi, the ABT representative on the Foundation Board, was a regular participant in Foundation staff and leadership meetings, knew, or should have known about the lack of transparency and adherence to Foundation policy violations.

508.    Plaintiffs assert that any reasonable entity with oversight responsibilities, with the same access to information, and acting with the same knowledge as Mr. Campi, would have taken action to stop the harmful and unlawful conduct of the Foundation.

509.    Plaintiffs assert that ABT owed Plaintiffs a duty to oversee and intervene in Foundation business that was potentially fraudulent, and to protect Plaintiffs from discriminatory and retaliatory practices.

510.    Plaintiffs further assert that the harm they suffered was predictable, and squarely within the realm of harm that would ensue from being discriminated and retaliated against and being forced to participate in potentially unlawful practices.

511.    Plaintiffs assert that ABT's failure to take any corrective action regarding the unethical, discriminatory, retaliatory, disparate and fraudulent acts of the Foundation constitutes negligent supervision.

512.    As a direct and proximate cause of the discrimination in pay, hostile work environment, harassment, and retaliation Plaintiffs endured because of the lack of oversight by the American Battlefield Trust, they suffered financial losses, and emotional and mental anguish, for which they now seek damages of not less than $250,000 each.


## CLAIM OF PLAINTIFFS GARLOCK AND BURCHARD AGAINST THE FOUNDATION

### COUNT X

### Defamation of Character

*(Defamation Per Se)*

513.    Plaintiffs reference and incorporate all of the allegations in the preceding paragraphs as if fully restated herein.

514.    On information and belief, on or about February 1, 2022, one or more Foundation executives were interviewed by Jess Bravin, a journalist with the Wall Street Journal, with a monthly online readership of over 40 million to comment for a newspaper article that they knew would be published.

515.    On information and belief, in that interview, Michael Frazier, a Foundation Executive Michael Frazier (hereinafter "Mr. Frazier") alleged that Plaintiffs Garlock and Burchard had approved payment of more than $30,000 in invoices that Plaintiffs believed to be fraudulent.

516.    The article stated that Mr. Frazier claimed that Ms. Garlock reviewed the invoices which ultimately resulted in an approved expense.  This statement was categorically false.

517.    In support of their false assertion, Mr. Frazier, provided the reporter with documents related to a separate, expired contract that had been completed, fulfilled and closed out, as evidence that Plaintiffs Garlock and Burchard had approved of the dubious expenditure.

518.    Mr. Bravin contacted Plaintiffs Burchard and Garlock asking for their on-the-record responses to America 250's assertions.

519.    The documents provided to the reporter did not relate to the questionable invoices, which Mr. Frazier knew or should have known when he made the false representation.

520.    Mr. Frazier was well aware of the fact that both Plaintiffs Garlock and Burchard had strenuously objected to the payment of the dubious invoices, and that they mentioned these potentially unlawful acts in their respective resignation letters.

521.    Mr. Frazier knew that the information was untrue, and/or acted with reckless disregard for its truth.

522.     Mr. Frazier engaged in defamation *per se*, alleging that Plaintiffs Garlock and Burchard had engaged in, and approved of illegal activity, causing clear and irreparable harm to their personal and professional reputations.

523.     Inasmuch as the Wall Street Journal has a massive readership, Mr. Frazier knew or should have known that the damage to Plaintiff Garlock and Plaintiff Burchard's reputations would be significant and irreparable.

524.     Plaintiffs Garlock and Burchard assert that Mr. Frazier did so for the express purpose of undermining their credibility, and tarnishing their reputations.

525.     Mr. Frazier was acting in his official capacity, and at the direction of the Foundation and Commission when he engaged in the defamatory acts at issue.

526.     Mr. Frazier is not a federal employee, and is not subject to any form of qualified immunity.

527.     The Foundation leadership either knew or should have known of Michael Frazier's false statements provided to the reporter and as a  proximate cause of the per se defamation engaged in by the Foundation's agent within the course of his/her duties, Plaintiffs Garlock and Burchard are entitled to liquidated and immediate damages of not less than $1,000,000.00 each.


## **PRAYER FOR RELIEF**

Plaintiffs ask this Court for an ORDER granting them all the compensation they seek in this Complaint.  They further ask this Court for declaratory relief in the form of an ORDER mandating a full, forensic and transparent investigation into the Commission and Foundation, including a full audit of the Foundation's financial transactions, and any further ORDER that this Court deems appropriate to address and rectify the issues raised in this Complaint.  Plaintiffs

further asks this Court for any and all additional remedies it deems appropriate to make them whole.

## JURY DEMAND

Plaintiffs herein demand trial by jury of all claims so triable.

Respectfully submitted,

__/s/ Pamela M. Keith
Pamela M. Keith [Bar No. 448421]
CENTER FOR EMPLOYMENT JUSTICE
650 Massachusetts Ave. NW
Suite 600
Washington, DC 20001
Tel: (202) 800-0292
pamkeith@centerforemploymentjustice.com
*Counsel for Plaintiffs*

85